# In the United States Court of Appeals
# For the Eighth Circuit

FA ND CHEV, LLC; FA ND SUB, LLC
*PLAINTIFFS – APPELLANTS*

BAPTKO, INC.
*PLAINTIFF – APPELLEE*

v.

ROBERT KUPPER; BISMARCK MOTOR COMPANY;
BMC MARINE, LLC, DOING BUSINESS AS MORITZ SPORT & MARINE
*DEFENDANTS – APPELLEES*

v.

FOUNDATION AUTOMOTIVE CORP., AN ALBERTA CORPORATION
*DEFENDANT – APPELLANT*

Appeal from the United Stated District Court for the District of North Dakota
No. 1:20-cv-00138-DMT-CRH | Honorable Daniel M. Traynor

## OPENING BRIEF OF APPELLANTS

MAXWELL N. SHAFFER, ESQ.
KENSYE N. WOOD, ESQ.
**LELAND SHAFFER LLP**
8694 E. 28th Avenue
Denver, Colorado 80238
(720) 556-1872
Maxwell.Shaffer@lelandshaffer.com
Kensye.Wood@lelandshaffer.com

*ATTORNEYS FOR APPELLANTS*

# SUMMARY OF THE CASE

This case arises out of Foundation Automotive Corp.'s ("Foundation") purchase of two North Dakota automotive dealerships from Kupper Chevrolet, Inc. ("KCI")—now known as BAPTKO, Inc. ("BAPTKO"). The parties' formalized the deal with their Asset Purchase Agreement (herein, the "APA"), which set compensation terms for the dealerships—including an earnout process, under which the parties held back $3,000,000 of the total purchase price for payment post-closing, depending on the dealerships' post-closing financial performance (the "Earnout").

Ultimately, Foundation uncovered BAPTKO's pre-closing wrongful conduct, which resulted in withheld Earnout payments. BAPTKO subsequently sued Foundation, as well as FA ND CHEV, LLC and FA ND SUB, LLC—which are not parties to the APA—for failing to pay the Earnout. Although in moving for summary judgment BAPTKO failed to establish which of the entities owed the Earnout obligation, the district court entered partial summary judgment *against all three* entities—yet, at the same time, left the excuse of performance/prior material breach defense viable for trial. Nonetheless, during a hearing at the outset of trial, the district court unexpectedly modified its ruling, entering summary judgment against all three entities *jointly and severally*—dramatically changing the case's trajectory.

Appellants respectfully request 20 minutes for oral argument to adequately address the multiple issues on appeal. 8th Cir. R. 28A(i).

i

# TABLE OF CONTENTS

SUMMARY OF THE CASE ................................................................. i

TABLE OF CONTENTS ................................................................... ii

TABLE OF AUTHORITIES ............................................................... v

STATEMENT OF JURISDICTION ...................................................... 1

STATEMENT OF THE ISSUES ......................................................... 1

STATEMENT OF THE CASE ............................................................ 4

   I.    RELEVANT FACTS. ................................................................. 4

       A. The Origins of KCI/BAPTKO. .................................................. 4

       B. The Transaction Underlying the Parties' Dispute. ..................... 5

           1. Representations and Warranties Related to Inventory. ...................10

           2. Conditions Precedent to Foundation's Obligations. ...........................11

           3. Earnout Provision. ................................................................12

           4. Amendments to the APA. ........................................................13

       C. Closing the Transaction. ........................................................17

       D. KCI's Wrongful Conduct and Resulting Damages. ................................18

           1. KCI failed to maintain inventory levels pursuant to the terms of the APA. ....................................................................19

           2. KCI improperly turned down new vehicles allocated by General Motors. .............................................................21

           3. Kupper's post-closing interference excuses Foundation's performance under the Earnout provisions. ........................................25

   II.   RELEVANT PROCEDURAL FACTS. ......................................................26

Appellate Case: 25-1741    Page: 3    Date Filed: 07/25/2025 Entry ID: 5541516

SUMMARY OF THE ARGUMENT .......................................................27

I. REVERSAL OF THE JUDGMENT. .............................................27

II. REVERSAL OF FEES AND COSTS AWARD..............................29

ARGUMENT....................................................................................29

I. THE DISTRICT COURT ERRED IN GRANTING SUMMARY
JUDGMENT ON THE EARNOUT OBLIGATION. ...................29

    A. Summary Judgment Was Improper Because Material Facts
Were in Dispute. .......................................................................29

    B. BAPTKO's Breaches of the APA Were Material. ...................31

    C. Appellants' Performance Was Excused by BAPTKO's Breaches. ..........32

    D. The Earnout Obligation Was Conditioned on KCI's Performance
Further Excusing Payment Obligations. ....................................35

    E. The District Court's Summary Judgment Ruling Was Inconsistent and
Deprived Appellants of Presentation of a Viable Defense at Trial. ..........37

    F. The District Court Improperly Imposed Joint Liability Without
Determining the Liable Party. ...................................................40

II. THE DISTRICT COURT UNFAIRLY PREJUDICED THE JURY AND
DEPRIVED APPELLANTS A FAIR TRIAL. .............................41

    A. Standards of Review and Preservation of the Issues. .............42

    B. The District Court's Conduct Undermined the Impartiality
of the Jury. ...............................................................................44

    C. The District Court Improperly Limited Evidence on
Subaru Inventory.......................................................................48

    D. The Jury Instructions Misstated the Law. .............................49

Appellate Case: 25-1741    Page: 4    Date Filed: 07/25/2025 Entry ID: 5541516

E. The District Court Prejudiced the Foundation Parties By Instructing the Jury and Allowing BAPTKO to Reference the Summary Judgment Order Entered Pre-trial. ..............................................................51

F. The Cumulative Effect of the District Court's Conduct Warrants Reversal and a New Trial. .......................................................52

III. THE DISTRICT COURT ABUSED ITS DISCRETION IN AWARDING BAPTKO AND KUPPER COSTS AND ATTORNEYS' FEES. .................52

A. Standard of Review. .................................................................52

B. The Court Erred in Awarding Attorneys' Fees and Contractual Costs to Kupper. ........................................................................53

C. The Court Erred in Awarding Cost for Expenses Outside § 1920 and Unnecessary Depositions. .....................................54

D. The Court Erred in Awarding Attorneys' Fees Based on Hypothetical Rates. ..................................................................55

CONCLUSION ...............................................................................55

CERTIFICATE OF COMPLIANCE..................................................57

CERTIFICATE OF SERVICE..........................................................58

Appellate Case: 25-1741    Page: 5    Date Filed: 07/25/2025 Entry ID: 5541516

# TABLE OF AUTHORITIES

## CASES

*AIG Centennial Ins. Co. v. Fraley–Landers*,
450 F.3d 761 (8th Cir. 2006)...............................................................35

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986)...................................................................2, 29

*Barrett v. Gilbertson*,
2013 ND 35, 827 N.W.2d 831 .........................................................32

*Bedford v. Doe*,
880 F.3d 993 (8th Cir. 2018)...........................................................30

*Blum v. Stenson*,
465 U.S. 886 (1984).....................................................................4, 55

*Celotex Corp. v. Catrett*,
477 U.S. 317 (1986) .................................................................2, 29, 30

*Check Control, Inc. v. Shepherd*,
462 N.W.2d 644 (N.D. 1990)...........................................................2, 33

*EEOC v. CRST Van Expedited, Inc.*,
944 F.3d 750 (8th Cir. 2019)...........................................................52

*Erie R.R. Co. v. Tompkins*,
304 U.S. 64 (1938)..........................................................................30

*Friedman & Friedman, Ltd. v. Tim McCandless, Inc.*,
606 F.3d 494 (8th Cir. 2010)...............................................3, 42, 43, 50

*Hensley v. Eckerhart*,
461 U.S. 424 (1983).....................................................................4, 55

*Honeycutt v. United States*,
581 U.S. 443 (2017).........................................................................41

*In re Gen. DataComm Indus., Inc.*,
407 F.3d 616 (3d Cir. 2005)............................................................50

v

Appellate Case: 25-1741   Page: 6   Date Filed: 07/25/2025 Entry ID: 5541516

*Johnson Lasky Kindelin Architects, Inc. v. United States*,
   151 Fed. Cl. 642 (Fed. Cl. 2020) ....................................................................41

*Langer v. Bartholomay*,
   745 N.W.2d 649 (N.D. 2008)..........................................................................34

*Lincoln Composites, Inc. v. Firetrace USA, LLC,*
   825 F.3d 453 (8th Cir. 2016) ....................................................................3, 50

*Long v. Jaszczak*,
   2004 ND 194, 688 N.W.2d 173........................................................................33

*Marmo v. Tyson Fresh Meats, Inc.*,
   457 F.3d 748 (8th Cir. 2006)...........................................................................51

*Monarch Photo, Inc. v. Qualex, Inc.*,
   935 F. Supp. 1028 (D.N.D 1996) ....................................................................32

*Ray v. United States*,
   367 F.2d 258 (8th Cir. 1966)...........................................................................43

*Reed v. Malone's Mech., Inc.*,
   765 F.3d 900 (8th Cir. 2014) ....................................................................3, 42

*Royal Indem. Co. v. Factory Mut. Ins. Co.*,
   388 F. Supp. 2d 906 (N.D. Iowa 2005) ..........................................................40

*Russell v. Anderson,*
   966 F.3d 711 (8th Cir. 2020)....................................................................3, 43

*Schilf v. Eli Lilly & Co.*,
   687 F.3d 947 (8th Cir. 2012)...........................................................................29

*Schultz v. Amick*,
   955 F. Supp. 1087 (N.D. Iowa 1997) ..............................................................44

*Serv. Oil, Inc. v. Gjestvang*,
   2015 ND 77, 861 N.W.2d 490. .........................................................................31

*United States v. American Employers' Ins. Co.*,
   192 F.Supp. 873 (D.N.D. 1961) ................................................................2, 32

Appellate Case: 25-1741    Page: 7    Date Filed: 07/25/2025 Entry ID: 5541516

*United States v. Brandom,*
    479 F.2d 830 (8th Cir. 1973).........................................................3, 43

*United States v. Singer,*
    710 F.2d 431 (8th Cir. 1983)..............................................................43

*United States v. White*,
    671 F.2d 1126 (8th Cir. 1982)...........................................................43

## **STATUTES**

28 U.S.C. § 1291...................................................................................... 1

28 U.S.C. § 1332(a)(1)............................................................................ 1

## **RULES**

Fed. R. Civ. P. 56............................................................................2, 29, 30

Fed. R. Evid. 602....................................................................................42

## **TREATISES**

15 WILLISTON ON CONTRACTS § 44:53 (4th ed. 2023)..........................50

13 WILLISTON ON CONTRACTS § 38:7 (4th ed. 1990) ...........................35

## **OTHER AUTHORITIES**

Restatement (Second) of Contracts § 224.....................................35, 36

Restatement (Second) of Contracts § 225.....................................35, 37

Restatement (Second) of Contracts § 237.....................................32, 36

Appellate Case: 25-1741    Page: 8    Date Filed: 07/25/2025 Entry ID: 5541516

## STATEMENT OF JURISDICTION

1.    **District Court Jurisdiction.** The district court had subject matter jurisdiction based on the parties' diversity of citizenship under 28 U.S.C. § 1332(a)(1). (App. 59, R.Doc. 3 at 2.)

2.    **Appellate Court Jurisdiction.** This Court has jurisdiction over Appellants' appeal pursuant to 28 U.S.C. § 1291. Appellants tried their case to a jury from October 28, 2025 to November 5, 2025, and the jury returned a verdict against Appellants. (App. 218-19, R.Doc. 488 at 1-2.)

3.    **Timely Appeal from Final Order.** The district court, after denying Appellants' motion for a new trial and for judgment notwithstanding the verdict, entered a final, amended judgment for BAPTKO and Kupper on April 7, 2025. (App. 2032-33, R.Doc. 545 at 1-2, Add. 41-42.) On April 11, 2025, Appellants filed their notice of appeal. (App. 234-35, R.Doc. 548 at 1-2.) Appellants' appeal is from a final judgment disposing of all of Appellants' claims. (App. 2032-33, R.Doc. 545 at 1-2, Add. 41-42.)

## STATEMENT OF THE ISSUES

1.    Did the district court err in granting partial summary judgment for BAPTKO and holding Foundation, FA ND CHEV, LLC, and FA ND SUB, LLC (the "Foundation Parties") jointly and severally liable under the APA's Earnout Provision despite genuine disputes of material facts regarding BAPTKO's prior breaches of

1

the APA, and BAPTKO's failure to meet its burden of providing which—if any—of the Foundation Parties had owed a contractual duty to make the Earnout payments?

Apposite Authorities: F.R.C.P. 56(a); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) (if moving party bears burden of persuasion at trial, it must support the motion with credible evidence sufficient to warrant a directed verdict if not controverted).

2.      Was it legal error for the district court to hold, pre-trial, and contrary to earlier rulings, that Appellants had breached the APA, where unresolved factual questions existed as to whether BAPTKO had engaged in conduct that resulted in prior material breaches of the APA; and which resulted in Appellants' being unexpectedly foreclosed from pursuing their primary affirmative defense to BAPKO's claim?

Apposite Authorities: *United States v. American Employers' Ins. Co*., 192 F. Supp. 873 (D. N.D. 1961); *Check Control, Inc. v. Shepherd*, 462 N.W.2d 644 (N.D. 1990).

3.      Did the cumulative effect of the district court's conduct—including hostile remarks, improper evidentiary rulings, comments on witness credibility, and erroneous instructions to the jury to disregard exculpatory testimony—create an environment that deprived Appellants of a fair trial, warranting reversal and a new trial?

Appellate Case: 25-1741     Page: 10     Date Filed: 07/25/2025 Entry ID: 5541516

Apposite Authorities: *Reed v. Malone's Mech., Inc.*, 765 F.3d 900 (8th Cir. 2014); *Russell v. Anderson,* 966 F.3d 711 (8th Cir. 2020); *United States v. Brandom,* 479 F.2d 830 (8th Cir. 1973).

4.     Whether the district court's decision limiting Appellants' presentation of expert testimony concerning inventory management obligations under the APA, which applied an incorrect legal standard requiring proof of intent and artificially distinguishing between Chevrolet and Subaru inventory levels, and, further, misapplied objective contractual performance standards, constitutes legal error, warranting reversal and a new trial?

Apposite Authorities: *Reed*, 765 F.3d 900; *Friedman & Friedman, Ltd. v. Tim McCandless, Inc.*, 606 F.3d 494 (8th Cir. 2010).

5.     Whether the district court committed reversible error in its jury instructions, by failing to instruct the jury on Appellants' excuse-of-performance/prior material breach defense, and, further, instructing the jury that Appellants had breached the APA as a matter of law?

Apposite Authorities: *Friedman,* 606 F.3d 494; *Lincoln Composites, Inc. v. Firetrace USA, LLC,* 825 F.3d 453 (8th Cir. 2016).

6.     Whether the district court erred when it awarded attorneys' fees and non-taxable expenses to BAPTKO related to the defense of Robert Kupper, when

3

Kupper signed the APA in a limited capacity unrelated to attorneys' fees, and the ruling was unsupported by adequate documentation or consistent legal standards?

Apposite Authorities: *Blum v. Stenson*, 465 U.S. 886 (1984); *Hensley v. Eckerhart*, 461 U.S. 424 (1983).

## STATEMENT OF THE CASE

### I.   RELEVANT FACTS.

#### A.   The Origins of KCI/BAPTKO.

Robert Kupper got his start in the automobile industry in 1987, when he took a sales position with Ivan Gandrud Chevrolet in Mandan, North Dakota. (App. 513, R.Doc. 500 at 192:1-3.) In 1988, Dave Ressler took over the dealership, purchasing it from Ivan Gandrud. (*Id*. at 192:4-6.) After a brief leave for medical issues, Kupper returned to the Chevrolet dealership in 1990, where he served as finance manager until 1995—when he moved to sales manager. (*Id*. at 192:6-10.) Three years later, in May 1998, Kupper received a promotion to general manager of the Chevrolet dealership. (App. 518, R.Doc. 500 at 197:12-15.) Kupper worked for Mr. Ressler as general manager until 1998, when he offered Kupper the opportunity to buy-into and buy Mr. Ressler out of the Chevrolet store. (App. 518-19, R.Doc. 500 at 197:16-198:1.)

Four years later, in 2002—with the buy-in/buy-out process ongoing—the Subaru dealership in Mandan became available for purchase. (App. 521-22, R.Doc.

Appellate Case: 25-1741   Page: 12   Date Filed: 07/25/2025 Entry ID: 5541516

500 at 200:21-201:2.) Mr. Ressler and Kupper decided to acquire it, which brought the Subaru store into the company, and, accordingly, made it a part of the buy-in/buy-out process. (App. 522, R.Doc. 500 at 201:3-5.)

Kupper completed his buy-in/buy-out of Mr. Ressler at the end of 2009, and, by January 2010, was the sole shareholder of the Mandan Chevrolet and Subaru stores. (App. 521, R.Doc. 500 at 200:8-15.) Shortly thereafter—in March 2010—Kupper changed the name of the company that owned and operated each of the Mandan dealerships to KCI. (*See id*., at 200:16-20.)

### B. The Transaction Underlying the Parties' Dispute.

When Mr. Ressler—Kupper's friend and mentor—unexpectedly passed away in late 2017, Kupper made the decision to put KCI's dealerships up for sale. (*See id*., at 206:4-207:4.) To facilitate the sale, Kupper retained a brokerage—specifically, National Business Brokers (herein, "NBB"), (App. 532, R.Doc. 500 at 211:19-21) and one of its brokers, DeVere Boyd. (App. 1765 (Ex.P1); App. 1386-88, 1407, R.Doc. 512-1 at 43:22-44:25, 45:13-46:17, 93:17-94:01, 94:07-11.)

Kupper provided Boyd with KCI's dealer financial statements—documents that KCI prepared and submitted to Chevrolet and Subaru corporate—to prepare the listing of the two dealerships. (App. 1758 (Ex.P1); App. 1765-66 (Ex.P1); App. 1386-90, R.Doc. 512-1 at 42:18-49:08.) Boyd relied upon and utilized these financial documents in his Executive Summary—a document that he provided to

Appellate Case: 25-1741    Page: 13    Date Filed: 07/25/2025 Entry ID: 5541516

prospective buyers, including Foundation. (*See* App. 1888 (Ex.D500) ("All information in this summary was provided by the dealer/seller. The financials used for file summary includes dealer financial statements from year-end 2015 through year end 2017 Plus year-to-date April 2018"); App. 1890 (Ex.D500) (listing 277 used vehicle units in inventory as of Apr. 30, 2018); App. 1909 (Ex.D500) (copying KCI's General Motors Dealer Operating Report for April 2018 that lists 90 used cars and 187 used trucks).)

Utilizing the dealer financial statements, Boyd formulated a range that the asking price for goodwill could reasonably fall within, specifically, between $15,000,000 and $20,000,000. (App. 1757 (Ex.P1); App. 1391, R.Doc. 512-1 at 50:20-51:04.) "Goodwill" (also called "blue sky") is, at its core, the value of the intangible assets of a dealership—including the established name, reputation, websites, accumulated operational expertise of a business, which is a valuable asset. (App. 533-34, R.Doc. 500 at 212:23-213:9.) It is derived from the dealership's past financial performance, and is calculated as a multiple of the dealership's pre-tax earnings, of which new vehicle inventory is the primary driver. (App. 590-91, R.Doc. 500 at 269-70; App. 457-64, R.Doc. 499 at 136:3-137:21, 142:20-143:21; App. 662-70, R.Doc. 501 at 341:24-349:16.) In his testimony in the case, Boyd provided the following explanation of the goodwill valuation:

> The Goodwill is the value of the -- essentially the value of the franchise
> and also in this case related to the name value of Kupper because the

discussion, as it had been initiated, involved using the name Kupper. So the business and future earnings value based on past performance allows you come up with a number of current value, what it's worth to acquire that store.

(App. 1390, R.Doc. 512-1 at 50:05-12.) During trial, Kupper agreed that Boyd used the financial information from KCI's dealer financial statements to assess past financial performance and, ultimately, the goodwill or blue-sky value of the subject dealerships. (App. 590-91, R.Doc. 500 at 269:11-270:13.)

Unfortunately, the vehicle inventory counts listed within the dealer financial statements that KCI provided to NBB could not be counted on for reliability or accuracy—a point that Kupper confirmed at trial. (App. 602-07, R.Doc. 500 at 281:24-286:8.) Nonetheless, KCI—through NBB—provided the dealer financial statements to Foundation as part of the due diligence process, and represented in the APA that the financial statements were "correct and complete" and "consistent with the historical books" of KCI. (App. 1567 (P2) §4.1(l)); App. 1659 (P4).) Kupper also admitted that KCI submitted its dealer financial statements to GM and Subaru, as well as its outside accounting firm, but did nothing to correct or notify these third parties of any purported errors in the statements. (App. 604-13, R.Doc. 500 at 283:3-285:23, 291:5-292:13.)

With NBB's Executive Summary in hand, Foundation used the historical data within the document—"and trends within it"—to build out a financial forecast. (App. 663, R.Doc. 501 at 342:19-25.) Derek Slemko, Foundation's Chief Financial

7

Officer, testified at trial about the process. He confirmed that the forecast projected out a fairly conservative rate of return ten years forward, and "discounted it back using the expected return rate to come to a [blue sky valuation] number that was 17 million." (App. 667, R.Doc. 501 at 346:11-13.)

To evaluate the reasonableness of its blue-sky valuation, Foundation calculated a blue sky multiple, which is a mathematical "measure of what like … or similar transactions are … trading … or selling for in the market." (App. 667, R.Doc. 501 at 346:14-20.) To calculate the blue sky multiple, "you … take the blue sky value that was assigned to th[e] transaction"—here, the $17,000,000—"and divide it by the earnings associated with the[e] business…." (*Id.* at 346:21-23.) Mr. Slemko testified that, here, Foundation utilized a weighted average to determine the associated earnings, specifically based on KCI's earnings before tax for 2015, 2016, and 2017. In doing so, Foundation applied the greatest weighting-value to 2017— the year closest in proximity to the contemplated transaction. (App. 668-69, R.Doc. 501 at 347:7-348:12.) In contrast, Foundation gave the least amount of weight to 2015—the year that was the most disconnected on the timeline from the potential transaction. (App. 667-69, R.Doc. 501 at 346:14-348:12.) With the weighted average of KCI's earnings before tax for 2015-2017 in hand, Foundation then divided it into the $17 million it calculated in its forecast, which produced a "blue sky multiple" of 3.95. (App. 670, R.Doc. 501 at 349:8-9.)

To see where the blue sky multiple fell in comparison to the then-existing market trends, Foundation looked to the Kerrigan Report—an industry publication that compiles and reports blue sky multiples. (App. 667-69, R.Doc. 501 at 346:17-348:12.) When Mr. Slemko compared Foundation's calculation to the Kerrigan Report, he found that it fell "right in the middle" of market trends at the time. (*See* App. 668-70, R.Doc. 501 at 347:12-349:16.)

On August 1, 2018, Foundation provided KCI with a Letter of Intent (App. 1679-94 (Ex.P136)) to purchase the dealerships and certain other assets of KCI. (*See* App. 1752-54 (Ex.P1).) Several months later, KCI and Foundation executed the APA, effective November 28, 2018. (App. 1562-1634 (Ex.P2).) Under its terms, KCI agreed to sell, and Foundation agreed to purchase, the two dealerships, as well as substantially all of the assets that KCI utilized or that were useful in the operations of the dealerships, for a total of $34,000,000 (the "Transaction"). The $17,000,000 in "goodwill" constituted half of the total purchase price. Among the assets included in the Transaction was the aforementioned goodwill of the two dealerships and all associated intangible assets. (App. 1562 (Ex.P2) §1.1; App. 1610 (Ex.P2).)

Per a pair of assignment and assumption agreements, Foundation transferred all its "right, title and interest in, to and under" the APA relating to the assets, and "all rights to receive assets and all obligations to perform" under the APA to the Chevrolet dealership to FA ND CHEV, LLC ("FA-CHEV") and, further, to the

9

Subaru dealership to FA ND SUB, LLC ("<u>FA-SUB</u>"). (App. 1674-76 (Ex.P6); App. 1677-78 (Ex.P7).) These agreements note that both FA-CHEV and FA-SUB were "formed for the purpose of holding" the assets and operating the dealerships. (*Id.*)

### 1. Representations and Warranties Related to Inventory.

The APA contains certain representations and warranties that KCI affirmatively made to Foundation. They included the following:

> Seller represents and warrants to Buyer that the following are true, complete and correct as of the Effective Date [November 28, 2018] and shall be true, complete and correct as of the Closing Date: . . . .
>
> (y) Except as set forth in Schedule 4.1(y), since January l, 2018, the Business of Seller has been conducted in the ordinary course and consistent with past practice. Except as set forth in Schedule 4.1(y), since January 1, 2018, Seller has not:
>
> . . . .
>
> > (vi) ***made any material changes in the customary or historic methods of operations of Seller, including practices or policies relating to purchasing [and] maintaining inventories***[.]

(App. 1574 (Ex.P2) §4.1(y) (emphasis added).)

In that same vein, the APA contained a provision setting forth certain obligations of KCI with respect to the pre-closing operations of the dealerships:

> Between the Effective Date and the Closing Date, Seller will (a) operate its business in the ordinary course; (b) ***use its best efforts to preserve its Dealerships' operations so that Buyer will obtain the benefits intended to be afforded by this Agreement***; (c) not take or permit any action which would result in any representation or warranty of Seller becoming incorrect or untrue in any respect; (d) obtain the prior written approval of Buyer in connection with all material decisions affecting the business, operations, assets and liabilities of the Dealerships; and

10

(e) *notify Buyer in writing promptly after Seller becomes aware of the occurrence of any event that might result in any of Seller's statements, representations and warranties under this Agreement or any Related Agreement being or becoming untrue.* **Seller shall keep all ratios, including, but not limited to inventory levels, in accordance with a 12-month rolling average***.*

(App. 1576 (Ex.P2) §5.2 (emphasis added).)

## 2. Conditions Precedent to Foundation's Obligations.

As noted above, one of the key issues leading into and during the course of the jury trial was the Foundation Parties' affirmative defense of excuse of performance. The defense is not only accepted and recognized as common law in North Dakota, but is also addressed under the Parties' contractual scheme. Specifically, the APA placed a number of conditions that must have occurred prior to Foundation's obligations. Specifically, the APA provides:

> ***[Foundation's] obligations under this Agreement are subject to the*** satisfaction, on or prior to the Closing Date, of each of the following conditions, any of which may be waived in writing by [Foundation]:
>
> (a)   Seller will have fully complied with and performed all its obligations under this Agreement, including, but not limited to, Section 3.2 and the Related Agreements.
>
> (b)   All representations of Seller in this Agreement and the Related Agreements will be true and complete as of the date when given and on the Closing Date.
>
> . . . .
>
> (n)   ***No material adverse change (as defined in*** **Section 7.1** ***hereof) shall have occurred***.

Appellate Case: 25-1741     Page: 19     Date Filed: 07/25/2025 Entry ID: 5541516

(App. 1585-86 (Ex.P2) §6.1 (emphasis added).) Section 7.2 of the APA states:

> [A] ***"material adverse change" shall mean an event, circumstance, development or condition that***, either individually or in the aggregate, ***has had or could be reasonably expected to have a material adverse effect on the ability of Buyer to operate the Dealerships after the Closing Date*** as Seller operates the Dealerships prior to the Closing Date.

(App. 1587 (Ex.P2) §7.2 (emphasis added).)

### 3. Earnout Provision.

Another key issue in the case was the APA's Earnout provision. Specifically, the APA obligates the "Seller"—initially defined thereunder as Foundation—to pay "Buyer" a "Maximum Earn Out Amount" of $3,000,000 following closing, subject to the earnout process set forth in the APA (the "Earnout"). (App. 1564 (Ex.P2) §2.1(c).) As originally agreed to, the Earnout provided that KCI (now, BAPTKO) could earn a maximum annual payment of $750,000 if the combined normalized earnings before tax ("EBT") equaled or exceeded $3,500,000. (App. 1564-65 (Ex.P2) §2.1(d).)

As discussed below, the APA was amended by way of the First Amendment, dated effective January 27, 2019. (App. 1635 (Ex.P4).) Because Kupper himself demanded a decrease to the EBT threshold for the Earnout payment obligation to kick-in, the parties agreed to amend Section 3(d) of the APA to reflect that "Seller"—i.e., KCI/BAPTKO—"shall receive . . . $750,000 per year . . . when the Dealerships reach the normalized EBT threshold target of $2,500,000 for a calendar

12

year. (App. 1635-36 (Ex.P4).) Relevant to the issue on appeal, both the APA and the First Amendment define "Seller" as "Kupper Chevrolet, Inc." and "Buyer" as "Foundation Automotive Corp." (App. 1562 (Ex.P2); App. 1635 (Ex.P4).)

### 4. Amendments to the APA.

Although the APA originally contemplated a January 31, 2019 outside closing date, the Parties did not meet that deadline. One of Kupper and BAPTKO's main themes at trial was that the APA terminated by its own terms when the parties did not close on January 31, 2019. In other words, Kupper maintained that because the parties did not close by the outside closing date, the parties had no agreement after that date for Foundation to purchase the dealerships. (App. 573, R.Doc. 500 at 252:4-20.) Unfortunately for Kupper and BAPTKO, the plain language of the APA does not include a specific termination date, let alone a provision that automatically terminated the APA on January 31, 2019. (App. 1562-91 (Ex.P2).) Moreover, on January 31, 2019, Kupper and his longtime business partner and friend, Chris Schneider, exchanged text messages indicating that Foundation was preparing an extension for the original closing date of the APA, but that Kupper had not signed it yet. (App. 574, R.Doc. 500 at 253:1-24; App. 1703 (Ex.P12).) Complicating matters thematically, testimony at trial established that Kupper became frustrated with the closing extensions, and as a result took deliberate steps to sabotage the dealerships, including by reducing new vehicle inventories and by rejecting crucial vehicle

allocations from GM—which are discussed in further detail below. Importantly, the APA provided the Parties with the ability to terminate the contract if the original January 31, 2019 closing date was not met, providing specifically:

> This Agreement may be terminated at any time before the Closing as follows:
>
> * * *
>
> (c)     Subject to Section 3.1 above, by Buyer or Seller, by notice to the other, if the Closing does not take place on or before January 31, 2019; provided that a Party will not be entitled to terminate this Agreement pursuant to Section 7.1 if such Party's willful breach of this Agreement or any Related Agreement or intentional misrepresentation under this Agreement or any Related Agreement has prevented the Closing from taking place before such date.

(App. 1586-87 (Ex.P2) §7.1(c).) For his part, Kupper readily admitted at trial that he did not exercise this termination right. (*See* App. 1216-20, R.Doc. 504 at 895:21-899:4.) And when neither Party exercised their right to terminate under Section 7.1(c), the Parties had no further outs—termination was no longer an option. (*See id.*) Making matters worse, it appeared that Kupper's pre-closing failures under the terms of the APA resulted in a decrease in the value of the dealerships. Kupper lamented this predicament in text messages with Chris Schneider on February 20, 2019:

14



(App. 1714 (Ex.P12).)

After months of negotiation—and with the Foundation Parties in the dark as to the details and circumstances of Kupper and KCI's operation of the dealerships—on May 1, 2019, the parties entered into the First Amendment to the APA, which they made effective January 27, 2019. (App. 1635 (Ex.P4).) In a good-faith effort to keep the deal alive, Foundation made certain concessions in the First Amendment, including a reduction of the normalized earnings before tax threshold required for KCI to be entitled to future earnout payments from $3,500,000 to $2,500,000—a $1,000,000 decrease benefiting BAPTKO. By reducing the EBT threshold necessary to trigger the Earnout payment obligations, the parties made it much easier for BAPTKO to receive payments under the Earnout Provision. (App. 1635 (Ex.P4) §3; App. 468-69, R.Doc. 499 at 147:19-148:12, 148:21-24.)

In agreeing to the First Amendment, Foundation also acknowledged that "the [Due] Diligence Period ha[d] expired," and that as the "Buyer," it was "satisfied with

the results of its diligence review" as of the effective date of the First Amendment. (App. 1637 (Ex.P4) §6.) This acknowledgement, however, appears to have little consequence—as under the original terms of the APA, the Diligence Period was to expire sixty (60) days following November 28, 2018, i.e., January 27, 2019—the same date the First Amendment was made effective. (*See* App. 1576 (Ex.P2) §5.1; App. 1635 (Ex.P4); App. 473, R.Doc. 499 at 152:1-6.)

Here, the First Amendment was an understanding between the parties that the Diligence Period had expired pursuant to the terms of the APA—which originally afforded Foundation "the right to terminate [the APA] for any reason during the Diligence Period upon written notice to Seller." (App. 1576 (Ex.P2) §5.1.) In other words, Foundation could not terminate the APA for any reason after the Diligence Period expired. Foundation maintained its "right to have its diligence review updated following the expiration of the Diligence Period and prior to the Closing to ensure there was no material change in the operations of the Dealerships prior to the Closing." (*Id.*) Mr. Slemko testified that this provision of the First Amendment meant that Foundation was satisfied with their review up to that point. (App. 685-86, R.Doc. 501 at 364:23–365:13.)

Unfortunately, however, as the revised closing deadline of June 3, 2019 approached, it was apparent that the parties would not be in a position to comply. Accordingly, on May 31, 2019, the parties executed the Second Amendment,

16

extending the closing date to June 21, 2019. (App. 1671 (Ex.P5) §3.)

Both the First and Second Amendments expressly provided that "[e]xcept as modified by this Amendment, the terms and conditions of the Agreement [APA], as previously amended, are hereby ratified, confirmed and shall remain unchanged and in full force and effect." (App. 1638 (Ex.P4) §13; App. 1672 (Ex.P5) §5.) Moreover, neither of the Amendments addressed, altered, or amended any of KCI's existing contractual obligations in the APA that are at issue in this case. (*Id.*) Notably, both the First and Second Amendments modified the closing dates, ratified and confirmed the terms of the APA—except as modified therein—and neither modified or altered any of the obligations related to operations of the Dealerships or maintenance of the inventory levels in the APA. Additionally, by virtue of the First Amendment's effective date—January 27, 2019—the Amendments applied during the timeframe BAPTKO contends there was no contract, disproving Kupper's baseless assertion that there was no contract governing KCI's maintenance and operations of the Dealerships. Further, Kupper did not exercise the right to terminate the APA once the original closing date of January 31, 2019 was not met, and therefore, the APA continued to bind KCI.

### C. Closing the Transaction.

Pursuant to the terms of the APA, Foundation paid KCI on the Closing Date for all of the purchased assets, including $17,000,000 in goodwill for the

17

"intangible" value of the dealerships, minus the potential $3,000,000 earnout. (App. 1562-63 (Ex.P2) §§1.1, 2.1(c); App. 1610 (Ex.P2) §N.)

A team from Foundation traveled to Mandan in the weeks prior to closing, and they were met with a complete mess when trying to count vehicles. Per Derek Slemko, the team was "just having difficulty matching the units on the lot to the information they were given from the DMS." (App. 703, R.Doc. 501 at 382:9-19.) Slemko noted that a "handful of units wouldn't be notable. That would be typical for a close. This was more than that. . . . [T]here were a lot of units that could not be located or found on that day, and it, I think, created a little bit of stress for us in the closing because we were having difficulty finding them, and we had several back-and-forths after closing to clean all that up." (App. 703-04, R.Doc. 501 at 382:21-383:3.) Slemko testified that there were dozens of vehicles missing at the Closing—something he had never seen before in his experience with many closings. (App. 704, R.Doc. 501 at 383:4-10.)

**D.     KCI's Wrongful Conduct and Resulting Damages.**

Immediately following the Parties' chaotic closing, the Dealerships experienced significant business-related challenges due specifically to inventory issues. New vehicle inventory at and immediately following closing was significantly low—which the Foundation Parties ultimately learned was the result of KCI and Kupper's pre-closing misconduct.

18

### 1. KCI failed to maintain inventory levels pursuant to the terms of the APA.

Kupper testified that he did nothing to ensure that the dealerships would maintain the twelve-month rolling average. (App. 559-62, R.Doc. 500 at 238:21-239:18, 241:13.) Kupper admitted that he did not tell anyone responsible for ordering inventory at the Dealerships about the twelve-month rolling average obligation. (App. 562-63, R.Doc. 500 at 241:14-242:3.) Kupper testified that his customary practice was to follow a 90-day average prior to entering into the APA with Foundation, but he failed to track the ordering process and inventory to ensure that the twelve-month rolling averages were met leading up to the close. (App. 563-64, R.Doc. 500 at 242:4-245:10.)

Both KCI's dealer financial statements and new vehicle schedules establish that between the effective date of the APA (November 28, 2018) and closing, KCI failed to maintain vehicle inventory levels consistent with the twelve-month rolling average, as required by the APA. (App. 1576 (Ex.P2) §5.2.) At closing, the Mandan Dealerships acquired 292 new vehicles from KCI; however, as of May 31, 2019, KCI's twelve-month rolling average based on the inventory unit counts in the dealer financial statement calculated to 488 vehicles—that is, 196 fewer new units. (App. 883-90, R.Doc. 502 at 562:11-21, 567:5-569:4; App. 1810 (Ex.P50); App. 1819 (Ex.P51).) Even based on KCI's new vehicle schedules, which Kupper claimed at trial are more accurate than the unit counts in the dealer financial statements, KCI

19

failed to maintain inventory levels consistent with the twelve-month rolling average requirement. As of May 31, 2019, KCI's twelve-month rolling average based on the new vehicle schedules was 382 vehicles—a reduction of 90 new units from the 292 new vehicles acquired at closing. (App. 883, R.Doc. 502 at 562:11-21; App. 1824-83 (Ex.P102).) Moreover, Mr. Slemko provided testimony as to the inventory trend—both with respect to Subaru and Chevrolet—prior to and following closing, as reflected in the following tables:

| SUBARU DEALER FINANCIAL STATEMENTS | | |
|---|---|---|
| **Month Ending Statement** | **Units** | **Monetary Value** |
| Feb. 2019 | 101 | $,3,037,736.00 |
| March 2019 | 125 | $3,778,810.00 |
| May 2019 | 79 | $2,428,300.00 |
| June 2019 | 68 | $2,206,611.00 |

(App. 690-91, R.Doc. 501 at 369:16-376:3.)

| CHEVROLET DEALER FINANCIAL REPORTS - CARS | | |
|---|---|---|
| **Month Ending Statement** | **Car Units** | **Monetary Value** |
| May 2019 | 13 | $580,957.00 |
| June 2019 | 7 | $230,222.00 |
| July 2019 | 6 | $230,122.00 |
| August 2019 | 5 | $202,319.00 |
| September 2019 | 4 | $169,503.00 |
| CHEVROLET DEALER FINANCIAL REPORTS - TRUCKS | | |
| **Month Ending Statement** | **Truck Units** | **Monetary Value** |
| May 2019 | 331 | $11,323,802.00 |
| June 2019 | 225 | $10,321,854.00 |
| July 2019 | 246 | $11,500,087.00 |
| August 2019 | 241 | $11,229,449.00 |
| September 2019 | 221 | $9,827,867.00 |

Appellate Case: 25-1741    Page: 28    Date Filed: 07/25/2025 Entry ID: 5541516

(App. 688-703, R.Doc. 501 at 367:3-382:5.)

BAPTKO and Kupper played the deposition of Kutschinski after failing to cross-examine him when he was called on the first day of trial. (*See* App. 490-91, R.Doc. 499 at 169-170.) Through his deposition, Kutschinski testified that, at the time of his October 3, 2023 deposition, he was not aware if the Foundation Parties were asserting a claim and/or damages for inadequate new Subaru vehicle inventory or used vehicle inventory at closing. (*See* R.Doc. 297-10 at 35:16-37:23.) BAPTKO improperly used this at trial to argue that KCI did not breach any of its inventory obligations under the APA in relation to new Subaru inventory or used vehicle inventory. BAPTKO, however, is incorrect in this assertion, because Kutschinski's testimony took place several months before Knutsen issued her expert report in the case, which included her expert opinions on this very issue regarding KCI's breach of its twelve-month rolling average inventory obligation and the resulting damages. Further, the twelve-month rolling average inventory requirement plainly applies to KCI's vehicle inventory as a whole, not just new Chevrolet vehicles, and, therefore, BAPTKO is liable for any resulting damages.

### 2. KCI improperly turned down new vehicles allocated by General Motors.

Mr. Slemko's testimony on inventory trends corresponded with the evidence admitted at trial regarding the Mandan Dealerships' impaired inventory levels, and their continued decline in the weeks and months after closing. The evidence revealed

Appellate Case: 25-1741   Page: 29   Date Filed: 07/25/2025 Entry ID: 5541516

that it was KCI's intentional and purposeful decision to turn down vehicle consensus allocations from GM that contributed to the decline.

David Sikkenga—the then-Chevrolet zone manager for Minnesota and North Dakota—explained that KCI chose not to accept allocation of 152 new trucks from February 2019 to May 2019. (App. 1740-43 (Ex.P18); App. 1744-47 (Ex.P20); App. 1444-45, R.Doc. 512-2 at 62:04-64:12; App. 1221, R.Doc. 504 at 900:8-16.) Kupper admitted to doing so at trial, stating, "I declined 152 trucks, yes." (App. 1221, R.Doc. 504 at 900:16.) Specifically, KCI declined 152 units that GM offered through the allocation process of the 2019 Chevrolet Silverado 1500 (also referred to as half-ton, light-duty, or LD) crew cab trucks. Sikkenga testified that Silverados accounted for 50 percent of all Chevrolet sales in the zone that included the Dealerships, and specifically, he stated, "the light-duty Silverado crew cab is the most popular Chevrolet truck . . . Nationwide." (App. 1447-48, R.Doc. 512-2 at 68:04-69:04; App. 1448, R.Doc. 512-2 at 69:11-15 ("Yes in [zone] 5120, [the light-duty Silverado] was a very popular vehicle during the time I was zone manager.").) The Silverado 1500 was indisputably KCI's best-selling vehicle in the years leading up to the Transaction. The Executive Summary that Boyd prepared and provided to Foundation contains KCI's historical sales of the Silverado 1500, among other makes and models:

Appellate Case: 25-1741    Page: 30    Date Filed: 07/25/2025 Entry ID: 5541516

| Vehicle Line | 2015 | 2016 | 2017 | | | |
|---|---|---|---|---|---|---|
| | Dealer Reported Retail Sales | Dealer Reported Retail Sales | Dealer Reported Retail Sales | Vehicle Line Registrations in APR/AGSSA | Sales to Equal State Average | Sales Variance from State Average |
| | | | (a) | (b) | (c) | (d) = (a) - (c) |
| Silverado 1500 | 459 | 310 | 313 | 94 | 111 | 202 |
| Silverado 2500 | 136 | 73 | 78 | 45 | 34 | 44 |
| Silverado 3500 | 60 | 35 | 50 | 30 | 14 | 36 |

(App. 1958 (Ex.D500).) Further, the Silverado 1500 Crew Cab accounted for 248 of KCI's 313 sales of the Silverado 1500. (App. 1959 (Ex.D500).)

Because Kupper was the only KCI agent who participated in the Transaction process, he was solely and affirmatively responsible for ensuring compliance with the business's obligations under the APA. (App. 561, R.Doc. 500 at 240:12-23 (Kupper testifying that he was the sole shareholder of KCI, and had decision-making authority).) Thus, under the circumstances, Kupper held an affirmative obligation to ensure that KCI maintained its historic inventory levels in compliance with the APA, and, further, that it refrained from improperly turning down allocations that would negatively impact the Dealerships' ability to successfully operate the business post-closing. (*See supra* at 10-17 (discussing relevant APA provisions).)

At trial, Kupper attempted to justify his decision to decline a substantial number of the best-selling trucks by pointing to the large number of units allocated by GM. The number of units allocated by GM is, however, important to support the Foundation Parties' claim. Sikkenga explained that available inventory is comprised of (1) units in the system, (2) units in transit, and (3) units on the ground. (App. 1465-72, R.Doc. 512-2 at 116:09-16, 131:17-24, 132:9-17.) The units in the system

23

are those units that have been ordered and are going into production at the factory. (*Id*.) Sikkenga also explained that a dealership earns units through allocation based on the daily sales rate and the average daily supply of available inventory. (*Id*.) If a dealership has a high daily sales rate with a decreasing total available inventory, the GM system is going to offer more units through the allocation process—this amount offered continues to increase if the daily sales rate is high and the availability of that particular vehicle is low. (App. 1471, R.Doc. 512-2 at 129:24-130:18; App. 1522-24, R.Doc. 512-3 at 132:8-133:1, 133:8-17, 135:8-136:03 (discussing how the dealership's daily sales rate and available days' supply affected allocation, and confirming that an 8-10 week average delivery time would have applied at the time of the Closing Date).)

Chuck Kramer, Foundation's former COO, testified about a conversation he had with Sikkenga on the Closing Date regarding the issues with inventory and resulting impact:

> [W]hat I was told by David Sikinnga [sic], that the – when the buy-sell was coming . . . there was – in three different months or three different times, I was told that –that because of the way this buy-sell went down, that there was [GM] inventory that was turned down. Now – now, when you . . . turn down inventory, you can't get it back. So by the time this deal closed in June . . . the census had already been – been turned down . . . So when the census was turned down, it affected later on down the line. . . . [B]ecause of the turned down census, it basically put us [Foundation] in a situation where [] we would have to outsell ourselves in order to gain that census back. . . . Now . . . the census was turned down . . . [and] our earn rate was different as we bought the new stores. . . . So it put us behind the eight ball on . . . inventory, to the point even

24

to this day.

(App. 1543-44, R.Doc. 512-4 at 257:05-259:10.)

### 3. Kupper's post-closing interference excuses Foundation's performance under the Earnout provisions.

At trial, Kupper testified that the purpose of the Earnout provision was for Kupper to "be an ambassador" of the Dealerships after the Closing. (App. 547-48, R.Doc. 500 at 226:25-227:5.) Through the Transaction, Foundation was "buying the name [Kupper Chevrolet] of the store," and according to Kupper, "in order to keep that [name], they . . . wanted me to be a cheerleader." (App. 548, R.Doc. 500 at 227:5.) In a 180-degree turnaround from his position that he sold the Dealerships to get completely out of the business, Kupper testified that there was an agreement with Mr. Kutschinski that he and Foundation "were going to be psychological partners," where he would be an "ambassador" and provide "moral support." (App. 548-50, R.Doc. 500 at 227:24-229:14.)

The parties came to an essential understanding that the purpose of the Earnout Provision was to ensure Kupper's continued support of Foundation's ownership of the Mandan Dealerships beyond the Closing of the Transaction. Kupper, nevertheless, worked against the Foundation Parties and their success after the Closing. Mr. Kramer, perhaps, captured the post-Closing issues best, stating:

> There was challenges of the transition, the culture. I feel that, you know, Bob -- my opinion -- . . . we didn't get a lot of help from the outside. And if anything, [] I felt like we got a force working against us.

25

* * *

Q.  Okay. But when you say no help from the outside, as you told -- told me earlier, you weren't expecting him to be in the stores doing anything after the closing occurred, Mr. Kupper?

A. Oh, no. We didn't need his -- we didn't need his help in -- any help. We just didn't need a negative force against us.

(App. 1542, R.Doc. 512-4 at 255:2-8, 256:3-10.)

## II.    RELEVANT PROCEDURAL FACTS.

On August 12, 2020, FA-CHEV and FA-SUB initiated litigation in the District of North Dakota against Kupper and KCI, among other parties, asserting multiple legal claims, including for breach of contract, civil conspiracy, defamation, and misrepresentation—*FA ND CHEV, LLC, et al. v. Kupper, et al.,* No. 1:20-cv-00138. On September 27, 2021, BAPTKO commenced a separate action in the District of North Dakota against the Foundation Parties, seeking payment under the Earnout provision—*BAPTKO, Inc. v. Foundation Automotive Corp., et al*., No. 1:21-cv-00183. The district court later consolidated the two matters. (R.Doc. 218.)

The consolidated matter proceeded to a jury trial on October 28, 2024. The district court submitted the case to the jury on November 5, 2024. That afternoon, the jury returned verdicts against Appellants, concluding that BAPTKO did not breach the APA. (*See* App. 218-19, R.Doc. 488)

Following the jury trial, and multiple dispositive rulings, the district court entered judgment in favor of BAPTKO on November 7, 2024, in the amount of

26

$3,000,000.00, plus prejudgment interest totaling $364,195.67. (App. 2030-31, R.Doc. 490, Add. 37-38.) After denying the Foundation Parties' motion for post-trial relief, and awarding BAPTKO and Kupper attorneys' fees ($1,085,186.44) and costs ($223,328.71), the district court entered a final amended judgment on April 7, 2025 —bringing the total judgment against the Foundation Parties to $4,672,710.82, plus post-judgment interest. (App. 2032-33, R.Doc. 545, Add. 41-42.)

## SUMMARY OF THE ARGUMENT

### I.   REVERSAL OF THE JUDGMENT.

The district court erred in its rulings both at the summary-judgment and trial stages. These rulings stripped Appellants of their central defense in the case on the morning of the first day of trial, after previously indicating they could present it, and in the process denied them a fair opportunity to litigate disputed issues of fact.

First, the district court wrongly granted partial summary judgment in favor of BAPTKO on the APA's Earnout provision. The undisputed evidence showed that KCI breached its contractual obligations—by failing to maintain inventory levels, turning down allocated vehicles, and materially altering dealership operations. These breaches, as fully supported by the evidence presented at trial, excused Appellants from any obligation to pay under the Earnout—both under the terms of the APA, and North Dakota common law. By resolving that liability issue as a matter of law, the court ignored the excuse-of-performance defense and improperly decided factual

27

disputes that belonged to the jury.

Second, the district court's conduct poisoned the jury pool, and prejudiced the Foundation Parties' rights from the outset of trial. The district court informed the jury that Appellants had already breached the APA—nullifying their primary defense and improperly commenting on a central issue. It then restricted key testimony, excluded expert analysis, and repeatedly displayed hostility toward Appellants and their witnesses. These cumulative errors denied Appellants a fair trial and require reversal for a new one.

Third, the district court improperly imposed joint and several liability without resolving which entity—if any—assumed the Earnout obligation. The APA designated "Foundation Automotive Corp. or its permitted assigns" as the Buyer, and, as such, the party originally holding the payment obligation. But the district court never determined whether that obligation had been assigned and, if so, which of FA-CHEV or FA-SUB actually assumed the payment duty under the Earnout provision. With such a legal ambiguity hanging over the claim, BAPTKO plainly failed to meet its burden at summary judgment, and, therefore, the judgment cannot stand.

Each of these rulings independently warrants reversal of the Judgment. Together, they demand it.

28

## II. REVERSAL OF FEES AND COSTS AWARD.

If this Court does not reverse the judgment, it should nevertheless vacate the district court's award of costs and fees. The award of attorneys' fees and non-taxable costs to BAPTKO lacked sufficient legal and documented support and, further, erroneously included non-taxable costs and attorneys' fees incurred by Kupper, a non-party to the APA, in his defense in the Kupper Litigation. This award lacks both contractual basis and evidentiary support.

## ARGUMENT

## I. THE DISTRICT COURT ERRED IN GRANTING SUMMARY JUDGMENT ON THE EARNOUT OBLIGATION.

### A. Summary Judgment Was Improper Because Material Facts Were in Dispute.

This Court reviews the district court's granting of summary judgment *de novo*, viewing the evidence in the light most favorable to the non-moving party and affirming only if there are no genuine issues of material fact such that the moving party is entitled to judgment as a matter of law. F.R.C.P. 56(a); *Celotex Corp.*, 477 U.S. at 322. "An issue is 'genuine' if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party." *Schilf v. Eli Lilly & Co.*, 687 F.3d 947, 948 (8th Cir. 2012) (*citing Anderson*, 477 U.S. at 248). Where, as here, "the *moving* party will bear the burden of persuasion at trial, that party must support its motion with credible evidence—using any of the materials specified in

29

Rule 56(c)—that would entitle it to a directed verdict if not controverted at trial."
*Celotex*, 477 U.S. at 331 (emphasis in original).

"A principal purpose of the summary-judgment procedure 'is to isolate and dispose of factually unsupported claims or defenses' . . . ." *Bedford v. Doe*, 880 F.3d 993, 996 (8th Cir. 2018) (citation omitted). Sitting in diversity, the Eighth Circuit applies the substantive law of the applicable state. *See Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938).

In granting partial summary judgment—and, on the doorsteps of the courthouse, full judgment as a matter of law—in favor of BAPTKO, the district court failed to follow established standards, disregarding extensive and genuine disputed factual issues about BAPTKO's pre-closing conduct, the scope of its breaches, and, further, whether those breaches excused performance under the APA. The district court's rulings ignored key record evidence: that KCI misrepresented inventory data, materially deviated from past practices, rejected over 150 vehicle allocations, and delivered dealerships that were operationally impaired. These facts bore directly on whether Appellants' performance was excused and whether any obligation under the Earnout provision ever matured. Resolving such factual disputes as a matter of law and eliminating Appellants' excuse-of-performance defense was clear error and violated Appellants' right to a jury determination. Reversal is required.

Appellate Case: 25-1741    Page: 38    Date Filed: 07/25/2025 Entry ID: 5541516

**B.      BAPTKO's Breaches of the APA Were Material.**

A breach of contract is "the nonperformance of a contractual duty when it is due." *Serv. Oil, Inc. v. Gjestvang*, 2015 ND 77, ¶ 15, 861 N.W.2d 490, 496. The elements of a breach of contract under North Dakota law are: (1) the existence of a binding contract agreement; (2) performance of the obligations by one party; (3) the other party's failure to fulfill its contractual obligations without legal excuse; and (4) one party suffered damages as a result of the breach. *Id.* A party asserting a claim for breach of contract has the burden to prove these elements. *Id.*

The APA obligated KCI to maintain new vehicle inventory "in accordance with a 12-month rolling average." (App. 1576 (Ex.P2) §5.2.) Yet, at closing, Foundation received only 292 new vehicles, compared to a rolling average of 488—showing a 196-unit shortfall. Even using KCI's new vehicle schedules, the twelve-month average was 382 vehicles—still 90 units short.

This inventory deficiency was no accident. From February to May 2019, KCI declined 152 new Chevrolet truck allocations—many of them Silverado 1500s, the dealership's best-selling model. These decisions deviated from historical ordering practices and were made despite clear obligations under the APA to maintain the dealerships' operational capacity.

Moreover, Kupper provided dealer financial statements—knowingly containing inaccurate vehicle inventory counts—to his broker for marketing the

31

dealerships and to Foundation for due diligence. Foundation relied on these statements to calculate its goodwill offer. KCI represented these financials as "correct and complete"—yet, Kupper later admitted to their inaccuracy. This misrepresentation breached APA §4.1(l) and materially influenced Foundation's valuation and purchase decision.

Together, these acts—failure to maintain inventory and misrepresentation of critical financial data—constitute material breaches of the APA. Appellants satisfied all three elements of breach: contractual duty, nonperformance, and damages in the form of impaired dealership value.

### C. Appellants' Performance Was Excused by BAPTKO's Breaches.

North Dakota follows the general rule "that a material failure of performance by one party to a contract, not justified by the conduct of the other, discharges the latter's duty to give the agreed exchange." *American Employers' Ins.,* 192 F. Supp. at 877; *see also* Restatement (Second) of Contracts (hereinafter, "Restatement") § 237; *Barrett v. Gilbertson,* 2013 ND 35, ¶ 19, 827 N.W.2d 831, 840 (holding if one party prevents the other's performance, it excuses the performance and provides a defense in a suit for breach by such non-performance); *Monarch Photo, Inc. v. Qualex, Inc*., 935 F. Supp. 1028, 1033 (D.N.D 1996) ("[A] material failure of performance by one party to a contract, not justified by the conduct of the other, discharges the latter's duty to give the agreed exchange.").

Moreover, in North Dakota, "[f]ailure of consideration arises when a valid contract has been formed, but the performance bargained for has not been rendered"—which the law distinguishes "from lack of consideration, which prevents an enforceable contract from ever being formed." *Shepherd*, 462 N.W.2d at 646. A total failure of consideration occurs where a party has failed to perform a substantial part of its obligations, so as to defeat the very object of the agreement. *Id.* at 647. The remedy under such circumstances is to excuse the non-breaching party from performance of its obligations under the agreement. *Id.*

In contrast, a partial failure of consideration occurs when there has been an insubstantial breach that leaves sufficient consideration for sustaining the contract. *Id.* (citation omitted). The remedy for a partial failure of consideration is to award damages to the non-breaching party. *Id.* Whether there has been a failure of consideration, total or partial, is a question of fact. *Id.* (citations omitted). "Only when the evidence is such that reasoning minds could draw but one conclusion does the fact question become a question of law for which summary judgment may be appropriate." *Long v. Jaszczak*, 2004 ND 194, ¶ 17, 688 N.W.2d 173 (quotations and citations omitted).

The APA's Earnout provision, as amended, was performance-based and expressly conditioned on the acquired dealerships achieving a $2,500,000 normalized EBT threshold per calendar year. (App. 1564 (Ex.P2) §2.1(d)). That

33

target assumed uninterrupted operational continuity and required KCI, as the seller, to deliver a business capable of hitting it—requirements expressly protected through seller covenants obligating KCI to: (1) maintain inventory in accordance with a 12-month rolling average (App. 1576 (Ex.P2) §5.2); (2) operate in the ordinary course with no changes affecting operations or inventory (App. 1574 (Ex.P2) §4.1(y)); (3) deliver all assets necessary to continue dealership operations post-closing (App. 1567-68 (Ex.P2) §4.1(c)); and (4) represent that no material omissions or misrepresentations have been made that would have a material adverse effect on the dealerships (App. 1572 (Ex.P2) §4.1(r)).

Appellants presented substantial evidence that BAPTKO materially breached these provisions prior to closing, undermining the dealerships' performance potential. These breaches gave rise to an excuse-of-performance defense—recognized under North Dakota law as discharging the non-breaching party's duty to perform. *See Langer v. Bartholomay*, 745 N.W.2d 649, 655 (N.D. 2008).

Rather than address this defense in its summary judgment order, the district court erroneously held that "the Foundation Parties were required to make the Earnout Payments and have failed to do so," resolving a contested issue in favor of BAPTKO, as the movant. (App. 2016, R.Doc. 373 at 25, Add. 25.) The court further concluded there was "no factual dispute" that the Foundation Parties failed to make Earnout payments, manufacturing admitted liability. (App. 2015, R.Doc. 373 at 24,

34

Add. 24.) The Foundation Parties consistently denied that any Earnout was "owed" because of BAPTKO's prior material breach.

Summary judgment cannot stand where genuine disputes exist over whether a party's performance was excused. Merely because Appellants invoked a recognized legal doctrine—here, excuse of performance—the court erred in treating the defense as admitting liability simply because Appellants acknowledged the existence of the underlying contract term.

### D. The Earnout Obligation Was Conditioned on KCI's Performance Further Excusing Payment Obligations.

As a matter of general contract law, conditions precedent are different from other contract terms: "Unlike a mere contract term, the breach of which must be material before it excuses another party from performing, one party's failure to fulfill a condition precedent entirely excuses any remaining obligations of the other party." *AIG Centennial Ins. Co. v. Fraley–Landers*, 450 F.3d 761, 763 (8th Cir. 2006) (*citing* 13 WILLISTON ON CONTRACTS § 38:7 (4th ed. 1990); Restatement, § 224)). If performance of a duty is subject to a condition, no liability arises until the condition occurs. Restatement, § 225(1). A "condition" is defined as "an event, not certain to occur, which must occur, unless its non-occurrence is excused, before performance under a contract becomes due." Restatement, § 224.

The APA's Earnout provision, as amended, expressly conditions BAPTKO's right to additional payments on the dealerships' achieving a "normalized EBT

threshold target of $2,500,000 for a calendar year," entitling the seller to "$750,000 per year" when the threshold is met. (App. 1635 (Ex.P4) §3.) That financial target was tied to the Mandan Dealerships' profitability, which, in turn, was premised on KCI's obligation to operate and maintain the business in accordance with historical practices prior to closing.

The Earnout was not an automatic extension of the purchase price—it was a contingent, performance-based obligation triggered only if the seller delivered a business capable of achieving profitability targets. *See* Restatement, §§ 224, 237. Evidence of inventory mismanagement and deteriorating dealership performance shows that the Foundation Parties received less than what they bargained for. This goes directly to the core purpose of the Earnout, which was to reward actual dealership profitability, not simply ownership. This underperformance is not hypothetical—prior to closing, Kupper himself demanded a reduction in the EBT threshold from $3,500,000 to $2,500,000 million, tacitly conceding the dealerships could not meet the original target. This pre-closing revision, formalized in the First Amendment, reflects Kupper's recognition that KCI failed to maintain the business in its represented condition.

These facts reinforce that the Earnout was conditional—not automatic. When BAPTKO failed to deliver a business consistent with contractual promises and representations, Foundation's obligation to pay was excused. *See* Restatement, §

36

225(1). By materially breaching this obligation, BAPTKO failed to satisfy a condition precedent to the Foundation Parties' duty to pay under the Earnout provision.

### E. The District Court's Summary Judgment Ruling Was Inconsistent and Deprived Appellants of Presentation of a Viable Defense at Trial.

The district court acknowledged that disputed facts existed regarding BAPTKO's pre-closing conduct—particularly related to vehicle inventory and maintenance of the status quo of the dealerships (App. 2011-14, R.Doc. 373 at 20-23, Add. 20-23.) It expressly held those issues must be resolved by the jury. (*Id.*) Yet, paradoxically, the court also held that the Foundation Parties were liable for failing to pay the Earnout—despite their affirmative defense that payment was excused by that very conduct (App. 2014-16, R.Doc. 373 at 23-25, Add. 23-25.) This is important, as the Excuse of Performance Defense rises and falls with the breach question. These logically incompatible rulings are legally untenable.

During the pre-trial conference, the court made an adverse ruling on the Foundation Parties' ultimate liability to BAPTKO, which severely undercut their affirmative defense of excuse of performance and prejudiced their ability to put on their case. (App. 332, R.Doc. 499 at 11:4-14.) Appellants argued that a material issue existed for the jury to determine as to whether the Foundation Parties were excused from any obligation under the Earnout provision of the APA due to BAPTKO's prior

37

material breaches and specifically requested the term "breach" not be mentioned to the jury, so as to not give the impression to the jury that the amounts are due and owing. (App. 328-331, R.Doc. 499 at 7:20-8:06, 9:24-10:24.) The defense was ultimately compromised before the jury entered the courtroom—a result the Foundation Parties were attempting to avoid when they filed their Motion to Reconsider or Clarify the court's ruling on summary judgment. (*See* R.Docs. 378-79.) The court granted, in part and denied in part, their Motion to Reconsider or Clarify, stating:

> Whether the Foundation Parties were excused from their payment obligations is a question that is essentially related to damages. The Court limited its grant of Summary Judgment to the undisputed fact that Foundation Parties failed to pay under the First Amendment. Whether and to what extent the Foundation Parties must pay, however, are fact questions preserved in the Order. The setoff and excuse arguments are essentially the same: Foundation Parties should not have to pay under the setoff provision because BAPTKO had its own breaches. There are no contradictions between the Court's holding in the Order on Motions for Summary Judgment and permitting the Foundation Parties to raise the issue of excuse of performance at trial. Whether the jury will be instructed on this affirmative defense ultimately depends on the evidence as it comes in at trial and the Court will not decide that question at this time.

(App. 2029, R.Doc. 386 at 2, Add. 38.)

Despite this clarification, the court determined during the pretrial conference that Appellants already breached the APA, thereby compromising their excuse of performance affirmative defense. The court "found there's no factual dispute whether the Foundation Parties have failed to pay as required under the First

38

Amendment. The only question is whether and to what amount BAPTKO is entitled to damages." (App. 332, R.Doc. 499 at 11:4-7.) Counsel for the Foundation Parties then moved the district court to certify an interlocutory appeal on this issue of excuse of performance. (App. 341-48, R.Doc. 499 at 20:13-27:13.)

The Court's decision meant that the Foundation Parties could not have prevailed against BAPTKO by way of excused performance since there was already a determination that the Foundation Parties breached because a party that is excused from performing cannot be liable for their non-performance. BAPTKO breached the contract prior to the Closing, and the Foundation Parties' contractual duties never became due because of BAPTKO's prior material breaches excusing performance— meaning they never breached the APA with BAPTKO. The district court failed to cure this inconsistency on reconsideration and only entered final judgment on the morning of trial—moments before *voir dire* began. This procedural timing materially prejudiced the Foundation Parties' ability to prepare and present their defense, undermining fundamental fairness.

By ignoring the Excuse of Performance Defense, the district court deprived Appellants of their right to present a central theory of non-liability. The Foundation Parties preserved their defense in their pleadings and summary judgment submissions. BAPTKO never moved to dismiss or strike the defense. The district court's failure to even acknowledge it, let alone address the underlying facts, was

39

not harmless oversight—it was reversible procedural error.

**F.    The District Court Improperly Imposed Joint Liability Without Determining the Liable Party.**

The APA named "Foundation Automotive Corp. or its permitted assigns" as the Buyer. The record did not establish, however, whether FA-CHEV or FA-SUB assumed liability for the Earnout. Yet, the district court's judgment holds the Foundation Parties jointly and severally liable without any analysis to support imposing liability on FA-CHEV and FA-SUB.

The district court did not make a definitive finding on assignment in prior orders. It merely noted BAPTKO had stated a plausible claim (App. 265-67, R.Doc. 40 (No.00183) ¶¶ 17-22) and broadly stated that Foundation assigned "rights and obligations" without clarifying if that included the Earnout (App. 2027, R.Doc. 373 at 2, Add. 2). The plain language of the Assignment and Assumption Agreements creates ambiguity about whether FA-CHEV or FA-SUB assumed any obligation to make Earnout payments. Such contract ambiguity requires factual resolution at trial—not judicial imposition of joint liability. *See Royal Indem. Co. v. Factory Mut. Ins. Co.*, 388 F. Supp. 2d 906, 915 (N.D. Iowa 2005).

In denying Appellants' renewed motion judgment as a matter of law, the district court noted that Appellants could not address the issue regarding BAPTKO's failure to prove which entity is obligated to pay under the Earnout provision because they did not raise this issue in their original motion. (*See* App. 2052-53, R.Doc. 544

40

at 4-5, Add. 61-62.) However, the Foundation Parties did not have the obligation to raise the issue at the close of their case because: (1) the district court had already entered judgment in favor of BAPTKO on its breach of contract claim during the pretrial conference; (2) Appellants did not carry the burden of proof on the issue of obligation to pay the Earnout under the APA; and (3) BAPTKO and Kupper had not yet presented their case to the jury.

Notably, the court could not justify imposing joint and several liability because no legal basis for doing so exists in these circumstances. Joint and several liability is only applicable in tort actions, and BAPTKO succeeded only on a contract-based claim. *See Johnson Lasky Kindelin Architects, Inc. v. United States*, 151 Fed. Cl. 642, 653 (Fed. Cl. 2020) ("[T]he concept of 'joint and several liability' is a standard tort doctrine, with no less than the United State[s] Supreme Court describing [the doctrine] as a 'creature of tort law.'" (*quoting Honeycutt v. United States*, 581 U.S. 443, 447 (2017))). Nowhere in its summary judgment briefing or during the trial did BAPTKO ask the court to hold Appellants jointly and severally liable. The district court erred by assigning collective liability without resolving the threshold question on joint and several liability under the contract.

## II. THE DISTRICT COURT UNFAIRLY PREJUDICED THE JURY AND DEPRIVED APPELLANTS A FAIR TRIAL.

It was clear, from the start of the trial, that the district court held animosity toward the Foundation Parties and their counsel. Indeed, upon counsel's express

position that Fed. R. Evid. 602 apply to witness testimony regarding exhibits, the district court responded:

> THE COURT: If you're going to get into that kind of monkey business in my courtroom, you're going to have a tough trial.
>
> MR. SHAFFER: And I do not intend to --
>
> THE COURT: If you're not going to stipulate to exhibits in that nature, it is not going to go well for you in your ruling – in my rulings. Do you understand me?

(App. 336-37, R.Doc. 499 at 15:25-16:6.) Trial transcripts demonstrate that just minutes into the first day of trial, the Foundation Parties found themselves on unequal footing with Kupper and BAPTKO in the eyes of the district court—which persisted for the duration of the proceedings. The result was a fundamentally inequitable trial environment. The district court allowed counsel for BAPTKO to state in front of the jury that the Foundation Parties had "breached" the APA and had judgment entered against them; inappropriately commented on witness credibility; made biased evidentiary rulings; and issued objectively erroneous jury instructions—and, in the process, deprived the Foundation Parties of a fair trial. Reversal for a new, fairly-conducted trial, is necessary.

### A. Standards of Review and Preservation of the Issues.

This Court reviews a district court's comments on witness credibility, evidentiary rulings, and jury instructions for abuse of discretion. *Reed*, 765 F.3d at 910; *Friedman*, 606 F.3d at 499. While district courts have discretion to assist the

42

jury through commentary on evidence and instructions on the law, that discretion is not unfettered. A district court may not "preclude a fair evaluation of the evidence by the jury." *Russell*, 966 F.3d at 722.

"The court has responsibility for directing the jury in matters of law, and may comment on the evidence to give appropriate assistance to the jury, so long as it does so fairly and impartially." *United States v. White*, 671 F.2d 1126, 1130 (8th Cir. 1982) (citation omitted). However, any comments made by the court should not "unfairly emphasize testimony nor add to or change the evidence given." *Ray v. United States*, 367 F.2d 258, 262 (8th Cir. 1966).

Because jurors "listen with particular interest and deference to the judge," courts must avoid any appearance of partiality. *Brandom*, 479 F.2d 835. Even a judge's "lightest word or intimation" may unduly influence the jury and, if it distorts the fact-finding process, constitutes reversible error. *Id.*; *United States v. Singer,* 710 F.2d 431, 436 (8th Cir. 1983).

The same caution applies to jury instructions: "A party is entitled to a jury instruction on its theory of the case if the instruction is both legally accurate and supported by the evidence." *Friedman*, 606 F.3d at 499.

These issues were preserved for appellate review when Appellants objected during the pre-trial hearing, (App. 327-48, R.Doc. 499 at 6:21-27:16); and, further, during trial—outside the presence of the jury—objected to the district court's

43

unexpected, improper comments, questioning, and hostility towards their witnesses, inmoving for a mistrial (App. 915-22, R.Doc. 502 at 594:25-601:4).

**B.      The District Court's Conduct Undermined the Impartiality of the Jury.**

From the outset of trial, the district court exhibited a pattern of hostility toward Appellants and their counsel. (*See, e.g.,* App. 336-37, R.Doc. 499 at 15:19-16:13 (suggesting if counsel did not stipulate to exhibits, that "it is not going to go well for you in . . . my rulings. Do you understand me?"); App. 346, R.Doc. 499 at 25:4-10 ("He [Kupper] starts with 3 million insofar as it gets reduced by . . . these various claims of him poaching your employees, which . . . good luck with that, because you know, based upon what I reviewed of the record, they're not very strong claims.").) *See Schultz v. Amick*, 955 F. Supp. 1087, 1102 (N.D. Iowa 1997) ("This court has given considerably more scrutiny to comments made by the trial judge prior to and during the trial than to comments made after the trial.").

That hostility extended to witnesses, particularly Foundation's corporate representative Derek Slemko. During questioning, the judge expressed overt frustration with Mr. Slemko, raising his voice and suggesting to the jury that Mr. Slemko was being evasive or dishonest. (*See* App. 818-20, R.Doc. 502 at 497:5–499:8.) Through Mr. Slemko, counsel for BAPTKO introduced certain CDK Authorization forms—documents not signed or executed by Mr. Slemko. (*See, e.g.,* App. 1695-96 (Ex.D523); App. 1697-98 (Ex.D524).) Nevertheless, the court

44

allowed BAPTKO to question Mr. Slemko at length on the meaning of the forms. (App. 758-66, R.Doc. 502 at 437:13–445:25.)

On redirect, Mr. Slemko attempted to clarify that Foundation did not have access to KCI's data prior to closing, consistent with the plain language of the authorization forms, which authorized CDK to begin a preparatory copy of data. Mr. Slemko testified that, to his knowledge, neither he nor Foundation had access to the data prior to closing. (App. 816-818, R.Doc. 502 at 495:7–497:2.) But instead of allowing the jury to assess the credibility of this testimony, the court seized questioning from counsel and pressed Mr. Slemko aggressively with confusing questions:

> THE COURT: Did you try to access the information?
>
> THE WITNESS: Me? Not me personally.
>
> THE COURT: Did anybody from Foundation attempt to access the information?
>
> THE WITNESS: I don't believe so.
>
> THE COURT: And so you did not know, and neither did Foundation, as to whether or not you could access the information when you signed the document here in this Kupper transaction?
>
> THE WITNESS: Others may – may have known the answer.
>
> THE COURT: **No. No. No. You. *What did you know? Answer my question*.**
>
> THE WITNESS: I – I didn't know.

45

(App. 819-20, R.Doc. 502 at 498:14-499:2 (emphasis added).) As is clear, Mr. Slemko was attempting, in good faith, to answer the court's questions, and, in fact, was doing so to the best of his ability. Unfortunately, however, the court refused to accept the testimony provided, and ultimately instructed the jury to disregard his testimony:

> And so, members of the jury, **they did not know whether or not they could access this information. You are to put out of your mind his testimony that he could not access the information because he didn't know it at the time.** You may proceed, Mr. Shaffer. ***Mr. Slemko, answer questions when you're asked.***

(App. 820, R.Doc. 502 at 499:3-8 (emphasis added).) This *sua sponte* instruction was a judicial credibility determination on a central factual issue—effectively eliminating Appellants' claims without evidentiary basis and misled the jury.

Notably, the court's instruction was not based in law, as the timing of when Mr. Slemko learned that Foundation could not access the CDK data pre-closing was inconsequential. The spectacle that opposing counsel and the court created with these CDK forms distracted the jury and improperly indicated that Foundation had a burden to discover the pre-closing wrongdoing and breaches of KCI and Kupper to avoid any damages. The APA and First Amendment, however, lead to the opposite conclusion even if Foundation accessed the CDK data before closing—which the documents and testimony demonstrate did not occur—Foundation would still have been required to move forward with the closing regardless of what the data would

46

have revealed because the Diligence Period had expired. (App. 1576 (Ex.P2) §5.1; App. 1637 (Ex.P4) §6.)

More concerning is that the court commandeered the jury's fact-finding function and impermissibly influenced its perception of witness credibility, precluding a fair evaluation of the evidence by the jury. The court's hostility was compounded by its misreading of the CDK Authorization forms—documents that plainly authorized CDK to initiate a data migration process—not the transfer of data control or access—in anticipation of the transaction closing—subject to clear conditions. The forms authorized only a "copy" of data to be prepared by CDK, stated that "original source data" would remain with the seller, and conditioned transfer on the occurrence of a closing. (App. 1695-96 (Ex.D523); App. 1697-98 (Ex.D524).) If the Transaction failed to close, CDK was obligated to destroy the data it copied from the seller.

Nevertheless, during Appellants' motion for directed verdict, the district court revealed its improper assumption that ultimately prejudiced the jury.

> THE COURT: . . . CDK is making the pledge, but obviously there's disclosure of information that will need to be deleted in the event that the sale does not occur. So there is some disclosure that has been made. Whether or not Foundation accessed it, I don't know. It appears that they didn't. But I think it's likely that they could have.
>
> The good news is this is very much a question not for me to answer. This is a question for the jury to answer[.]

(App. 1275, R.Doc. 504 at 954:18-25.) This *post hoc* assertion directly contradicted

the court's earlier instruction removing the issue from jury consideration. By first telling the jury to disregard Mr. Slemko's testimony, and then claiming the matter was for the jury, the court substituted its own reading for that of the jury, usurping the fact-finding function and preventing a fair trial. (App. 1275-76, R.Doc. 504 at 954:3-955:2.)

## C. The District Court Improperly Limited Evidence on Subaru Inventory.

The court also improperly curtailed Appellants' expert testimony regarding the damages caused by BAPTKO's failure to maintain inventory, ruling that Appellants failed to present sufficient evidence related to Subaru inventory—which occurred prior to Appellants resting their case-in-chief and during BAPTKO and Kupper's *Daubert* motion. (App. 840-57, R.Doc. 502 at 519:8-536:13; App. 808-11, R.Doc. 502 at 487:17-490:7; App. 851-52, R.Doc. 502 at 530:20-531:1 (stating "there is no evidence in the record establishing that Mr. Kupper had anything to do with the reduced inventory numbers at the Subaru store or that he took any actions to do so, similar to what you have with regard to the GM transactions").) This was error.

Kupper, as KCI's sole shareholder, officer, or director with decision-making authority, operated both the Chevrolet and Subaru dealerships under the corporation—combining inventory numbers for both dealerships in the monthly financial statements submitted to the corporate original equipment manufacturers.

48

(*See* App. 608-09, R.Doc. 500 at 287:11-288:17.) Kupper had complete control over both Subaru and Chevrolet operations and, accordingly, had the responsibility to ensure that KCI met the twelve-month rolling average standard in the APA. (App. 561, R.Doc. 500 at 240:8–23.)

The APA required KCI to maintain inventory, as a whole, based on a 12-month rolling average. (*See* App. 1576 (Ex.P2) §5.2.) The contract did not require Appellants to prove intent—only breach. The court's inquiry into whether Appellants had shown that Kupper intentionally suppressed Subaru inventory was legally erroneous and created an improper evidentiary barrier that severely undercut the expert's testimony and prejudiced their case. (*See* App. 809-810, R.Doc. 500 at 488:15-489:8 ("[Is there] any evidence that he was purposely reducing inventories at Subaru? We have 10 models basically of light-duty trucks that he didn't order from Chevy when it was offered. Do you have any similar evidence from Subaru?").)

### D. The Jury Instructions Misstated the Law.

The district court's jury instructions also prejudiced Appellants to a degree that requires reversal a new trial. Given the central importance of the issue to the case, the court's charge should have included language making it clear that if BAPTKO materially breached the APA, before any obligations under the Earnout provision became due, then Appellants were excused from further performance. (*See* App. 136, R.Doc. 454 at 33.) This is true both under common law, and the terms of

49

the APA. Instead, the district court provided the following instruction:

> [¶ 27] A party to a contract is not excused from performing its obligations . . . when the other party has substantially performed its obligations . . . . A party has substantially performed its obligations . . . when the essential purpose of the contractual performance is accomplished.

> [¶ 28] A party . . . is also not excused . . . when, after the other party has breached . . . , the non-breaching party subsequently performs an act indicating an intent to continue with the contract rather than ceasing or repudiating the contract. A party may waive a breach by another party and be liable for its own subsequent breach.

(App. 205, R.Doc. 487 at 16.) Not only is the instruction misleading, but it excluded a legally supported defense that, had it been credited, would have materially affected the verdict. *See Friedman*, 606 F.3d at 499 ("A party is entitled to a jury instruction on its theory of the case if the instruction is both legally accurate and supported by the evidence."); *Lincoln*, 825 F.3d at 463. (*See also* App. 167, R.Doc. 484 at 3 (objection to excuse of performance instruction).)

Moreover, the plain terms of the APA demanded the excuse of performance instruction. Here, the agreement expressly made performance of certain provisions material. Under longstanding contract principles, substantial performance does not suffice where the contract demands strict compliance. *See In re Gen. DataComm Indus., Inc.*, 407 F.3d 616, 623-24 (3d Cir. 2005); 15 WILLISTON ON CONTRACTS § 44:53 (4th ed. 2023) ("[I]f the terms of an agreement make full, strict, or literal performance an express condition precedent to recovery, substantial performance

50

will not suffice.").

**E. The District Court Prejudiced the Foundation Parties By Instructing the Jury and Allowing BAPTKO to Reference the Summary Judgment Order Entered Pre-trial.**

Further compounding its multiple errors, the district court allowed counsel for BAPTKO to indicate to the jury that the Foundation Parties had breached the APA, and had judgment entered against them. (App. 327-33, R.Doc. 499 at 6:21-12:4.) While this was in-and-of itself clear error, the court nevertheless indicated in its final instructions to the jury that Appellants had already "breached the contract by failing to pay $3 million of Earnout Payments to BAPTKO" and further, that BAPTKO was "entitled to prejudgment interest $362,716.19" (App. 207, R.Doc. 487 at 18). By facilitating the communication of this information to the jury from the beginning through the end of trial, the district court improperly communicated its summary judgment ruling to the jury, and, in the process, painted Appellants as the ultimate wrongdoers without the jury even having an opportunity to address the Foundation Parties' claims. (*See* App. 168-69, R.Doc. 484 at 4-5 (objection to instruction on BAPTKO's Earnout claim).) In short, the district court irreparably tainted and conditioned the jury against Appellants from the beginning to the end of trial, eliminating any chance for a fair evaluation of the Foundation Parties' affirmative claims, and, moreover, their excuse-of-performance defense. A new trial is necessary.

51

**F.    The Cumulative Effect of the District Court's Conduct Warrants Reversal and a New Trial.**

While some isolated rulings might appear minor, their cumulative effect deprived Appellants of a fair trial. Improper comments, sustained and overruled objections, and multiple *sua sponte* instructions harmed Appellants' presentation of evidence and credibility before the jury. (*See* App. 673-708, R.Doc. 501 at 352:1–353:24, 362:12–363:3, 383:22–387:21; App. 818-23, R.Doc. 502 at 497:3–499:8, 502:7–10.)

This is not a case of harmless error. The trial was fundamentally imbalanced and, as a result, Appellants were denied their right to a fair trial. Reversal ordering a new trial is warranted.

**III.    THE DISTRICT COURT ABUSED ITS DISCRETION IN AWARDING BAPTKO AND KUPPER COSTS AND ATTORNEYS' FEES.**

**A.    Standard of Review.**

This issue was preserved for review when the district court partially granted BAPTKO and Kupper's requests for bills of costs and attorneys' fees over Appellants' objections. (*See* App. 2034-48, R.Doc. 543, Add. 43-57.) This Court reviews orders awarding attorneys' fees and imposing costs for abuse of discretion. *EEOC v. CRST Van Expedited, Inc.*, 944 F.3d 750, 755-56 (8th Cir. 2019); *Marmo v. Tyson Fresh Meats, Inc.*, 457 F.3d 748, 762 (8th Cir. 2006).

Appellate Case: 25-1741    Page: 60    Date Filed: 07/25/2025 Entry ID: 5541516

## B. The Court Erred in Awarding Attorneys' Fees and Contractual Costs to Kupper.

The district court erred by awarding attorneys' fees and non-taxable expenses under the APA to Robert Kupper, who was not a signatory to that agreement. The APA expressly limits fee-shifting to "Parties," defined as the "Buyer" (Foundation Automotive Corp.) and "Seller" (Kupper Chevrolet, Inc.). (App. 1588 (Ex.P2) §9.7; App. 1562 (Ex.P2).) Kupper was defined separately as the "Seller Principal," and not as a "Party" entitled to enforce fee-shifting rights. (App. 1566 (Ex.P2) §3.2(d).) The district court's justification—that BAPTKO paid the fees on behalf of Kupper's defense and thus could recover them (App. 2041, R.Doc. 543 at 8, Add. 50)—improperly circumvented corporate separateness and sidesteps the plain language of the contract.

Compounding the error, the district court applied legal principles inconsistently across related rulings. Specifically, in its summary judgment order, the court held that BAPTKO could not be liable for Kupper's individual actions under the non-compete agreement because "all liability for breaching this provision falls to Kupper individually and not BAPTKO." (App. 2010, R.Doc. 373 at 19, Add. 19.) Additionally, in assessing responsibility for Subaru inventory declines, the court found insufficient evidence that Kupper bore responsibility—even though he was the sole shareholder with decision-making authority—despite now acknowledging the APA's definition of "Knowledge of Seller" included "Bob Kupper" individually.

53

(*See* App. 2056-57, R.Doc. 544 at 8-9, Add. 65-66; App. 2041, R.Doc. 543 at 8, Add. 50; App. 809-810, R.Doc. 500 at 488:15-489:8.)

These conflicting positions demonstrate an inconsistent application of the law on corporate separateness and undermine the legitimacy of awarding Kupper recovery under an agreement to which he was not a party. The Court should reverse.

C.    **The Court Erred in Awarding Cost for Expenses Outside § 1920 and Unnecessary Depositions.**

The district court's award of $166,956.79 in "contractual costs," including expert witness fees, process server charges, synchronization of video depositions, and vague "shipping and handling" fees, violates both the APA's fee-shifting limitations and federal cost recovery standards. (App. 2040, R.Doc. 543 at 7, Add. 49.) Most egregiously, a portion of this amount is allocated to costs incurred in the defense of Kupper—despite his status as a non-party to the APA. (App. 2046-47, R.Doc. 543 at 13-14, Add. 55-56.) As set forth above, the district court's previous holding that BAPTKO could not be liable for Kupper's individual breaches of the non-complete agreement is inconsistent with its order on costs. (*See* App. 2010, R.Doc. 373 at 19, Add. 19.) In the cost ruling, the court permitted BAPTKO to recoup contractual costs related to Kupper's defense, effectively collapsing their legal identities and disregarding the limits of the APA. This inconsistency demands reversal.

**D.     The Court Erred in Awarding Attorneys' Fees Based on Hypothetical Rates.**

Despite finding that the reasonable hourly rates in North Dakota ranged between $300–$400 for attorneys and $175 for paralegals, and that Kupper Parties' counsel actually charged those lower rates, the district court initially accepted the inflated $2,200,000 request. (App. 2043-44, R.Doc. 543 at 10-11, Add. 52-53.) Only after struggling to reconcile the fee figures and noting vague and inconsistent documentation did it impose a 10% blanket reduction. (App. 2045-46, R.Doc. 543 at 12-13, Add. 54-55.) This constitutes clear error. The lodestar method requires courts to multiply hours reasonably expended by actual, reasonable hourly rates—not inflated rates later justified retroactively. The award based on inconsistent and unclear records, followed by an arbitrary 10% cut, reflects a failure to exercise reasoned judgment. *See Hensley*, 461 U.S. 424; *Blum*, 465 U.S. 886.

## <u>CONCLUSION</u>

Based on the foregoing arguments and authorities, Appellants respectfully request that this Court reverse the district court's judgment and remand for further proceedings. If this Court does not reverse the judgment, Appellants respectfully request this Court vacate the order awarding attorneys' fees and costs.

Appellate Case: 25-1741     Page: 63     Date Filed: 07/25/2025 Entry ID: 5541516

Dated this 23rd day of July, 2025.

Respectfully submitted,

By: _/s/ Maxwell N. Shaffer_
Maxwell N. Shaffer, Esq.
Kensye N. Wood, Esq.
LELAND SHAFFER LLP
8694 E. 28th Avenue
Denver, Colorado 80238
(720) 556-1872
Maxwell.Shaffer@lelandshaffer.com
Kensye.Wood@lelandshaffer.com

*ATTORNEYS FOR APPELLANTS*

56

## CERTIFICATE OF COMPLIANCE

The undersigned attorney certifies that the foregoing brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32. The brief contains 12,993 words, proportionally spaced using Times New Roman, 14-point font. The brief was prepared using Word for Microsoft 365. The undersigned attorney also certifies that the brief and addendum have been scanned for viruses and, to the best of our ability and technology, believes it is virus-free.

DATED: July 23, 2025                    Respectfully submitted,

*/s/ Kensye N. Wood*
Attorneys for Appellants

Appellate Case: 25-1741    Page: 65    Date Filed: 07/25/2025 Entry ID: 5541516

## **CERTIFICATE OF SERVICE**

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure and Circuit Rule 25A(a), I hereby certify that on this 23rd day of July, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit through the Court's CM/ECF system. I further certify that all participants in the case are registered users of the CM/ECF, and that service will be accomplished by the CM/ECF system.

Respectfully submitted,

*/s/ Kensye N. Wood*
Attorneys for Appellants