No. 25-1741

# In the United States Court of Appeals For the Eighth Circuit

FA ND CHEV, LLC; FA ND SUB, LLC

*PLAINTIFFS – APPELLANTS*

BAPTKO, INC.

*PLAINTIFF – APPELLEE*

v.

ROBERT KUPPER; BISMARCK MOTOR COMPANY;
BMC MARINE, LLC, DOING BUSINESS AS MORITZ SPORT & MARINE

*DEFENDANTS – APPELLEES*

v.

FOUNDATION AUTOMOTIVE CORP., AN ALBERTA CORPORATION

*DEFENDANT – APPELLANT*

Appeal from the United Stated District Court for the District of North Dakota
No. 1:20-cv-00138-DMT-CRH  |  Honorable Daniel M. Traynor

**APPELLANTS' ADDENDUM**

# ADDENDUM TABLE OF CONTENTS

| ECF DOC. NO. | DOCUMENT | ADD. PG. NO. |
|---|---|---|
| R.Doc. 373 | Order Granting, in part, and Denying, in part, Motions for Summary Judgment | 1 |
| R.Doc. 386 | Order Denying Appellants' Motion to Reconsider and Granting Motion to Clarify Summary Judgment Order | 37 |
| R.Doc. 490 | Clerk's Original Judgment | 39 |
| R.Doc. 545 | Clerk's Amended Judgment of April 7, 2025 | 41 |
| R.Doc. 543 | Order Granting, in part, and Denying, in part, Kupper and BAPTKO's Request for Bill of Costs and Motion for Attorneys' Fees | 43 |
| R.Doc. 544 | Order Denying Appellants' Motion for Judgment Notwithstanding the Verdict and Motion for New Trial | 58 |

Dated this 23rd day of July, 2025.

Respectfully submitted,

By:   */s/ Maxwell N. Shaffer*
Maxwell N. Shaffer, Esq.
Kensye N. Wood, Esq.
**LELAND SHAFFER LLP**
8694 E. 28th Avenue
Denver, Colorado 80238
(720) 556-1872
Maxwell.Shaffer@lelandshaffer.com
Kensye.Wood@lelandshaffer.com

*ATTORNEYS FOR APPELLANTS*

ii

Appellate Case: 25-1741     Page: 2     Date Filed: 07/25/2025 Entry ID: 5541519

# CERTIFICATE OF COMPLIANCE

Pursuant to Circuit Rules 28A(g) and 28A(h), I hereby certify that the textual portion of Appellants' Addendum is in 14-point Times New Roman font and, excluding the district court's orders on appeal, does not exceed 15 pages, and that an electronic file of Appellants' Addendum has been submitted to the Clerk via the Court's CM/ECF system. The file has been scanned for viruses and is virus-free.

DATED: July 23, 2025     Respectfully submitted,

         */s/ Kensye N. Wood*
         Attorney for Appellants


# CERTIFICATE OF SERVICE

I hereby certify that on this 23rd day of July, 2025, I electronically filed a copy of the foregoing **APPELLANTS' ADDENDUM** with the Clerk of the Court through the Court's CM/ECF system. I further certify that all participants in the case are registered users of the CM/ECF, and that service will be accomplished by the CM/ECF system.

         Respectfully submitted,

         */s/ Kensye N. Wood*
         Attorney for Appellants

Appellate Case: 25-1741  Page: 3  Date Filed: 07/25/2025 Entry ID: 5541519

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA

FA ND Chev, LLC, and
FA ND Sub, LLC,

                         Plaintiffs,

vs.                                                    Case No. 1:20-cv-00138

Robert Kupper; Bismarck Motor Company;
and BMC Marine LLC, d/b/a Moritz Sport &
Marine,

                         Defendants.

---

**ORDER GRANTING BISMARCK MOTOR COMPANY'S AND BMC MARINE LLC, D/B/A MORITZ SPORT & MARINE'S MOTIONS FOR SUMMARY JUDGMENT; AND GRANTING, IN PART, AND DENYING, IN PART ROBERT KUPPER'S AND BAPTKO, INC.'S MOTIONS FOR SUMMARY JUDGMENT**

---

## INTRODUCTION

[¶1]    THIS MATTER comes before the Court on several Motions for Summary Judgment. FA ND Chev v. Robert Kupper, case number 1:20-cv-00138 ("Lead Case") has been consolidated with BAPTKO, Inc. v. Foundation Automotive Corp., case number 1:21-cv-00183 ("Consolidated Case). Doc. No. 218. Motions relating to both cases have been filed and are disposed of herein.

[¶2]    In the Lead Case, Defendant Bismarck Motor Company ("BMC") filed a Motion for Summary Judgment on January 13, 2023. Doc. No. 163. Plaintiffs FA ND Chev and FA ND Sub. (collectively "FA Plaintiffs") filed their Response on March 27, 2023. Doc. No. 200. BMC filed its Reply on April 14, 2023. Doc. No. 212. Defendant BMC Marine, LLC, d/b/a Moritz Sport & Marine ("Moritz Sport") filed a Motion for Summary Judgment on April 10, 2023. Doc. No. 204. Plaintiffs filed their Response on May 23, 2023. Doc. No. 224, 265. Moritz Sport filed its Reply

-1-

**ADD-1**

on June 20, 2023. Doc. No. 243. Defendant Robert Kupper ("Kupper") filed a Motion for Summary Judgment on April 10, 2023. Doc. No. 205. Plaintiffs filed a Response on May 24, 2023. Doc. No. 226. Kupper filed a Reply on June 20, 2023. Doc. No. 238.

[¶3]     In the Consolidated Case, BAPTKO filed a Motion for Summary Judgment on January 18, 2024. Doc. No. 356. The Consolidated Case Defendants, Foundation Automotive, Inc., FA ND Chev, LLC, FA ND Sub, LLC (collectively with the lead case Plaintiffs, "Foundation Parties"), filed a Response on February 15, 2024. Doc. No. 363. BAPTKO filed a Reply on March 14, 2024.

[¶4]     For the reasons set forth below, BMC's Motion for Summary Judgment is **GRANTED**; Moritz Sport's Motion for Summary Judgment is **GRANTED**; Kupper's Motion for Summary Judgment is **GRANTED, in part, and DENIED, in part**; and BAPTKO's Motion for Summary Judgment is **GRANTED, in part, and DENIED, in part.**

**<u>BACKGROUND</u>**

[¶5]     The facts are taken in the light most favorable to the Foundation Parties as the non-moving parties. See <u>Van Dorn v. Hunter</u>, 919 F.3d 541, 544 (8th Cir. 2019).

### I.   The Asset Purchase Agreement

[¶6]     For several years, Kupper Chevrolet, Inc. ("KCI"), whose principal owner was Robert Kupper, owned one Chevrolet and one Subaru dealership in Mandan, North Dakota. Kupper also had an ownership interest in BMC. On November 28, 2018, KCI[1] and Foundation Automotive Corp. ("Foundation") entered into an Asset Purchase Agreement ("APA"). Doc. No. 44-1. The APA was signed by Kupper on behalf of KCI. Id. The APA contemplated KCI would sell both the Chevrolet and Subaru dealerships and substantially all their assets to Foundation. Id. at pp. 1-2. Foundation subsequently assigned its rights and obligations under the agreement to the two named

---

[1] There is no dispute BAPTKO is KCI's successor in interest.

Plaintiffs, FA ND Chev and FA ND Sub.[2] <u>See</u> Doc. Nos. 44-3, §§ B-C & §§ 1-2; 44-4, §§ B-C, §§ 1-2.

[¶7]    Several aspects of the APA are relevant here. At closing, Kupper in his individual capacity agreed to execute a non-compete, non-solicitation and no-hire agreement. Doc. No. 44-1, p. 5, § 3.2(d). At closing on June 21, 2019, Kupper, acting in his individual capacity, executed the Non-Competition and Non-Solicitation Agreement ("NCNSA"). Doc. No. 3-1. Kupper agreed he would not own another car dealership within 93 miles except he could maintain his ownership interest in BMC and he could own an interest in outdoor recreational vehicle dealerships. <u>Id.</u> at pp. 2-3, ¶ 2(a). Kupper was also prohibited from soliciting or recruiting employees from his former dealerships who still worked at those dealerships. <u>Id.</u> at ¶ 2(b).

[¶8]    In the APA, KCI (now BAPTKO) represented they would disclose employee bonus schedules concerning its employees as of September 30, 2018. Doc. No. 44-1, p. 7-8, § 4.1(f). In the time between the effective date (November 28, 2018) and closing date (June 21, 2019) KCI agreed it "shall keep all ratios, including, but not limited to inventory levels, in accordance with a 12-month rolling average." Doc. No. 44-1, p. 15, § 5.2. The Parties agreed to hold the APA in confidence after the effective date. Doc. No. 44-1, p. 21-22, § 5.14. The Parties could, however, disclose (1) a transaction was occurring without disclosing any of the specific details, (2) public information that was lawfully acquired from sources not prohibited from disclosing such information. <u>Id.</u>

---

[2] In these consolidated cases, the Court will refer to "FA Plaintiffs" when discussing the Lead Case Plaintiffs. Foundation, FA ND Chev and FA ND Sub, as Defendants in the Consolidated Case will be referred to as the "Foundation Parties." Occasionally, when the claims overlap, they will be referred to as the "Foundation Parties" as well.

**ADD-3**

[¶9]    KCI and Foundation entered into a First Amendment to the APA ("First Amendment") that was executed on May 1, 2019, but was "made and entered into effective as of the 27th day of January, 2019." Doc. No. 44-2, p. 1. Under the First Amendment, KCI was entitled to receive $750,000 per year (what the First Amendment called the "Base Earn Out Amount") when Foundation's dealerships reached the threshold target of $2,500,000 for a calendar year. Id., p. 1, § 3(d). In the event the Foundation dealerships reached $6,000,000 or more, KCI would receive fifty percent (50%) of the amount that exceeds $6,000,000 (what the First Amendment calls the "Additional Earn Out Amount"). Id. If Foundation did not meet the threshold amounts, KCI was not entitled to any "earn out amount". Id. at p. 2, § 3(e). The First Amendment also indicated the diligence period had ended on the "date hereof" or May 1, 2019, and Foundation was satisfied with the results of its diligence review. Id. at p. 3, § 6.

## II. Kupper's Alleged Recruitment Efforts of Plaintiffs' Employees

[¶10]    The Complaint in the Lead Case specifically alleges Kupper was involved in recruiting nine of the FA Plaintiffs' employees after closing the sale of the dealerships to the Foundation Parties:

   a.   The second top salesperson at the Chevrolet dealership—Preston Englehard;

   b.   The parts manager at the Chevrolet dealership—Todd Laframboise;

   c.   The controller for the Chevrolet and Subaru dealerships—Kelsey Hanson;

   d.   A technician at the Chevrolet dealership—Chris Helbing;

   e.   The marketing manager for the Chevrolet and Subaru dealerships—Shaneille Ulmer;

   f.   A parts clerk at the Chevrolet dealership—Gerard Leingang;

   g.   A sales consultant at the Chevrolet dealership—Erik Olson;

   h.   The service manager for the Subaru dealership—Jordan Williams; and

-4-

**ADD-4**

i.   A technician at the Subaru dealership—Michael Peterson.

Doc. No. 3, ¶ 35; see also Doc. No. 166-3. Through discovery, additional employees were allegedly recruited by Kupper to leave Plaintiffs' dealerships to work for one of the Defendants: Nathan Gosser, Ben Dingus, Justin Rambur, Shane Hill, Dan Yushta, Rodney Sandvig, Ryan Schulte, Blake Malo, Kaitlyn Paulson, Mario Hernandez, Dale Vincent, and Kasey Weber. Doc. No. 255-9, pp. 13-14. The FA Plaintiffs now contend Kupper was directly involved in recruiting six individuals: (1) Kelsey Hanson ("Hanson"), (2) Justin Rambur ("Rambur"), (3) Shane Hill ("Hill"); (4) Shanielle Ulmer ("Ulmer"); (5) Todd Laframboise ("Laframboise"); and (6) Rodney Sandvig ("Sandvig"). Doc. No. 265, pp. 19-28.

**A.  Kelsey Hanson**

[¶11]   Hanson was the controller for Plaintiffs' dealerships when Kupper owned the business and continued to work there after Kupper sold the dealerships to the Plaintiffs. See Doc. No. 241, p. 1, ¶ 3 (indicating she was controller from December 2015 to January 7, 2020). In October 2019, Kupper sent a message to Hanson asking her, "[w]ould you work for me in a different industry as long as you were accountant??" Doc. No. 264-4, p. 3. Hanson indicated she was interested in leaving work for Plaintiffs and that she "would love to have a different opportunity and work for [Kupper] again." Id. at pp. 3-4. Kupper told Hanson he was working on another deal and wanted Hanson as his accountant. Id. at p. 4. Hanson replied, "I trust you! I'm in." Id. This meant Hanson would go work for Defendant Moritz Sports if offered the position. Doc. No. 249-7, pp. 34:25-35:23. Hanson's quitting at the Plaintiffs' dealerships was timed so she could immediately begin working for Defendant Moritz Sports. Id. at 152:7-18. At Kupper's suggestion, after she quit Hanson emailed Kevin Kutschinski ("Kutschinski")—Foundation's CEO—for permission to work

**ADD-5**

at BMC and Moritz. Doc. No. 264-6, p. 2. Kutschinski gave Hanson permission, albeit without knowing of Kupper's involvement in Hanson leaving. Doc. No. 255, p. 16:9-13.

### B. Justin Rambur

[¶12]   Rambur was the general manager of the FA Plaintiffs' dealerships when Kupper owned them and continued as the general manager under FA Plaintiffs' ownership. Doc. No. 200-3, pp. 11:16-25, 15:18-23. Around February 2020, FA Plaintiffs intended to put Rambur through a management training program with the intent to promote him to operations manager. Doc. Nos. 259-3, pp. 127:15-24, 240:24 – 241:8; 270-5, pp. 29:16 – 31:4. The plan was for Rambur to replace Terry Weszner ("Weszner") who was recently promoted to operations manager. See Doc. No. 259-3, pp. 127:15-24, 240:24 – 241:8; Doc. No. 106, p. 11:9-20. Before going through with this plan, Kutschinski discussed the potential plan with Kupper. Doc. No. 270-5 p. 31:5-21. Kupper said Rambur was not ready to be operations manager, but Weszner was a good fit. Id. The FA Plaintiffs later learned Kupper and Chris Schneider ("Schneider") were soliciting Rambur to work at BMC or Moritz Sport. Id. at 32:1-12. Schneider is BMC's general manager. Doc. No. 226-2, p. 20:13-15.

[¶13]   In the morning of February 7, 2020, Kupper and Rambur were communicating about employment with either BMC or Moritz Sport. Doc. No. 255-1, pp. 186:22 – 191:19. After the conversation, Kupper texted Schneider several items: (1) Rambur wanted to visit around 9:00 a.m. that morning; (2) Rambur's monthly household expense was $8,000; and (3) Rambur would like a couple weeks of vacation, which Rambur would not take from March to September. Doc. No. 200-2, pp. 21-22. That morning Kupper, Schneider, and Rambur had a three-way conversation to further discuss Rambur coming to work at either BMC or Moritz Sport. Doc. No. 255-1, p. 192:1-7. Rambur was assured he would have a job at either dealership if he wanted. Doc. No. 200-3, p.

55:1-19. Hours after this conversation, Rambur resigned as general manager effective immediately. Doc. No. 200-3, pp. 52:8-22, 156:6-19. At the time of his resignation, Rambur told Kramer he had a job with Kupper. Doc. No. 255-3, p. 128:7-12.

[¶14]   Following Rambur's resignation, he had further discussions with Kupper about different job positions at Moritz Sport that were available. Doc. No. 200-3, p. 56:16-24. On February 19, 2020, Kupper and Schneider discussed hiring Rambur because they had not heard back from Kutschinski regarding permission to hire Rambur. Doc. No. 200-2, p. 23. Kupper informed Schneider that if Kutschinski declined their request to hire Rambur at Moritz Sport, they would just hire Rambur for BMC. Id. Without knowing the discussions that occurred between Kupper, Schneider, and Rambur; Kutschinski gave Moritz Sport permission to hire Rambur. Doc. No. 255, p. 83:13-16. Rambur joined Moritz Sport in February 2020. Doc. No. 200-3, pp. 42:2-6, 72:2-8.

### C.  Shane Hill

[¶15]   Hill was the Mandan Chevrolet dealership's new car sales manager. Doc. No. 166-3. While still employed by FA Plaintiffs, Schneider hinted to Hill on September 7, 2019, that Hill could come work for BMC if Hill's issues with the FA Plaintiffs did not resolve. See Doc. No. 226-10, p. 3 (text message from Schneider to Hill saying, "You are great at what you do. Don't let them effect your performance so you end up being avg. [Y]ou will end up disappointed in yourself not them. If it doesn't work with you trying[,] we know what we can do."). On September 11, 2019, Schneider texted Kupper they "could grab Shane [Hill] and [J]ay if available." Doc. No. 226-11, p. 2. On November 14, 2019, Hanson texted Kupper the FA Plaintiffs had just fired Hill. Doc. No. 200-4, p. 2. Kupper responded he "just talked to [Hill]" and "Hill will] b[e] fine. He is now an employee of Bismarck [M]otor [C]ompany. Or he will be as soon as Chris calls him." Id. at p. 3. Alex Nowicki, General Motors' district manager assigned to the Mandan Dealerships, indicated

**ADD-7**

people in the industry believed Hill left employment with the Plaintiffs because he wanted to go work for Kupper. Doc. No. 200-5, pp. 39:15 – 41:13.

### D. Shanielle Ulmer, Todd Laframboise, and Rodney Sandvig.

[¶16]   According to Charles Kramer ("Kramer")—COO of Foundation—on the day Ulmer quit working for FA Plaintiffs, she and Schneider had been talking and Schneider offered her a position to work with Kupper. Doc. Nos. 255-3, p. 15:22 – 16:7; 270-1, p. 57:6 – 58:3. Ulmer allegedly told Kramer she met with Schneider, Schneider's wife, and Kupper and they all "felt it was better that she would be more in a comfortable environment." Doc. No. 270-1 at p. 59:7-11. Ulmer told Kramer that Kupper initiated the conversation to have Ulmer work for BMC. Id. Ulmer told all this information to Kramer after she quit working for FA Plaintiffs. Id. at p. 138:7 – 139:5. Kramer claimed Laframboise told him Kupper approached Laframboise to work at BMC, saying Laframboise needed to work for Schneider. Id. at 63:6-19. Kramer also indicated Sandvig told him Kupper approached Sandvig several times to work for BMC and he had already been offered a job when FA Plaintiffs terminated Sandvig's employment. Id. at 74:11 – 76:8.

### III.   Kupper's Statements About Plaintiffs

[¶17]   FA Plaintiffs point to three instances of "defamatory" statements. First, after Kupper sold the Dealerships to FA Plaintiffs, Kramer and Kutschinski heard from other individuals that Kupper told several of FA Plaintiffs' employees that Plaintiffs' management team was "a bunch of idiots" who did not know how to run a dealership and they were running the Mandan Dealerships into the ground. Doc. No. 259-3, pp. 62:18 – 63:5, 194:14 – 195:3; 203:5 – 206:6. After Foundation and the FA Plaintiffs acquired the Dealerships, Kupper showed up at the Dealerships asking loudly on the showroom floor, "which of you is getting fired next?" Doc. No. 255, pp. 106:4-18, 121:5-21. Finally, either at or near closing, Kupper allegedly said "he was going to wait for Foundation to

-8-

**ADD-8**

fail and then buy the [D]ealerships back for pennies on the dollar." Doc. No. 249, pp. 120:10 – 122:21.

## IV. Kupper's Alleged Accesses Plaintiffs' Information

[¶18]  As part of the APA, KCI's files were transferred to Foundation and the FA Plaintiffs. Doc. No. 44-1, p. 49, § M. KCI retained the right to request those records. Id. Kupper submitted an affidavit indicating he was and still is entitled to the FA Plaintiffs financial statements to determine what earn out payments are due to BAPTKO. Doc. No. 240, pp. 2-3, ¶ 9. On September 11, 2019, Kupper texted Kutschinski he did not need monthly financial statements. Doc. No. 240-1, p. 1. Kutschinski indicated it has always been his intention to send a monthly statement. Id. at p. 2. Kupper indicates he sent the message because Kramer was not providing him with the financial statements.

[¶19]  On September 30, 2019, Kupper sent Hanson a text message asking, "I'm CDK how do I see itemized of all charges to used unit in inventory[?]" Doc. No. 265-2, p. 2. In response, Hanson stated, "Click the pie thing. Click GL inquiry. On drop down select Control detail. Type stock number Hit view and it should be the data under either 24000 or 24100. Call if you need me to walk u thru it." Id. at pp. 2-3. Kupper replied, "Got it. Thanks." Id. at p. 3. CDK is a car dealership management system with numerous pods that allow the user to view data and analyze data, integrate customer information, leads, and opportunities. Doc. No. 226-12, p. 200:1-7. It also allows the user to communicate with the manufacturer on units sold, data, gross profits, and compare balance sheets with the capital standard. Id. at p. 200:8-11. It is the "lifeblood" of a dealership's data. Id. at p. 200:12-15. CDK is non-public. Id. at p. 200:16-21. CDK is also used by car dealerships nationwide, including by BMC. Doc. No. 241, p. 2, ¶ 6.

[¶20]   On November 13, 2019, Kupper texted Hanson, "Did foundation make any money last month??" Doc. No. 265-5, p. 2. Hanson responded, "$176k…but that includes some ebe$. Just between you and me tho right?" Id. Kupper replied, "[a]lways. Thanks." Id.

[¶21]   On November 25, 2019, Hanson texted Kupper saying she "[j]ust emailed [Kupper] the reports from October. Sorry it took me a while to get it to you!" Doc. No. 265-3, p. 2. She sent the report to Kupper's "Kupper properties" email from her personal gmail account. Id. at pp. 2-3.

[¶22]   Around December 9, 2019, Hanson again texted Kupper, "I printed those statements… I don't know if I want to leave them anywhere. Do you want to get them tomorrow? Or can I drop them off for you?" Doc. No. 265-4, p. 2. Kupper indicated he would get them the next day. Id.

[¶23]   On December 11, 2019, Hanson texted Kupper she was in a policy meeting discussing an 8-page policy and called them "ridiculous." Doc. No. 264-5, p. 2. She texted, "[t]hey are a joke! Their 'policies'…they are going to lose business." Id. Eventually, the text messages indicate Hanson showed Kupper the policies when she texted, "[p]lease [j]ust don't say anything about those policies to anyone till after I'm done." Id. at p. 4. Kupper responded, "Nope. Secret." Id.

V.   **Inventory, Bonuses, and Disclosure of Confidential Details**

[¶24]   Between the Complaint in the Lead Case and the Counterclaim in the Consolidated Case, the Foundation Parties allege (1) Kupper and/or BAPTKO or BAPTKO acting through Kupper improperly maintained inventory levels in accordance with the 12-month rolling average; (2) Kupper and/or BAPTKO failed to disclose the applicable bonus schedules as required by the APA or pay the accrued employee bonuses on the Closing Date; and (3) BAPTKO, through Kupper, improperly disclosed confidential information relating to the APA and First Amendment.

[¶25]   At the time of the contract closing in June 2019, Foundation acquired approximately 300 new vehicles from KCI. Doc. No. 257-1 (expert Ginger Knutsen deposition), p. 267:24. Ending in

June 2019, the previous year's twelve-month rolling average vehicles in the dealerships was 465. Id. at pp. 267:24-25. Foundation was, therefore, short approximately 165 vehicles based on the previous twelve-month rolling average as required under the APA. Id. at p. 268:1-2.

[¶26]   Derek Slemko ("Slemko"), as representative of Foundation, testified the bonuses were not included at closing. Doc. No. 249, pp. 65:21 – 66:24. In other words, Foundation did not have the bonus information stating what had been paid in 2018. Id. at p. 69:14-19. In fact, Slemko personally requested the payroll information from 2018 which should have included the bonuses. Id. at pp. 70:8 – 71:7. It was not until after closing that the Foundation Parties discovered KCI employees had been paid $183,700 in bonuses in 2018. Doc. No. 226-9, pp. 85:21 – 86:14; see also Doc. No. 363-6, pp. 2-15. Ultimately, Foundation had to pay $64,100 in bonuses for the year 2019. Doc. No. 249, p. 77:22-25.

[¶27]   On June 26, 2019, mere days after closing, Kupper emailed Schneider the Pre-Closing Purchase Price Allocation Statement signed by KCI and FA Plaintiffs. Doc. No. 363-7, pp. 1-7. Also included in this email was the "Funds Flow Memorandum." Id. at pp. 10-11. Each document details the specific payments made in the APA. Id. at pp. 2-11.

## V.   Earn Out Payments

[¶28]   It is undisputed that the earnout thresholds were met for 2020 and 2021. Doc. No. 297-10, pp. 198:2-8, 205:6-17 (Kutschinski's portion of deposition), 298:4 – 304:4 (Slemko's portion of deposition). The Foundation Parties indicate that, at the time briefing was finished, the annual review for 2023 was not complete and nothing was due at that time for 2023. See Doc. No. 363, pp. 41-42. Slemko in particular denies BAPTKO is entitled to the earnout due to the alleged breaches of the APA. Doc. No. 297-10, pp. 298:20 – 299:4, 303:11-20. Kutchinski also demurred, stating the Foundation Parties' preference was to defer to the APA and North Dakota law on the

**ADD-11**

impact of BAPTKO's alleged breaches on the earnout provision. Id. at 198:2-8, 205: 6-17, 266:16 – 267:9. The Foundation Parties have not paid BAPTKO any earnout payments. Id. at pp. 199:1 – 200:25, 305:1 – 306:25.

## DISCUSSION

### I. Summary Judgment Standard

[¶29]   The Court will grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). "An issue is 'genuine' if the evidence is sufficient to persuade a reasonable jury to return a verdict for the nonmoving party." Schilf v. Eli Lilly & Co., 687 F.3d 947, 948 (8th Cir. 2012) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). "A fact is material if it 'might affect the outcome of the suit.'" Dick v. Dickinson State Univ., 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting Anderson, 477 U.S. at 248). Courts must afford "the nonmoving party the benefit of all reasonable inferences which may be drawn without resorting to speculation." TCF Nat'l Bank, 812 F.3d at 707 (quoting Johnson v. Securitas Sec. Servs. USA, Inc., 769 F.3d 605, 611 (8th Cir. 2014)). "At summary judgment, the court's function is not to weigh the evidence and determine the truth of the matter itself, but to determine whether there is a genuine issue for trial." Nunn v. Noodles & Co., 674 F.3d 910, 914 (8th Cir. 2012) (citing Anderson, 477 U.S. at 249).

[¶30]   If the movant demonstrates the absence of a genuine issue of material fact, "[t]he nonmovant 'must do more than simply show that there is some metaphysical doubt as to the material facts,' and must come forward with 'specific facts showing that there is a genuine issue for trial.'" Torgerson v. City of Rochester, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986)). "Where the

-12-

**ADD-12**

record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Id. In this diversity action, the Court will apply the substantive law of North Dakota. Atkinson v. McLaughlin, 462 F.Supp.2d 1038, 1047 (D.N.D. 2006).

## II. Breach of Contract

### a. Legal Standards

[¶31]   It is well established a claim for breach of contract in North Dakota must meet three elements: "(1) the existence of a contract; (2) breach of the contract; and (3) damages which flow from the breach." Bakke v. Magi-Touch Carpet One Floor & Home, Inc., 2018 ND 273, ¶ 13, 920 N.W.2d 726. "The nonperformance of a contractual duty when it is due is a breach of contract." Three Aces Properties LLC v. United Rentals (North America), Inc., 2020 ND 258, ¶ 10, 952 N.W.2d 64. Under North Dakota law, the language of a contract controls when such language is clear, explicit, and free from absurdity. N.D.C.C. § 9-07-02. Contracts are interpreted to give effect to the mutual intention of the parties. N.D.C.C. § 9-07-03. "The whole of a contract is to be taken together so as to give effect to every part if reasonably practicable." N.D.C.C. § 9-07-06. To aid in that determination, "[e]ach clause is to help interpret the others." Id.

### b. Non-Solicitation Agreement

[¶32]   As an initial matter, Kupper and BAPTKO argue the restrictive covenant at Section 2(b)(iii) of the Agreement is void under N.D.C.C. § 9-08-06.[3] Kupper and BAPTKO also urge the Court to apply the previous version of this statute effective prior to August 1, 2019, which limited noncompetitive agreements to a city or county.

---

[3] Kupper also appears to argue Section 2(b)(iv) is void under N.D.C.C. § 9-08-06. Section 2(b)(iv), however, is not subject to review at this time because FA Plaintiffs' Complaint and the Foundation Parties' Counterclaim only allege a breach of contract for soliciting or inducing Plaintiffs employees to work for BMC or Moritz Sport. The Court will not opine on whether Section 2(b)(iv) is void under North Dakota law.

[¶33]   Prior to August 1, 2019, the version of N.D.C.C. § 9-08-06 limited the anti-competitive permission in situations such as here to a specific city or county or a part of each. See 2019 N.D. Laws, Ch. 87 (H.B. 1351) (noting the changes to Section 9-08-06 to be effective August 1, 2019). Effective August 1, 2019, after the closing on the APA in this case, Section 9-08-06 of the North Dakota Century Code states in relevant part:

> A contract by which anyone is restrained from exercising a lawful profession, trade, or business of any kind is to that extent void, except:
>
> 1. A person that sells the goodwill of a business and the person's partners, members, or shareholders may agree with the buyer to refrain from carrying on a similar business within a reasonable geographic area and for a reasonable length of time, if the buyer or any person deriving title to the goodwill from the buyer carries on a like business in that area.

[¶34]   Beginning with the public policy argument, this issue is controlled by Warner and Co. v. Solberg, 2001 ND 156, 634 N.W.2d 65 (2001). In Warner, the defendant entered into an employment agreement with plaintiff that included a restrictive covenant stating "The [defendant] will not solicit or seek to influence any other employee of the [plaintiff] to become directly or indirectly the employee or representative of any other insurance agency or insurance company." Id. at ¶ 11 (alterations added). The North Dakota Supreme Court concluded, "This prohibition is narrowly drawn to penalize only [the defendant's] actions of soliciting or influencing an employee to leave [the plaintiff] and come to work for [the competing insurance company] **and is not void as a restraint of trade**." Id. at ¶ 25 (emphasis added) (alterations added). Like the prohibition in Warner, Section 2(b)(iii) is narrow and only penalizes Kupper for his attempts to solicit FA Plaintiffs' employees. It does not prohibit any of FA Plaintiffs employees from working for Kupper. Rather, it only indicates Kupper will be in breach of contract if he induces or solicits FA Plaintiffs' employees to work for him. This is essentially the same agreement in Warner. Accordingly, Section 2(b)(iii) of the Agreement is not void as a restraint of trade. See id.

-14-

**ADD-14**

[¶35]   As for which version of Section 9-08-06 of the North Dakota Century Code applies, McKibben v. Grigg, 1998 ND APP 5, ¶¶ 10-11, 582 N.W.2d 669 (quoting 17A Am. Jur. 2d *Contracts* at pp. 402-406, 407 (1991)(footnotes omitted)), makes clear the law in effect at the time of contracting governs the interpretation of the contract. The nonsolicitation clause in the NCNSA contains no geographic limitation to Kupper's solicitation activities. See Doc. No. 3-1, p. 2, §2(b). The law in effect at the time, however, the Parties closed on the APA would have limited the scope of the NCNSA to Mandan or Morton County. See 2019 N.D. Laws, Ch. 87 (H.B. 1351) (noting the changes to Section 9-08-06 to be effective August 1, 2019). As discussed below, Kupper's solicitation of Kelsey Hanson and Justin Rambur would satisfy the geographic restrictions in Section 9-08-06 of the North Dakota Century Code in effect before August 1, 2019, because Kupper's acts were to solicit employees from the Mandan Dealerships, which were necessarily in Morton County, North Dakota.

[¶36]   As set forth in the Agreement, Kupper agreed to certain restrictive covenants. The relevant clause states:

> Section 2. Restrictive Covenants. As a material inducement for [FA Plaintiffs] to consummate the transactions under the Purchase Agreement, [Kupper] agrees that [Kupper] shall not, directly or indirectly:
>
> \*       \*       \*
>
> (b) For a period beginning on the date hereof and continuing through January 31, 2022, . . .(iii) solicit or otherwise induce to leave the employ of any Buyer [Plaintiffs] or its affiliates any employees or associates from the current Sellers [Kupper] or from any Buyer or its affiliates who will own and operate the Dealerships following Closing;
>
> \*       \*       \*

Doc. No. 3-1, pp. 2-3.[4]

[¶37]   FA Plaintiffs claim Kupper, and by necessity BAPTKO, solicited several of FA Plaintiffs' employees and induced them to leave working at the Dealerships and, instead, work for Kupper at BMC or Moritz Sport, specifically Kelsey Hanson, Justin Rambur, Shane Hill, Shanielle Ulmer, Todd Laframboise, and Rodney Sandvig.[5] Kupper argues there is no evidence to show he solicited or otherwise induced any of FA Plaintiffs' employees to work for him. Kupper and BAPTKO argue (1) there is no evidence Kupper solicited any of Plaintiffs employees and (2) this restrictive covenant does not apply to BAPTKO.

[¶38]   There is a factual dispute whether Kelsey Hanson was solicited by Kupper to work for him at either Moritz Sport or BMC. Text messages indicate Kupper was communicating with her about working for him "in a different industry as long as [she was] accountant." Doc. No. 264-4, p.3. Hanson indicated she was interested. Id. at pp. 3-4. They timed her quitting work for FA Plaintiffs so she could begin working at Moritz Sports immediately. Doc. No. 249-7, p. 152:7-18. Kupper disputes this. There is sufficient factual question regarding whether Kupper induced or solicited Kelsey Hanson to work for Moritz Sport. See Warner, 2001 ND 156 at ¶ 25 ("Warner alleges Solberg solicited Hilkerbaumer to leave Warner and come work for her at Vaaler. Solberg

---

[4] Throughout briefing, Kupper combines Section 2(b)(iii) with Section 2(b)(iv), which provides Kupper could not "hire any employees or associates from the current Sellers [Kupper] from any Buyer [FA Plaintiffs] or its affiliates who will own and operate the Dealerships following Closing unless approved by the Buyers [FA Plaintiffs]." Doc. No. 3-1, p. 3. The Lead Case Complaint alleges Kupper breached the Agreement by soliciting or inducing Plaintiffs' employees to leave their work with FA Plaintiffs. It does not allege Kupper hired certain individuals without FA Plaintiffs' permission. This clause is inapplicable to Claim One.

[5] FA Plaintiffs also claim Gerard Leingang and Erik Olson may have been solicited by Kupper. The evidence FA Plaintiffs rely on, however, shows (1) Leingang approached Kupper seeking employment after he was terminated from the Mandan Chevrolet and (2) Erik Olson approached the Moritz Sport sales manager, Jordan Bosch, looking for employment. The first fails because Leingang allegedly approached Kupper and the second fails because no evidence supports the contention Olson sought employment from Kupper.

maintains Hilkerbaumer contacted her about a possible position at Vaaler and independently decided to come work for Vaaler. The fact question remains if Solberg solicited Hilkerbaumer in violation of Paragraph 6(c) of the agreement.").

[¶39]   There is also a factual dispute whether Kupper solicited Justin Rambur to work for BMC or Moritz Sport. There is evidence that suggests Kupper and Rambur had a conversation about Rambur's needs if he were to work for Kupper at BMC or Moritz Sport prior to Rambur leaving FA Plaintiffs employment. Doc. No. 153-4, pp. 186:22 – 191:19; Doc. No. 200-2, pp. 21-22; Doc. No. 153-4, p. 192:1-7; Doc. No. 200-3, p. 55:1-19.  It was only after these conversations that Rambur quit work for FA Plaintiffs. Doc. No. 200-3, pp. 52:8-22, 156:6-19; see also Doc. No. 203-2, p. 128:7-12 (at the time of his resignation, Rambur indicated he had a job with Kupper). Kupper disputes this. There is a sufficient factual question about whether Kupper solicited Rambur to work for BMC or Moritz Sport in violation of Section 2(b)(iii) of the Agreement. See Warner, 2001 ND 156 at ¶ 25.

[¶40]   There is no factual dispute Kupper was involved in soliciting or inducing Shane Hill to leave working for FA Plaintiffs. The evidence provided by Plaintiffs only suggests Schneider was in communication with Hill prior to Hill being fired by Plaintiffs. Doc. No. 226-10, p. 3 (text message from Schneider to Hill regarding Hill's current employment). Schneider then indicated to Kupper that they "could grab Shane and [J]ay if available." Doc. No. 226-11, p. 2. Only after learning FA Plaintiffs fired Hill did Kupper discuss with Hill about him working with Kupper's dealerships. See id. There is no evidence of Kupper inducing Hill to leave FA Plaintiffs' employment.  There is only evidence Schneider communicated with Hill during the time of this

Appellate Case: 25-1741     Page: 20     Date Filed: 07/25/2025 Entry ID: 5541519

employment. Accordingly, FA Plaintiffs have failed to establish Kupper breached the Section 2(b)(iii) of the Agreement relating to Hill.[6]

[¶41]   As for Shanielle Ulmer, Todd Laframboise, and Rodney Sandvig, FA Plaintiffs only point to the deposition testimony of Charles Kramer who claimed (1) Ulmer told him she had met with Schneider, Schneider's wife, and Kupper to discuss leaving FA Plaintiffs employment to work for Kupper; (2) Laframboise told him Kupper approached Laframboise to work for him; and (3) Kupper approached Sandvig several times to convince him to work for Kupper. Kupper objects to this as inadmissible hearsay. FA Plaintiffs fail to appropriately support these claims. Each piece of evidence they offer is inadmissible hearsay—that is, information Kramer allegedly heard third-hand from another individual. Fed. R. Evid. 801(c) (defining hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement"). This is especially pertinent because Ulmer, Laframboise, and Sandvig do not claim Kupper solicited or induced them to leave working for Plaintiffs. Doc. No. 168-4, pp. 85:7-23 (noting the decision to leave FA Plaintiffs was only Ulmer's and no one else influenced that), 88: 15 – 89:5 (Ulmer indicating she would text with Kupper approximately once a week to discuss "[h]ow he's doing, life, kids"); Doc. No. 168-2, pp. 50:15 – 51:9 (Laframboise indicating he did not recall talking to Kupper prior to leaving Plaintiffs except for the occasional greeting); Doc. No. 255-11, p. 153:17-23 (Sandvig indicating Kupper did not solicit or induce him to leave working for Plaintiffs). Accordingly, Plaintiffs have failed to

---

[6] Plaintiffs claim Hill's efforts to recruit Engelhard and Dingus evince Kupper's recruitment of Hill. This is beside the point. Hill is not a party to this case. There is simply no evidence Kupper personally recruited Hill. The only evidence Plaintiffs point to in the record is a conversation between Kupper and Hill that occurred after Plaintiffs terminated Hill. This only shows Kupper solicited employment of a former employee of Plaintiffs' dealerships. As such, there is no genuine dispute of material fact that Kupper did not recruit Hill while Hill was an employee of Plaintiffs. The evidence only shows Kupper recruited Hill after he was terminated.

establish a factual question appropriate for consideration by the jury regarding Ulmer, Laframboise, and Sandvig. <u>Walker v. Wayne Cnt'y, Iowa</u>, 850 F.2d 433, 434-35 (8th Cir. 1988) ("When ruling on a summary judgment motion, the district court may consider only the portion of the submitted materials that is admissible or useable at trial. Thus, without a showing of admissibility, a party may not rely on hearsay evidence to support or oppose the motion." (internal citations omitted)).

[¶42]   As to the restrictive covenant's application to BAPTKO, the Court agrees it is limited to Kupper's activities and excludes BAPTKO from liability. The NCNSA is plainly between the FA ND Plaintiffs and Kupper in his individual capacity. Doc. No. 3-1, p. 2. Likewise, the signature block indicates Kupper was "the individual" in signing and it noted he signed it "individually." <u>Id.</u> at 1, 7. Under the plain terms of this non-solicitation agreement, there was no corporate responsibility assigned to BAPTKO under this agreement. All liability for breaching this provision falls to Kupper individually and not BAPTKO. Accordingly, the Foundation Parties' Counterclaim in this respect as alleged in the consolidated case fails.

[¶43]   Plaintiffs' claims that Kupper solicited or induced Hanson and Rambur have sufficient factual dispute for a jury to decide. As to Hill, Ulmer, Laframboise, and Sandvig, the undisputed facts show Kupper did not solicit those individuals and Count One – Breach of Contract – with respect to them fails. Accordingly, Kupper's Motion for Summary Judgment on Count One in the Lead Case is **GRANTED, in part, and DENIED, in part**. BAPTKO's Motion for Summary Judgment on the Breach of Contract Counterclaim in the Consolidated Case as it relates to its liability under the non-solicitation restrictive covenant is **GRANTED**.

### c.   Non-Compete Agreement

[¶44]   The Counterclaim in the Consolidated Case alleges BAPTKO breached the NCNSA because Kupper exercised meaningful control over BMC by continuing to purchase used vehicles for BMC and engaging in recruiting and hiring decisions for the company after he sold his ownership interest in BMC. This claim necessarily fails as a matter of law. First, as discussed above, BAPTKO was not a party to the NCNSA. Doc. No. 3-1, pp. 2, 7. Further, even if BAPTKO was a party, the agreement specifically states the restrictive non-compete clause at Section 2(a) does not apply to "(iii) [Kupper's] ownership in Bismarck Motor Company, a North Dakota corporation ("Bismarck"), with respect to the operations of Bismarck as conducted on the Effective Date." Id. at p. 3. The NCNSA specifically exempts Kupper's role at BMC from the non-compete clause. Even if BAPTKO was a party to the NCNSA, Kupper would nevertheless be free to continue his work for BMC.

[¶45]   Accordingly, BAPTKO's Motion for Summary Judgment on the Counterclaim in the Consolidated Case as it relates to BAPTKO's alleged liability for breach of contract due to Kupper's continued role at BMC is **GRANTED**.

### d.   Kupper's Alleged Failure to Maintain Inventory Levels

[¶46]   The Foundation Parties' Counterclaim in the Consolidated Case alleges BAPTKO breached the APA by "failing to maintain inventory levels in accordance with a 12-month rolling average during the period between the effective date of the APA and Closing Date, and otherwise materially changing the customary or historic operations methods relating to maintaining inventories during this timeframe." Case No. 1:21-cv-183, Doc. No. 43, ¶ 41 (filed Sept. 26, 2022). BAPTKO argues the Foundation Parties have waived this argument by signing off on the satisfaction of diligence clause of First Amendment. The Foundation Parties argue there is

evidence to show they received less inventory than the twelve-month rolling average under the APA and First Amendment.

[¶47]   The APA required KCI to keep inventory at the twelve-month rolling average at the time of sales. Doc. No. 44-1, p. 15, § 5.2. In other words, the inventory to be handed over to Foundation should have been in line with that rolling average at the time of closing. The Parties argue at length about various aspects of the inventory. Relevant to this decision, the Foundation Parties have established a genuine issue of material fact for the jury to resolve this claim. There is evidence showing the Foundation Parties did not receive the May 2019 inventory lists until after closing. Doc. No. 297-10, p. 248:1-7. Without the report, there was no way for the Foundation Parties to have the ability to verify the inventory at closing. Expert Ginger Knutsen testified in her deposition that the average twelve-month rolling average of inventory at the KCI Dealerships in the year preceding closing was 465 vehicles. Doc. No. 257-1, p: 267:24-25. However, when Foundation acquired the KCI dealerships, they inherited approximately 300 new vehicles. Id. at 267:24. This is 165 fewer vehicles than under the rolling average. Id. at p. 268:1-2. This is sufficient to give rise to a factual dispute to be resolved by the jury.[7]

[¶48]   Accordingly, BAPTKO's Motion for Summary Judgment on the Consolidated Case's Counterclaim regarding inventory is **DENIED**.

### e.  BAPTKO's Alleged Failure to Disclose Applicable Bonus Schedules

[¶49]   The Foundation Parties' Counterclaim in the Consolidated Case alleges BAPTKO breached the APA by "failing to disclose the applicable bonus schedules in compliance with

---

[7] The Parties dispute whether Foundation waived this claim by signing off it was satisfied after conducting its due diligence. Foundation specifically claims it did not learn of the discrepancy until after the closing. The issues surrounding waiver are replete with fact questions for the jury to decide.

**ADD-21**

Section 4.1(f) of the APA or pay the accrued employee bonuses on the Closing Date. Case No. 1:21-cv-183, Doc. No. 43, ¶ 41 (filed Sept. 26, 2022). BAPTKO argues the Foundation Plaintiffs waived this provision because they signed off on a satisfaction of the due diligence under the APA. The Foundation Plaintiffs claim they were unaware BAPTKO and/or Kupper withheld the bonus information because they had requested it, and it was not included at closing as required.

[¶50]   Whether the Foundation Parties were put on notice of the bonus structure or payouts is fraught with factual questions. At this stage, the Foundation Parties have provided evidence showing (1) Foundation requested the bonus information; (2) such information was not provided at closing; and (3) Foundation only learned of it after the fact. Kupper and BAPTKO cannot now rely on the diligence period as a waiver because Kupper and KCI (now BAPTKO) allegedly did not comply with their contractual requirements. Likewise, whether the actions taken by the Foundation Parties constitute a satisfaction of the diligence period or investigations is a fact question for the jury to decide. Defendants dispute this arguing Foundation had all the relevant documents in its possession at closing. These are all factual questions to be developed at trial.

[¶51]   BAPTKO's Motion for Summary Judgment on the Foundation Parties' Counterclaim relating to bonuses is **DENIED**.

### f.   Kupper's Alleged Disclosure of Confidential Details about the Asset Purchase Transaction

[¶52]   The Foundation Parties' Counterclaim in the Consolidated Case alleges BAPTKO breached the APA by "disclosing confidential details about the asset purchase transaction to others." Case No. 1:21-cv-183, Doc. No. 43, ¶ 42 (filed Sept. 26, 2022). BAPTKO argues there is no disputed fact that shows it breached the confidentiality provision.

[¶53]   The APA required all Parties to keep the agreement and its details confidential. Doc. No. 44-1, p. 21-22, § 5.14. The Parties could, however, disclose (1) a transaction was occurring without

disclosing any of the specific details or (2) public information that was lawfully acquired from sources not prohibited from disclosing such information. Id.

[¶54]   Reading the facts in the light most favorable to the Foundation Parties, there is a genuine dispute of material fact whether Kupper breached the confidentiality provision of the APA. There is evidence in the record Kupper emailed Schneider the pre-closing purchase price allocation statement that contained relevant information from the APA. Doc. No. 363-7, pp. 1-7. It also included a "Funds Flow Memorandum". Id. Each document contained specific details regarding the payments under the APA. Id. at pp. 2-11. If a jury believes the facts as alleged by the Foundation Parties, the jury could conclude Kupper breached the confidentiality provision under the APA.

[¶55]   Accordingly, BAPTKO's Motion for Summary Judgment on the breach of the confidentially provision of the APA is **DENIED**.

### g.  Earnout Payments

[¶56]   BAPTKO argues there is no dispute the Foundation Parties have not paid earnout payments to BAPTKO and are, therefore, in breach of the First Amendment to the APA. BAPTKO further argues the Foundation Parties are not entitled to set off the payments it owes under the Earnout Provision. The Foundation Parties do not dispute they have not paid any earnout payments. Instead, they argue they are entitled to a setoff of the amount they owe based on Kupper and BAPTKO's own breaches of the APA and the First Amendment.

[¶57]   Under the First Amendment, KCI was entitled to receive $750,000 per year (what the First Amendment called the "Base Earn Out Amount") when Foundations dealerships reached the threshold target of $2,500,000 for a calendar year. Doc. No. 44-2, p. 1. § 3(d). In the event the Foundation dealerships reached $6,000,000 or more, KCI would receive fifty percent (50%) of the

**ADD-23**

amount that exceeds $6,000,000 (what the First Amendment calls the "Additional Earn Out Amount"). Id. If Foundation did not meet the threshold amounts, KCI was not entitled to any Earn Out Amount. Id. at p. 2, § 3(e).

[¶58]   There is no factual dispute whether the Foundation Parties have failed to pay as required under the First Amendment. The only question is whether and to what amount BAPTKO is entitled to damages. BAPTKO argues the Foundation Parties do not have any contractual rights to offset their payments under the Earnout Provision. The Foundation Parties argue they have a right to offset independent of the APA and First Amendment.

[¶59]   In North Dakota, "[t]he doctrine of setoff is 'an equitable doctrine requiring that the demands of mutually indebted parties be set off against each other and that only the balance be recovered.'" Dakota Partners, L.L.P. v. Glopak, Inc., 2001 ND 168, ¶ 21, 634 N.W.2d 520 (quoting 20 Am. Jur. 2d Counterclaim, Recoupment, Etc. § 6 (1995); see also Continental Resources, Inc. v. Northland Royalty Corp., 2022 WL 5179845, *8 (D.N.D. Aug. 15, 2022) ("North Dakota appears to recognize an extrajudicial right to setoff."). The terms "offset" and "setoff" are synonymous. Glopak, 2001 ND 168 at ¶ 21. North Dakota defines "setoff" as "'a defendant's counterdemand against the plaintiff, arising out of a transaction independent of the plaintiff's claim' or 'a debtor's right to reduce the amount of a debt by any sum the creditor owes the debtor; the counterbalancing sum owed by the creditor.'" Id. (quoting Black's Law Dictionary 1376 (7th ed. 1999)).

[¶60]   BAPTKO argues the indemnification provision at § 5.3 of the APA only applies to third-parties. The Foundation Parties do not dispute this, rather, they argue they have an equitable right to offset any amount owed. Assuming the indemnification provision only applies to third-parties, the offset provision at §5.3(d) does not apply in this scenario. But North Dakota's equitable

-24-

**ADD-24**

considerations of ultimate damages awarded at jury trial still apply. The jury will have to determine (1) how much the Foundation Parties owe BAPTKO for their admitted breach of contract by failing to pay the required Earnout Payments; (2) the value of the Foundation Parties surviving claims; and (3) how much each party is owed under the circumstances. See Glopak, 2001 ND 168 at ¶ 21 ("[T]he demands of mutually indebted parties [must] be set off against each other and [ ] only the balance be recovered.").

[¶61]   Accordingly, BAPTKO's Motion for Summary Judgment on its breach of contract claim for a breach of the earnout payments provision is **GRANTED** insofar as there is no factual dispute the Foundation Parties were required to make the Earnout Payments and have failed to do so. As to damages to be paid, the record is replete with factual disputes regarding how much the Foundation Parties will ultimately have to pay for their breach of the Earnout Provision due to the surviving claims of breach of contract against Kupper and BAPTKO as outlined above. In this regard, BAPTKO's Motion for Summary Judgment is **DENIED**.

### III. Defamation

[¶62]   North Dakota classifies defamation into two categories: libel and slander. N.D.C.C. § 14-02-02.[8] Relevant here, North Dakota defines slander as:

> Slander is a false and unprivileged publication other than libel, which:
>
> \* \* \*
>
> 3. Tends directly to injure the person in respect to the person's office, profession trade or business, either by imputing to the person general disqualifications in those respects which the office or other occupation peculiarly requires, or by imputing something with reference to the person's office, profession, trade, or business that has a natural tendency to lessen its profits[.]
>
> \* \* \*

---

[8] While inapplicable to the present dispute, libel is a false writing. N.D.C.C. § 14-02-03.

**ADD-25**

N.D.C.C. § 14-02-04.

[¶63]   Plaintiffs argue Kupper committed defamation in three ways. First, Plaintiffs argue Kupper told several of Plaintiffs' employees that Plaintiffs' management team was "a bunch of idiots" who did not know how to run a dealership and they were running the Mandan Dealerships into the ground. See Doc. No. 259-3, pp. 62:18 – 63:5, 194:14 – 195:3; 203:5 – 206:6. Second, Plaintiffs argue Kupper came to the Mandan Dealerships and asked loudly on the showroom floor, "[W]hich of you is getting fired next?" Doc. No. 255, pp. 106:4-18, 121:5-21. Third, either at or near closing, Kupper allegedly said "he was going to wait for Foundation to fail and then buy the [D]ealerships back for pennies on the dollar." Doc. No. 249, pp. 120:10 – 122:21. Kupper argues these statements are inadmissible hearsay.

[¶64]   The first two statements asserted by the Plaintiffs involve two-levels of potential hearsay. The first level is Kupper's alleged statements, which would be admissible as an opposing party statement. Fed. R. Evid. 801(d)(2) (statements of an opposing party are not hearsay). But neither Kramer nor Kutschinski actually heard Kupper say Foundation and its employees were a bunch of idiots who were running the business into the ground. Doc. No. 270-1 (Deposition of Charles Kramer), p. 203:5-16 ("Q: Okay. And then you said that Bob was in the store and yelled out or said something in the store about the Foundation or Kramer people being a bunch of idiots? A: Yes. Q: Were you there? A: No. Q: Okay. Q: Who heard that, if anybody? A: Rod, Rambur, Ronsburg was all in the tower when Bob walked up there and made a derogatory comment about us."); p. 205:15 – 206:2 ("A: I was told from two of the—two—two people, Rambur and Ronsburg, that Bob got his mail, walked into the tower to say hello to everybody there. There was—there was people in the tower. The—Rambur, Ronsburg, Rod was in the corner. They're all together and Bob walks up with his mail and says what are you guys doing? He goes, oh, we're training on this

-26-

vAuto tool, the new tool. He goes, oh, that's fucking stupid. I don't understand. I don't understand. I don't know why you're doing this. These guys are idiots."); Doc. No. 255, p. 108: 8-17 ("Q: Okay. But you're not aware of Bob Kupper making any comments to any employees in the—the store, other than you're claim he told somebody that—that Foundation people were idiots and came in the store and said loudly, which one of you is getting fired next? A: He said it in front of several people."); Doc. No 255, p. 109:12 – 110:13 (Kutschinski noting Terry Wiesner, Shawn Weeks, Justin Rambur, and Chuck heard Kupper say Foundation and its owners were idiots).

[¶65]   There is also no evidence Kutschinski heard Kupper ask who was going to be fired next. Doc. No. 255, pp. 106:19 – 107:5 ("Q: I want to know all of them. I want to know—well, let me— let me ask you this: First of all, were you and—you or Mr. Kramer or Mr. Slemko present at the dealership at any time after the purchase occurred on June 21, 2019, where you heard or someone from Foundation's office in Texas heard Mr. Kupper make any disparaging comments about Foundation or its operations? A: No, nor did I imply that. The only negative things I heard was Bob talking to me about Monte and—and Chuck.").

[¶66]   As to the first two statements, hearsay within hearsay is admissible so long as each layer is independently admissible. Neither Kramer nor Kutschinski heard these statements firsthand. Their testimony necessarily contains a second level a hearsay, namely, that what they were told by the other individuals who alleged heard it was, in fact, true. This is classic hearsay. Fed. R. Evid. 801(c) (defining hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; and (2) a party offers in evidence to prove the truth of the matter asserted in the statement"). This evidence is inadmissible to support a claim for defamation. Walker v. Wayne County, Iowa, 850 F.2d 433, 434-35 (8th Cir. 1988) ("When ruling on a summary judgment motion, the district court may consider only the portion of the submitted

-27-

**ADD-27**

materials that is admissible or useable at trial. Thus, without a showing of admissibility, a party may not rely on hearsay evidence to support or oppose the motion." (internal citations omitted)).

[¶67]   As to Kupper's statement he would buy the dealerships back for pennies on the dollar, Slemko overheard Kupper say this at "the dive bar in Mandan." Doc. No. 249, p. 122:6-21. This is not hearsay because Slemko personally overheard Kupper make this statement. It would be admissible as a statement of an opposing party under Fed. R. Evid. 801(d)(2). Despite its admissibility, FA Plaintiffs have failed to provide evidence to show how this singular statement, made at a local bar tends to directly injure FA Plaintiffs' business or imputed any disqualification on the part of FA Plaintiffs in their business. N.D.C.C. § 14-02-04(3). In fact, it is impossible to prove how this statement is demonstrably false. It was a speculative statement about FA Plaintiffs potential future success and Kupper's potential future business decisions. Whether Foundation actually failed or not is irrelevant because Kupper's opinion does not claim a false fact to be true. It only renders his view of what may occur in the unknown future. Therefore, this claim does not meet the definition of slander in N.D.C.C. § 14-02-04(3).

[¶68]   Accordingly, Kupper's Motion for Summary Judgment on Count Three of the Lead Case Complaint alleging defamation is **GRANTED**.

### IV. Misappropriation of Trade Secrets

[¶69]   Count III of the Lead Case Complaint alleges Kupper misappropriated Plaintiffs' trade secrets. Doc. No. 3, ¶¶ 64-75. The Complaint specifically claims Kupper took or accessed without authorization employee compensation information and customer information, which included customer identities, vehicle purchases, needs, and preferences. Id. Plaintiffs argue there is evidence to show Kupper misappropriated Plaintiffs trade secrets in two respects. Doc. No. 265, p. 45-46. First, Plaintiffs argue Hanson provided Kupper with Plaintiffs' financial performance records. Id.

**ADD-28**

Second, Plaintiffs argue Kupper accessed Plaintiffs CDK dealer management system. Id. Defendants argue these claims fall outside the scope of the Complaint because they are not employee compensation information or customer information. Insofar as these arguments may be embraced by the Complaint, Kupper argues the undisputed record shows there is no fact question and the FA Plaintiffs have failed to show misappropriation of trade secrets.

[¶70]   North Dakota has adopted the Uniform Trade Secrets Act ("UTSA")[9] which recognizes a statutory claim[10] for "misappropriation of trade secrets." See N.D.C.C. 47-25.1, et seq.; Macquaire Bank Ltd. v. Knickel, 723 F.Supp.2d 1161, 1183 (D.N.D. 2010). Under the UTSA, "a complainant is entitled to recover damages for misappropriation" of a trade secret. N.D.C.C. § 47-25.1-03. The UTSA defines "Trade Secret" as:

> [I]nformation, including a formula, pattern, compilation, program, device, method, technique, or process, that:
>
> > a. Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use; and
> >
> > b. Is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

N.D.C.C. § 47-25.1-01(4). The UTSA defines "misappropriation" as:

> a. Acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or
> b. Disclosure or use of a trade secret of another without express or implied consent by a person who:
> (1) Used improper means to acquire knowledge of the trade secret;
> (2) At the time of disclosure or use, knew or had reason to know that the person's knowledge of the trade secret was:

---

[9] Chapter 47-25.1, et seq., may be referred to as the Uniform Trade Secrets Act. N.D.C.C. § 47-25.1-08.

[10] In general, the UTSA "displaces conflicting tort, restitutionary, and other laws of this state providing civil remedies for misappropriation of a trade secret." N.D.C.C. § 47-25.1-07(1).

**ADD-29**

        (a) Derived from or through a person who had utilized improper means to acquire it;

        (b) Acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use; or

        (c) Derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use; or

    (3) Before a material change of the person's position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

N.D.C.C. § 47-25.1-01(2). "'Improper means' includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means." N.D.C.C. § 47-25.1-01(1).

[¶71]   There is no factual dispute over whether Kupper had the right to access FA Plaintiffs financial performance records.[11] Under the APA, Kupper, as the principal of KCI, had the right to access FA Plaintiffs' accounting records for a period of 12 months after closing. Doc. No. 44-1, p. 20, § 5.9(a). In addition, Kutschinski stated he "always" intended on providing Kupper with the financial statements after Kupper indicated he did not need them indicates Kutschinski's agreement that Kupper is entitled to the financial statements. Doc. No. 240, ¶ 10.  Hanson worked as the controller for the FA Plaintiffs. She would have been an appropriate individual to provide Kupper with the financial statements. On November 13, 2019, Hanson texted Kupper FA Plaintiffs made $176,000 in October of 2019. Doc. No. 265-5, p. 2. On November 25, 2019, Hanson indicated she emailed Kupper certain unspecified reports from her personal gmail account. Doc. No. 265-3, pp. 2-3. She later printed off statements and Kupper indicated he would pick them up from her the next day. Doc. No. 265-4, p. 2. Given Kupper's undisputed right to access accounting

---

[11] The Court does not consider the arguments that Plaintiff failed to amend the Complaint to include the information argued in briefing. The Defendants suffer no prejudice by the Court or a jury considering the merits of the claim. It is clear there has been significant discovery over these issues and the Parties are well-versed in the factual development of this case.

ADD-30

records under the APA, he did not obtain these records by improper means. Plaintiffs claim for misappropriation of trade secrets relating to the financial documents fails.

[¶72]   There is no evidence in the record that Kupper accessed FA Plaintiffs CDK account apart from mere speculation. According to Hanson, she did not know why Kupper asked for CDK information on September 30, 2019. Doc. No. 241, ¶ 8. The account numbering system (24000 for used cars, 24100 for trucks) is not unique to the Dealerships but was also used by BMC. Id. at ¶ 8, 9. If Kupper had access to BMC's CDK, he could have looked up instructions in the help screen, "it was just easier for him to reach out to someone that he knew how to get there." Id. at ¶ 9. Hanson provided no confidential information to Kupper in the texts relating to the CDK. Id. at ¶ 10. In addition, the Court notes FA Plaintiffs have provided nothing more than speculation that Kupper was accessing the Dealerships' CDK and not BMC's account. FA Plaintiffs have not provided any evidence beyond the vague text messages relating to Kupper's access of a CDK. Absent this proof, their misappropriation of trade secrets claim relating to Kupper's access of the CDK fails. See Ganon Intern., Ltd. v. Blocker, 684 F.3d 785, 794 (8th Cir. 2012) ("Speculation and conjecture are insufficient to defeat summary judgment.").

[¶73]   As to whether Kupper access Plaintiffs' employee compensation information or customer information as alleged in the Complaint, Plaintiffs have not provided any evidence to support those contentions. Instead, they have chosen to rely on Kupper's accessing Plaintiffs' financial records and CDK management system. Without proof to support those claims, Count III in the Lead Case Complaint fails in this regard as well.

[¶74]   Accordingly, Kupper's Motion for Summary Judgment on Count III in the Lead Case Complaint is **GRANTED**.

**ADD-31**

## V. Civil Conspiracy

[¶75]   Kupper, BMC, and Moritz Sport all argue the FA Plaintiffs have failed to establish a civil conspiracy because (1) civil conspiracy requires an underlying tort, which is not present here, and (2) there is no evidence Kupper, BMC, and Moritz Sport conspired together. The FA Plaintiffs argue there are disputed facts relating to their claim for Civil Conspiracy.

[¶76]   To show a civil conspiracy, a plaintiff must establish: (1) two or more people acted together; (2) to commit an unlawful act or a lawful act by unlawful means; (3) an agreement between the alleged conspirators; (4) the purpose of which agreement is to inflict a wrong or injury against another; and (5) an overt act in furtherance of the conspiracy. Burris Carpet Plus, Inc. v. Burris, 2010 ND 118, ¶ 42, 785 N.W.2d 164 (quoting Peterson v. North Dakota Univ. Sys., 2004 ND 82, ¶ 27, 678 N.W.2d 163)). "Generally, the underlying act must be actionable as a tort claim to support a claim for civil conspiracy." Id. at ¶ 45. When an underlying tort is dismissed, the civil conspiracy claim fails. Id. "[B]reach of contract alone is not a tort and it will not support a claim for civil conspiracy." Peterson v. N.D. Univ. Sys., 2004 ND 82, ¶ 27, 678 N.W.2d 163.

[¶77]   The FA Plaintiffs contend BMC, Moritz Sport, and Kupper conspired to solicit and/or hire FA Plaintiffs' employees. The FA Plaintiffs also argue the alleged defamatory statements made were an independent tortious act. FA Plaintiffs argue Kupper participated in soliciting and hiring FA Plaintiffs' employees, committed defamation, and accessed the confidential information.

[¶78]   Because the Court has granted summary judgment on the defamation claim and misappropriation of trade secrets claim, the only remaining potentially viable claim for conspiracy is the alleged conspiracy to poach the FA Plaintiffs' employees. See Burris, 2010 ND 118 at ¶ 45 ("Dismissal of the underlying tort claim defeats the related claim for civil conspiracy."). As to the alleged conspiracy with BMC and Moritz Sport, the FA Plaintiffs' grounds each relate to the

**ADD-32**

solicitation and hiring of Foundation employees. But this is merely a conspiracy to breach a contract which fails as a matter of law in North Dakota. Peterson, 2004 ND 82 at ¶ 27 ("[B]reach of contract alone is not a tort and will not support a claim for civil conspiracy."). The FA Plaintiffs have failed to show an independent tort was involved and their conspiracy to breach the contract claim fails. See id. Because the civil conspiracy sounds in contract, it necessarily fails under North Dakota law. Id.

[¶79]   Accordingly, Kupper, BMC, and Moritz Sports' Motions for Summary Judgment on the Civil Conspiracy claim is **GRANTED**.

## VI. Tortious Interference with Business Relations

[¶80]   The FA Plaintiffs argue there are three disputed areas in which Kupper, BMC, and Moritz Sport committed tortious interference with a business relation: (1) soliciting Foundation's employees to work for Kupper, BMC, or Moritz Sport; (2) Kupper's alleged misrepresentations and defamatory statements; and (3) Kupper's utilization of Foundation's CDK system and obtaining confidential financial information regarding the Dealerships.

[¶81]   For a tortious interference with a business relation, plaintiff must show: "(1) the existence of a valid business relationship or expectancy; (2) knowledge by the interferer of the relationship or expectancy; (3) an independently tortious or otherwise unlawful act of interference by the interferer; (4) proof that the interference caused the harm sustained; and (5) actual damages to the party whose relationship was disrupted." Trade 'N Post, L.L.C. v. World Duty Free Americas, Inc., 2001 ND 116, ¶ 36, 628 N.W.2d 707.

[¶82]   The court has already found the claims for defamation and misappropriation of trade secrets fail. This only leaves the FA Plaintiffs' claim for breach of contract remaining. However, breach of contract is not grounds for a tortious interference with a business relation because the third

element requires an independently tortious or otherwise unlawful act. The FA Plaintiffs attempt to paint Kupper's alleged solicitation of its employees as something more nefarious than a claim for breach of contract. However, Plaintiffs cannot escape the fact that Kupper's alleged participation in the solicitation of FA Plaintiffs' employees is only a potential breach of contract, nothing more. Because the basis for the claim for tortious interference with a business relation is a breach of contract, the claim necessarily fails. Northern Bottling Co., Inc. v. Pepsico, Inc., 5 F.4th 917, 925 (8th Cir. 2021) (finding North Dakota law prohibits claims for tortious interference with a business relationship that are solely based in contract).

[¶83]   Accordingly, Kupper's, BMC's, and Moritz Sports' Motions for Summary Judgment on the claim for tortious interference with a business relation are **GRANTED**.

## VII.   Damages

[¶84]   Kupper, BMC, Moritz Sport, and BAPTKO each argue summary judgment should be granted as to each claim because the FA Plaintiffs have failed to support their claim for damages. It is well established in North Dakota that "[d]amages issues are questions of fact." Valley Honey Co., LLC v. Graves, 2003 ND 125, ¶ 21, 666 N.W.2d 453. Evidentiary imprecision does not take the question of damages out of the jury's hands. Keller v. Bolding, 2004 ND 80, ¶ 21, 678 N.W.2d 578. "[A]ny uncertainty goes to the amount, not the fact, of damages. The determination of damages, if any, is therefore left to the sound discretion of the trier of fact at trial." Farmers Ins. Exchange v. Schirado, 2006 ND 141, ¶ 17, 717 N.W.2d 576.

[¶85]   Here, the record contains multiple disputes relating to the FA Parties' damages in both the Lead and Consolidated case. Whether and to what extent they suffered damages is a question this Court will leave "to the sound discretion of the trier of fact at trial." Id. Accordingly, the Motions

**ADD-34**

Appellate Case: 25-1741     Page: 37     Date Filed: 07/25/2025 Entry ID: 5541519

for Summary Judgment seeking dismissal of the entire case for failure to show damages are **DENIED**.

## CONCLUSION

[¶86]   For the reasons set forth above, Kupper's Motion for Summary Judgment (Doc. No. 205) in the Lead Case is **GRANTED, in part, and DENIED, in part**; BMC's Motion for Summary Judgment (Doc. No. 163) in the Lead Case is **GRANTED**; Moritz Sports' Motion for Summary Judgment (Doc. No. 204) in the Lead Case is **GRANTED**; BAPTKO's Motion for Summary Judgment (Doc. No. 355) in the Consolidated Case is **GRANTED, in part, and DENIED, in part**.

[¶87]   The Court, therefore, **ORDERS** the following:

(1) Lead Case Complaint Count II (Defamation against Kupper), III (Misappropriation of Trade Secrets against Kupper), Count IV (Civil Conspiracy against Kupper, BMC, and Moritz Sport), and Count V (Tortious Interference with a Business Relations against Kupper, BMC, and Moritz Sport) are **DISMISSED with prejudice**.

(2) There are no remaining claims against Defendants BMC and Moritz Sport and they are **DISMISSED** from this case.

(3) Lead Case Complaint Count I (Breach of Contract against Kupper) relating to Shane Hill, Shanielle Ulmer, Todd Laframboise, and Rodney Sandvig is **DIMISSED with prejudice.**

(4) Lead Case Complaint Claim I survives insofar as the FA Plaintiffs have shown there is a genuine issue of material fact for the jury to decide whether Kupper solicited Kelsey Hanson and Justin Rambur.

(5) The Consolidated Case Counterclaim is **DISMISSED with prejudice** insofar as it alleges BAPTKO is liable for Kupper's breach of the non-solicitiation agreement relating to hiring Hanson and Rambur as well the Counterclaim's breach of the non-competition agreement by BAPTKO.

(6) The Consolidated Case Counterclaim is **DISMISSED with prejudice** insofar it alleges BAPTKO violated the Non-Competition Agreement when Kupper retained control over BMC.

[¶88]   Trial is scheduled to begin October 21, 2024, and will be limited to:

-35-

**ADD-35**

(1) FA Plaintiffs' Count I for Breach of Contract in the Lead Case Complaint relating to Kupper's participation in the solicitation of Kelsey Hanson and Justin Rambur and the damages the allegedly occurred as a result;

(2) Foundation Parties' Counterclaim for Breach of Contract in the Consolidated Case relating to BAPTKO's alleged breach of the APA by (1) failing to maintain the requisite inventories in accordance with a 12-month rolling average during the period from the effective date and closing date; (2) failing to disclose the applicable bonus schedules; (3) disclosing confidential details about the APA; and

(3) How much that breach of contract offsets the Foundation Parties' obligation to pay BAPTKO under the Earnout Provision in the Consolidated Case (BAPTKO's Breach of Contract in the Lead Case).
   a. There is no question of fact for the jury to decide whether FA Parties' breached the contract. The remaining question is essentially one for damages.

[¶89]   **IT IS SO ORDERED.**

DATED August 5, 2024.

Daniel M. Traynor, District Judge
United States District Court

-36-

**ADD-36**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NORTH DAKOTA**

| | |
|---|---|
| FA ND Chev, LLC, and<br>FA ND Sub, LLC,<br><br>                  Plaintiffs,<br><br>vs.<br><br>Robert Kupper; Bismarck Motor Company;<br>and BMC Marine LLC, d/b/a Moritz Sport &<br>Marine,<br><br>                  Defendants. | Case No. 1:20-cv-00138 |

**ORDER DENYING MOTION FOR RECONSIDERATION AND**
**GRANTING MOTION FOR CLARIFICATION**

[¶1]   THIS MATTER comes before the Court on a Motion for Reconsideration or, alternatively, a Motion for Clarification filed by Foundation Automotive Corp., FA ND Chev, LLC, and FA ND Sub, LLC (collectively, "Foundation Parties") on August 30, 2024. Doc. Nos. 378, 384. Robert Kupper and BAPTKO, Inc., filed a Response on September 4, 2024. Doc. No. 380.

[¶2]   The Foundation Parties ask the Court to reconsider its Order on the numerous Motions for Summary Judgment claiming the Court did not address the Foundation Parties' excuse of performance affirmative defense when it granted BAPTKO's Motion for Summary Judgment on the issue of whether the Foundation Parties paid under the earnout provision of the First Amendment to the Asset Purchase Agreement ("First Amendment").

[¶3]   The Court addressed the issues raised in the briefing and concluded the remaining issue is "[h]ow much that breach of contract offsets the Foundation Parties' obligation to pay BAPTKO under the Earnout Provision in the Consolidated Case (BAPTKO's Breach of Contract in the Lead

-1-

**ADD-37**

Case).” Doc. No. 373, ¶ 88(3). As previously decided, “[t]here is no question of fact for the jury to decide whether F[oundation] Parties’ breach the contract. The remaining question is essentially one for damages.” Id.

[¶4]    Whether the Foundation Parties were excused from their payment obligations is a question that is essentially related to damages. The Court limited its grant of Summary Judgment to the undisputed fact that Foundation Parties failed to pay under the First Amendment. Whether and to what extent the Foundation Parties must pay, however, are fact questions preserved in the Order. The setoff and excuse arguments are essentially the same: Foundation Parties should not have to pay under the setoff provision because BAPTKO had its own breaches. There are no contradictions between the Court’s holding in the Order on Motions for Summary Judgment and permitting the Foundation Parties to raise the issue of excuse of performance at trial. Whether the jury will be instructed on this affirmative defense ultimately depends on the evidence as it comes in at trial and the Court will not decide that question at this time.

[¶5]    The Motion for Reconsideration is **DENIED** and Motion for Clarification is **GRANTED**.

[¶6]    **IT IS SO ORDERED.**

DATED September 10, 2024.

Daniel M. Traynor, District Judge
United States District Court

-2-

**ADD-38**

Local AO 450 (rev. 1/23)

# United States District Court
## *District of North Dakota*

FA ND Chev, LLC, and
FA ND Sub, LLC,
        Plaintiffs,
    v.

Robert Kupper; Bismarck Motor Company;
and BMC Marine LLC, d/b/a Moritz Sport & Marine,
        Defendants.

_____

BAPTKO, Inc.,
        Plaintiff and
        Counterclaim Defendant.
    v.

Foundation Automotive Corp. an Alberta Corporation,
FA ND Chev, LLC; and FA ND Sub, LLC,

        Defendants and
        Counterclaimants.

JUDGMENT IN A CIVIL CASE


Case No.   1:20-cv-138 (lead case)

           1:21-cv-183 (consolidated case)

---

[✓] **Jury Verdict**. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

[ ] **Decision by Court**. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

[✓] **Decision on Motion**. This action came before the Court on motion. The issues have been considered and a decision rendered.

[ ] **Stipulation**. This action came before the court on motion of the parties. The issues have been resolved.

[ ] **Dismissal**. This action was voluntarily dismissed by Plaintiff pursuant to Fed. R. Civ. P. 41(a)(1)(ii).

## IT IS ORDERED AND ADJUDGED:

Pursuant to the jury's verdict entered on November 5, 2024, Judgment is hereby entered in favor of BAPTKO, Inc. against Foundation Automotive Corp., FA ND Chev, LLC, and FA ND Sub, LLC on the Counterclaim of breach of contract regarding disclosing confidential information about the sale of the dealership to third parties and breach of contract relating to the operations of the dealership and inventory levels.

Pursuant to the Court's oral Order on October 28, 2024, BAPTKO, Inc. is awarded $3,000,000 against Foundation Automotive Corp., FA ND Chev, LLC, and FA ND Sub, LLC.

Pursuant to the Court's Order at Docket 480 entered on October 29, 2024, BAPTKO, Inc. is awarded prejudgment interest in the amount of $123.29 per day at a rate of 6% for a total of $364,195.67 against Foundation Automotive Corp., FA ND Chev, LLC, and FA ND Sub, LLC.

(Continued on page 2.)

Date: ___November 7, 2024___

KARI M. KNUDSON, CLERK OF COURT

by: ___*/s/ Roxanne Muffenbier, Deputy Clerk*___

**ADD-39**

1

**ADD-40**

Pursuant to the Court's Order at Docket 373 entered on August 5, 2024, Claims II, III, IV, and V in the Complaint in case number 1:20-cv-138 are DISMISSED with prejudice.

Pursuant to the Court's Orders at Docket 373 entered on August 5, 2024, and Docket 482 entered on November 1, 2024, Count I of the Complaint in case number 1:20-cv-138 is DISMISSED with prejudice.

Pursuant to the Court's Order at Docket 373 entered on August 5, 2024, insofar as the Counterclaim in case number 1:21-cv-183 alleges claims for breach of contract against BAPTKO, Inc., for Robert Kupper's breach of the non-solicitation agreement relating to hiring Foundation employees and the claim BAPTKO breached Robert Kupper's non-competition agreement, the Counterclaim is DISMISSED with prejudice.

Pursuant to the Court's Order at Docket 482 entered on November 1, 2024, insofar as the Counterclaim in case number 1:21-cv-183 alleges a claim for breach of contract for BAPTKO's failure to disclose bonus schedules, the Counterclaim is DISMISSED with prejudice.

Appellate Case: 25-1741    Page: 43    Date Filed: 07/25/2025 Entry ID: 5541519

Local AO 450 (rev. 1/23)

# United States District Court
## *District of North Dakota*

FA ND Chev, LLC, and
FA ND Sub, LLC,
         Plaintiffs,
   v.

Robert Kupper; Bismarck Motor Company;
and BMC Marine LLC, d/b/a Moritz Sport & Marine,
         Defendants.
_____

BAPTKO, Inc.,
      Plaintiff and
      Counterclaim Defendant.
   v.

Foundation Automotive Corp. an Alberta Corporation,
FA ND Chev, LLC; and FA ND Sub, LLC,

      Defendants and
      Counterclaimants.

**AMENDED
JUDGMENT IN A CIVIL CASE**

Case No.   1:20-cv-138 (lead case)

           1:21-cv-183 (consolidated case)

---

[✓] **Jury Verdict**. This action came before the Court for a trial by jury. The issues have been tried and the jury has rendered its verdict.

[ ] **Decision by Court**. This action came to trial or hearing before the Court. The issues have been tried or heard and a decision has been rendered.

[✓] **Decision on Motion**. This action came before the Court on motion. The issues have been considered and a decision rendered.

[ ] **Stipulation**. This action came before the court on motion of the parties. The issues have been resolved.

[ ] **Dismissal**. This action was voluntarily dismissed by Plaintiff pursuant to Fed. R. Civ. P. 41(a)(1)(ii).

## IT IS ORDERED AND ADJUDGED:

Pursuant to the jury's verdict entered on November 5, 2024, Judgment is hereby entered in favor of BAPTKO, Inc. against Foundation Automotive Corp., FA ND Chev, LLC, and FA ND Sub, LLC on the Counterclaim of breach of contract regarding disclosing confidential information about the sale of the dealership to third parties and breach of contract relating to the operations of the dealership and inventory levels.

Pursuant to the Court's oral Order on October 28, 2024, BAPTKO, Inc. is awarded $3,000,000 against Foundation Automotive Corp., FA ND Chev, LLC, and FA ND Sub, LLC.

Pursuant to the Court's Order at Docket 480 entered on October 29, 2024, BAPTKO, Inc. is awarded prejudgment interest in the amount of $123.29 per day at a rate of 6% for a total of $364,195.67 against Foundation Automotive Corp., FA ND Chev, LLC, and FA ND Sub, LLC.

(Continued on page 2.)

Date: April 7, 2025

KARI M. KNUDSON, CLERK OF COURT

by: */s/ Janelle Brunner, Deputy Clerk*

**ADD-41**

1

**ADD-42**

Pursuant to the Court's Order at Docket 373 entered on August 5, 2024, Claims II, III, IV, and V in the Complaint in case number 1:20-cv-138 are DISMISSED with prejudice.

Pursuant to the Court's Orders at Docket 373 entered on August 5, 2024, and Docket 482 entered on November 1, 2024, Count I of the Complaint in case number 1:20-cv-138 is DISMISSED with prejudice.

Pursuant to the Court's Order at Docket 373 entered on August 5, 2024, insofar as the Counterclaim in case number 1:21-cv-183 alleges claims for breach of contract against BAPTKO, Inc., for Robert Kupper's breach of the non-solicitation agreement relating to hiring Foundation employees and the claim BAPTKO breached Robert Kupper's non-competition agreement, the Counterclaim is DISMISSED with prejudice.

Pursuant to the Court's Order at Docket 482 entered on November 1, 2024, insofar as the Counterclaim in case number 1:21-cv-183 alleges a claim for breach of contract for BAPTKO's failure to disclose bonus schedules, the Counterclaim is DISMISSED with prejudice.

Pursuant to the Court's Order at Docket 543 entered on April 7, 2025, Kupper Parties' Motion for Costs and Attorneys' Fees and Costs is GRANTED, in part, and DENIED, in part. Kupper Parties attorneys' fees in the amount of $1,085,186.44 and costs totaling $223,328.71 are awarded.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

FA ND Chev, LLC, and
FA ND Sub, LLC,

Plaintiffs,

vs.

Robert Kupper et al.,

Defendants.

Case No. 1:20-cv-00138

BAPTKO, Inc.,

Plaintiff and
Counterclaim Defendant,

vs.

Foundation Automotive Corp. et al.,

Defendants and
Counterclaimants.

---

### ORDER GRANTING, IN PART, AND DENYING, IN PART,
### MOTION FOR COSTS AND ATTORNEYS' FEES

---

### INTRODUCTION

[¶ 1]   THIS MATTER comes before the Court on Kupper Parties' Motions for Bill of Costs, Bill of Costs Per Agreement, and Attorneys' Fees filed on November 20, 2024. Doc. Nos. 492–94. Foundation Parties filed a Response on December 11, 2024. Doc. No. 515. Kupper Parties filed a Reply on December 24, 2024. Doc. No. 520.

- 1 -

**ADD-43**

## STATUTORY COSTS

[¶ 2]    "[F]ederal law governs an award of costs." Dunne v. Res. Converting, LLC, 991 F.3d 931, 941 (8th Cir. 2021). Rule 54(d) of the Federal Rules of Civil Procedure provides costs other than attorneys' fees "should be allowed to the prevailing party" absent a prohibition by federal statute, rule, or court order. A district court has considerable discretion in awarding costs. Jet Midwest Int'l Co., Ltd. v. Jet Midwest Grp, LLC, 93 F.4th 408, 422 (8th Cir. 2024). The costs to be awarded as a matter of course under Rule 54(d)(1) are listed in 28 U.S.C. §1920. If a federal statute only allows the recovery of "costs," then Section 1920 must be read in conjunction with 28 U.S.C. § 1821. Rimini St., Inc. v. Oracle USA, Inc., 586 U.S. 334, 339 (2019). Section 1821 address per diem and mileage amounts for witnesses in attendance at any court of the United States. 28 U.S.C. § 1821. "Federal courts are bound by the limitations on expenses set out in 28 U.S.C. § 1821 and § 1920 in the absence of explicit statutory or contractual authorization for the taxation of an expense as costs." Jet Midwest, 93 F.4th at 422 (quoting Johnson Tr. Of Operating Eng'rs Loc #49 Health & Welfare Fund v. Charps Welding & Fabricating, Inc., 950 F.3d 510, 527 (8th Cir. 2020) (cleaned up)).

[¶ 3]    Local Rule 54.1 requires a party seeking an award of costs to provide

> a verified statement of costs that contains, for each category of costs being claimed, a detailed breakdown of each item of claimed costs within the category with sufficient description that the item can be readily understood, together with a brief citation to the statutory or other legal authority that provides for recovery of the category of claimed costs, and any supporting documents that will be relied upon to establish the claims of costs.

D.N.D. Civ. Loc. R. 54.1.

[¶ 4]    Section 1920 provides the court may tax the following as costs:

(1) Fees of the clerk and marshal;
(2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;

**ADD-44**

(3) Fees and disbursements for printing and witnesses;

(4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;

(5) Docket fees under section 1923 of this title; and

(6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

28 U.S.C. § 1920. Although a prevailing party is presumptively entitled to recover costs allowed by 28 U.S.C. § 1920, the submitted bill of costs should always be given careful scrutiny. Koppinger v. Cullin–Schiltz and Assocs., 513 F.2d 901, 911 (8th Cir. 1975). Kupper Parties requested $65,772.42. Doc. No. 492.

### I. Transcripts

[¶ 5]   Kupper Parties request $63,318.02 in costs related to depositions. Doc. No. 492, p. 2. Foundation Parties argue $2,206.28 for syncing video depositions is not allowable. Doc. No. 515, p. 14. Kupper Parties agree and argue it is recoverable as a contractual cost. Doc. No. 520, p. 12. Syncing video depositions is not recoverable under Section 1920. See Wilansky v. Morton Cnty., No. 1:18-cv-00236, 2024 WL 4264192, ¶ 16 (D.N.D. Sept. 23, 2024). The Court will address these costs under that section and will assess the remaining $61,111.74.

[¶ 6]    When recovering transcript costs, courts look to whether the "depositions reasonably seemed necessary at the time they were taken." Zotos v. Lindberg School Dist., 121 F.3d 356, 363 (8th Cir. 1997) (cleaned up) (quoting Manildra Milling Corp. v. Ogilvie Mills, Inc., 76 F.3d 1178, 1184 (Fed. Cir. 1996)). Whether the depositions at issue here were used in obtaining judgment in favor of a party is immaterial. Smith v. Tenet Healthsystem SL, Inc., 436 F.3d 879, 889 (8th Cir. 2006) ("[E]ven if a deposition is not introduced at trial, a district court has discretion to award costs if the deposition was necessarily obtained for use in [a] criminal case and was not purely investigative." (cleaned up)).

**ADD-45**

[¶ 7]   Foundation Parties argue four depositions were unnecessary and should not be taxable. Doc. No. 515, p. 17. Kupper Parties argue they had no opportunity to interview these individuals outside of a deposition because they were employed by Foundation Parties. Doc. No. 520, p. 14.

[¶ 8]   Depositions can only be taxed when they are "necessarily obtained for use in [a] case" and not "purely investigative." Zotos v. Lindbergh Sch. Dist., 121, F.3d 356, 363 (8th Cir. 1997) (quoting Slagenweit v. Slagenweit, 63 F.3d 719, 720 (8th Cir. 1995) (per curiam)). Necessity is judged by what "reasonably seemed necessary at the time [the depositions] were taken." Id. (quoting Manildra Milling Corp. v. Ogilvie Mills, Inc., 76 F.3d 1178, 1184 (Fed. Cir 1996)).

[¶ 9]   The claims in this case included the allegation that Robert Kupper defamed Foundation Parties to their employees and induced Foundation Parties employees to quit their jobs in violation of the Asset Purchase Agreement. Doc. No. 3. The Court finds the depositions at issue to be reasonably necessary at the time they were taken, which was years before trial. Therefore, costs will be taxable.

[¶ 10]   Foundation Parties argue the video depositions of Brian LoBaugh and Derek Slemko were unnecessary because Mr. Slemko had been deposed in a representative capacity and Mr. LoBaugh was not an employee of Foundation Parties. Doc. No. 515, p. 19. Kupper Parties argue they were needed for impeachment purposes at trial. Doc. No. 520, p. 15.

[¶ 11]   Printed and electronically recorded transcripts of the same deposition are recoverable as long as both were necessary for use in the case. Stanley, 784 F.3d at 465. Kupper Parties do not detail why it needed Mr. Slemko in his individual capacity or why Mr. LoBaugh was considered reasonable to depose at the time. Therefore, the Court finds the video depositions of Brian LoBaugh and Derek Slemko, in his individual capacity, as unnecessary and $2,982.50 is not taxable.

**ADD-46**

[¶ 12]  The Court has reviewed the entire record and concludes the other depositions were reasonably necessary at the time they were taken.

## II.    Ancillary Deposition Costs

[¶ 13]  Foundation Parties argue $2,600.72 should be disallowed because processing and compliance costs are not taxable without proof of necessity. Doc. No. 515, pp. 16–17. Kupper Parties argue these costs are recoverable as a contractual cost. Doc. No. 520, p. 14. The Eighth Circuit has held that shipping and handling fees are not taxable. Smith, 436 F.3d at 889. Some of these charges are listed specifically as "shipping charges," while all reasonably pertain to the "handling" of information for transcription. Therefore, $2,600.72 will be assessed as a contractual cost.

[¶ 14]  Foundation Parties argue the cancellation fee for Ginger Knutsen is not recoverable. Doc. No. 515, pp. 19–20. Cancellation fees are not contemplated in Section 1920. Kupper Parties do not respond to this argument and, therefore, $295.00 is not taxable.

## III.    Witnesses

[¶ 15]  Kupper Parties requested $1,586 for Printing and Witness fees. Doc. No. 492, p. 7. However, the Court calculated the total for the same charges to be $1,556.

[¶ 16]  Foundation Parties argue process server fees amounting to $1,116.00 are not provided for under Section 1920. Doc. No. 515, pp. 14–15. Kupper Parties agree and argue they are recoverable as a contractual cost. Doc. No. 520, p. 13. Process service fees are not recoverable under Section 1920. Crues v. KFC Corp., 768 F.2d 230, 234 (8th Cir. 1985). The Court will address these fees under that section and will assess here the remaining $440.00 in witness fees.

[¶ 17]  Foundation Parties argue the costs for three witnesses who did not testify at trial and rescheduling deposition costs for Monte Clair are not taxable. Doc. No. 515, pp. 15–16. Kupper

**ADD-47**

Parties argue that time limitations prevented them from calling Sherry Moos and Shawn Weekes, calling Chris Schneider was made unnecessary when Foundation Parties called him themselves, and Monte Clair's rescheduling was beyond their control. Doc. No. 520, pp. 13–14.

[¶ 18]  Witness fees are not ordinarily taxed if the witnesses do not testify unless the testimony was material. United States v. Adams, 996 F.3d 514, 522 (8th Cir. 2021). Testimony does not become immaterial simply because outside circumstances rendered the testimony unnecessary. Id. at 522–23. In Adams, the government was going to call a witness but could not because of time constraints. Id. The testimony was material to the admissibility of certain records and calling the witness was a condition of a stipulation to entering the documents as evidence. Id. The Eighth Circuit affirmed the district court in allowing these fees to be taxed. Id. In Stanley v. Cottrell, Inc., counsel planned to call a witness to rebut expert testimony. 784 F.3d 454, 467–68 (8th Cir. 2015). However, the expert did not testify to certain topics and therefore there was no need to have a rebuttal witness. Id. The Eighth Circuit affirmed taxing the witness fee.

[¶ 19]  Here, Kupper Parties intended to call Sherry Moos and Shawn Weekes as witnesses, but time limitations prevented them. Doc. No. 520, p. 13. These witnesses were both employees of the businesses in question and had personal knowledge of some of the events discussed at trial. Therefore, the Court finds their testimony material and their witness fees taxable. As for Chris Schneider, Foundation Parties called the witness in their case and therefore it was unnecessary for Kupper Parties to call him separately. Id. at 13. Mr. Schneider was a key witness in the case. Therefore, the witness fee for Mr. Scheider is taxable even though Kupper Parties did not need to call him to the stand. Lastly, Section 1920 does not contemplate cancellation or rescheduling fees and therefore, $120.00 is not recoverable for costs related to Mr. Clair's deposition.

**ADD-48**

## IV.   Copies for Trial

[¶ 20]   Kupper Parties request $818.40 in printing costs for creating binders of exhibits for the evidentiary hearing and for trial. Doc. No. 492, p. 7. Foundation Parties do not contest this amount. Costs for making copies used in the case are specifically contemplated in Section 1920(4). Therefore, the Court finds this cost taxable.

## V.   Conclusion

[¶ 21]   Kupper Parties request a total of $65,772.42 under Section 1920. The Court found as non-taxable: charges for syncing video depositions ($2,206.28), process service fees ($1,116.00), and "shipping and handling" fees relating to depositions ($2,600.72), unnecessary video depositions ($2,982.50), and cancellation and rescheduling fees ($415). Further the amount is reduced by $30 reflecting a typo. Supra ¶ 15. The Court finds the remaining costs taxable: deposition fees ($55,233.52), witness fees ($320), and printing costs ($818.40). In total, the Court finds $56,371.92 in costs and fees taxable under Section 1920.

**CONTRACTUAL COSTS AND FEES**

[¶ 22]   In an Asset Purchase Agreement ("Agreement") between Foundation Automotive Corp. and Kupper Chevrolet, Inc., the entities contracted that if litigation was necessary to enforce the Agreement "the nonprevailing Party will pay the reasonable expenses of the prevailing Party, including reasonable attorneys' fees and costs." BAPTKO, Inc. v. Foundation Automotive Corp. et al, Case No. 1:21-cv-00183, Doc. No. 3-1, p. 27. Kupper Parties request $2,257,336.72 in attorneys' fees, $154,478.79 in expert costs and expenses, and $6,555 in costs paid directly by Kupper Parties.[1] Doc. No. 493, p. 4. Kupper Parties also assert several costs not allowed by Section

---

[1] Kupper Parties also list $30,597.37 in copying, research, and travel costs but state this amount is included in the request for attorneys' fees. Doc. No. 493, p. 4.

**ADD-49**

1920 are reasonable costs under the Agreement. Doc. No. 520, pp. 12, 13, 17 ($2,206.28 for syncing video depositions, $1,116.00 in process service fees, and $2,600.72 in deposition "shipping and handling fees").

## I.    Parties to the Agreement

[¶ 23] Foundation Parties argue Robert Kupper should not recover attorneys' fees in his individual capacity because he was not individually a party to the Agreement. Doc. No. 515, p. 8. Kupper Parties argue the fees were paid by BAPTKO, not Mr. Kupper. Doc. No. 520, pp. 6–7. Further, they argue Mr. Kupper was a party through the non-solicitation and confidentiality clauses of the Agreement. Id.

[¶ 24] The Agreement states the "Parties" to the Agreement are the "Buyer," defined as Foundation Automotive Corp., and "Seller," defined as Kupper Chevrolet, Inc., while Mr. Kupper was listed as the "Seller Principal" or "Individual." BAPTKO, Inc. v. Foundation Automotive Corp. et al, Case No. 1:21-cv-00183, Doc. No. 3-1, pp. 1, 5, 39. However, in Section 4.1(d) "Knowledge of Seller" includes knowledge of "Bob Kupper," not Kupper Chevrolet, Inc. Id. at 7. Foundation Parties brought claims against Mr. Kupper and BAPTKO brought claims against Foundation Parties, which were combined into the present consolidated case. Foundation Parties argued at trial their non-performance of the contract with BAPTKO was excused by Mr. Kupper's alleged violation of the non-solicitation and confidentiality agreements. BAPTKO's efforts to enforce its contract necessarily included defending Mr. Kupper as an individual. Further, Mr. Kupper is not being personally reimbursed. BAPTKO paid the expenses detailed in these motions and BAPTKO is being reimbursed. Therefore, the Court finds any amounts spent defending Mr. Kupper are recoverable under the Agreement.

**ADD-50**

## II.   Attorneys' Fees

[¶ 25]   In this diversity case, "North Dakota law governs the award of attorneys' fees." <u>Continental Res., Inc. v. Fisher</u>, 102 F.4th 918, 929 (8th Cir. 2024). The North Dakota Supreme Court has approved two methods of determining reasonable attorneys' fees: (1) "the lodestar method" and (2) use of an itemized bill and affidavit. <u>Id.</u> The Parties agree the lodestar method is appropriate.

[¶ 26]   Under the lodestar method, when deciding whether and to what extent to award attorneys' fees, courts look to the number of the hours reasonably spent on a case times a reasonable hourly rate. <u>Burlington v. Dague</u>, 505 U.S. 557, 559 (1992). Courts have considerable discretion when determining reasonable attorneys' fees. <u>Hensley v. Eckerhart</u>, 461 U.S. 424, 437 (1983). "The trial judge should weigh the hours claimed against his knowledge, experience and expertise of the time required to complete similar activities." <u>Gilbert v. City of Little Rock</u>, 867 F.2d 1063, 1066 (8th Cir. 1989). In North Dakota, courts consider eight factors:

(1) the time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
(2) the likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
(3) the fee customarily charged in the locality for similar legal services;
(4) the amount involved and the results obtained;
(5) the time limitations imposed by the client or by the circumstances;
(6) the nature and length of the professional relationship with the client;
(7) the experience, reputation, and ability of the lawyer or lawyers performing the services; and
(8) whether the fee is fixed or contingent.

<u>Fisher</u>, 102 F.4th at 930–31 (quoting <u>Big Pines, LLC v. Baker</u>, 2021 ND 70, ¶ 18, 958 N.W.2d 480).

**ADD-51**

### a. Time, Difficulty, and Skill

[¶ 27]  Foundation Parties argue Kupper Parties have inflated their attorney hours, both through duplicative billing and through unnecessary work and request an evidentiary hearing on the matter. Doc. No. 515, pp. 10–11.

[¶ 28]  This case has a docket of over 500 entries over five years, and another docket in the consolidated case. The Court has no doubt this extended litigation took the 1,920.1 hours Mr. Bakke charged. See Doc. No. 520, p. 6. All other attorneys bill a total of 964.1 hours over the same time period. Id. Considering the breadth of representation from Foundation Parties and the voluminous record, the Court finds no "over-lawyering" as Foundation Parties argue. Therefore, the Court denies Foundation Parties request to hold a hearing and finds this factor weighs in favor of a full award.

### b. Precluded Employment

[¶ 29]  It is apparent that Counsel for Kupper Parties were precluded from other employment by taking this case. A significant amount of time was expended on this case that resulted in the loss of other potential employment for their counsel. This factor weighs in favor of a full award.

### c. Local Rate

[¶ 30]  Foundation Parties argue the rate Kupper Parties request is unreasonable because it is not the actual rate charged and it was a rate deemed unreasonable in previous negotiations. Doc. No. 515, pp. 6–7. Kupper Parties argue the rates are reasonable, but in the alternative, provides the Court with the amounts actually charged in the case. Doc. No. 520, pp. 5–6.

[¶ 31]  As a general rule, a reasonable hourly rate is the prevailing market rate, that is, "the ordinary rate for similar work in the community where the case has been litigated." Emery v. Hunt, 272 F.3d 1042, 1048 (8th Cir. 2001). The party seeking attorneys' fees bears the burden of

**ADD-52**

producing sufficient evidence "that the requested rates are in line with those prevailing in the community for similar services by lawyers of reasonably comparable skill, experience and reputation." Blum v. Stenson, 465 U.S. 886, 895 n.11 (1984). The district court is in the best position to understand what services are reasonable and what hourly rates are appropriate in the relevant market. Al-Birekdar v. Chrysler Grp., LLC, 499 F. App'x 641, 648 (8th Cir. 2013) (holding the district court did not abuse its discretion in reducing the requested hourly rates).

[¶ 32]  In North Dakota, courts look to the reasonable rate of similar work in the state of North Dakota. Deadwood Canyon Ranch, LLP v. Fidelity Expl. & Prod. Co., Case No. 4:10-cv-081, 2014 WL 11531553, at *3 (D.N.D. June 26, 2014). Therefore, the Court declines to apply the rate of Foundation Parties out-of-state counsel. The actual rates charged are: $175 for paralegals and $300–$400 for attorneys. Doc. No. 520, p. 6. The Court finds the range reasonable for North Dakota. Therefore, the Court will examine the requested fees at these rates.

### d.  Amount Involved and Results Obtained

[¶ 33]  The jury awarded $3,364,195.67 to BAPKTO in this case. Doc. No. 490. The requested attorneys' fees total $1,387,954.22. Doc. No. 520, p. 7. The amount is reasonable considering the number of hours expended, the number of issues and parties involved, and the results obtained.

### e.  Counsel's Reputation and Ability[2]

[¶ 34]  Counsel for Kupper Parties is a reputable lawyer and skilled in his field. He advocated well for his clients during trial and received a good result. This factor weighs in favor of a full award.

---

[2] The factors of time limitations and relationship with the client do not appear to be significant to this case and are excluded from analysis. Further, as to the final factor, the Court notes the fee was not contingent.

**ADD-53**

### f. Discrepancy and Documentation

[¶ 35]  Kupper Parties submitted a "Quick Report" detailing charges to BAPTKO from August 17, 2020, to November 7, 2024. Doc. No. 521. This report states BAPTKO was billed a total of $1,558,208.92. Id. at 7. Kupper Parties note the discrepancy of this amount from the requested $1,387,954.22, saying the report includes costs that are otherwise reported. Doc. No. 520, p. 7 n.2.[3]

[¶ 36]  Try as the Court might, it cannot make these numbers match up with the numbers listed in the tables in Doc. Nos. 493 and 520. Further, it seems this report lists charges for expert witness fees that Kupper Parties request separately under non-taxable costs but did not reduce under the requested attorneys' fee amount. See Doc. Nos. 493, 520. Therefore, the Court will use its own calculations.

[¶ 37]  The attorneys' fees billed to BAPTKO total $1,558,208.92. Doc. No. 521. The Court deducts the starting value of the report ($125,720), the non-taxable amount requested ($161,033.79), and the taxable amount requested ($65,692.42). See Doc. Nos. 493, 520, 521. The remaining balance for attorneys' fees totals $1,205,762.71.

[¶ 38]  Poor documentation regarding the accrued fees also warrants a reduction. See Jensen v. Clarke, 94 F.3d 1191, 1203, 1204 (8th Cir. 1996) (affirming a 10% reduction for poor documentation). It is not the Court's job to be a "pig[] hunting for truffles" in the record. Murthy v. Missouri, 144 S. Ct. 1972, 1992 n.7 (2024). While Kupper Parties provided over 600 pages of documentation, this was ultimately unhelpful in reconciling the amount requested and the amount billed. Further, the duplicative reporting of costs and fees under three motions compounded the Court's difficulty in reconciliation, especially considering the responses merged discussion of all

---

[3] The Court wonders why an amount for the total number of hours billed by attorneys and paralegals need be reduced by costs at all. Doc. No. 520, p. 6.

**ADD-54**

three. See Doc. Nos. 492–96, 515, 520–21. Therefore, the Court finds a percentage reduction of 10% is warranted. $120,576.27 will be deducted from the final award, bringing the final total of attorneys' fees to $1,085,186.44.

### g.  Conclusion

[¶ 39]  Upon review of all eight factors, the Court finds they favor a full award of attorneys' fees. Considering the discrepancies and poor documentation, the Court's calculation of the total is reduced by 10%. Therefore, the total awarded is $1,085,186.44.

## III.    Contractual Costs

[¶ 40]  Kupper Parties further request costs under the Agreement. Doc. No. 493, pp. 2–4. Foundation Parties argue these expenses are either unrecoverable or documentation is too vague for recovery and request a hearing to determine the proper scope of the costs. Doc. No. 515, pp. 12–13.

[¶ 41]  The Agreement states the prevailing party will be reimbursed all "reasonable expenses," including "attorneys' fees and costs." BAPTKO, Inc. v. Foundation Automotive Corp. et al, Case No. 1:21-cv-00183, Doc. No. 3-1, p. 27. Contract interpretation requires use of the plain meaning when the terms are not defined, with the goal being to identify the intent of the parties. See In re Estate of Moore, 2018 ND 221, ¶ 8, 918 N.W.2d 69. Here, the contract was for sale of a business. The intent of the provisions was to make sure the Parties adhered to the contract by giving a penalty for having to enforce it through litigation, which is exactly what happened in this case. Foundation Parties did not adhere to the contract and BAPTKO resorted to litigation.

[¶ 42]  Foundation Parties argue the terms do not contemplate expanding the scope of recoverable fees beyond what is allowed by statute. Doc. No. 515, pp. 11–12. They rely on a case from Alabama; however, the court in that case had to "construe the language of the contract against [the

plaintiff] as the party that drafted it." <u>Natures Way Marine, LLC v. Everclear of Ohio, Ltd.</u>, No. CIV.A 12-316-CG-M, 2015 WL 1757116, at *8 (S.D. Ala. Apr. 17, 2015). Here, the Parties jointly drafted the contract. <u>BAPTKO, Inc. v. Foundation Automotive Corp. et al</u>, Case No. 1:21-cv-00183, Doc. No. 3-1, p. 29.

[¶ 43]  The intent of the Parties was to "make it hurt" not to abide by the contract or, to put it another way, to make sure the non-breaching party got the full benefit of the bargain without having to incur additional legal fees. Limiting the fees to a statutory maximum would not serve this purpose. Therefore, the Court interprets "reasonable expenses" to include all expenses incurred in litigation while enforcing the contract.

[¶ 44]  Kupper Parties request that fees incurred since trial and during an appeal be judged recoverable. Doc. No. 520, p. 15. Foundation Parties did not respond to this argument. The Court declines to make a ruling on costs for an appeal that has not occurred and unproven costs. Kupper Parties may make future motions for further costs and fees if they occur.

[¶ 45]  The Court has reviewed the entire record and finds documentation sufficient. Kupper Parties are awarded $166,956.79 in reasonable expenses under the Agreement: $154,478.79 in expert witness fees; $6,555.00 for Cross Sell Reports and ISG Background Searches; $2,206.28 for syncing video depositions, Doc. No. 520, p. 12; and $1,116.00 process service fees, <u>id.</u> at 13; $2,600.72 in deposition "shipping and handling" fees, <u>id.</u> at 17.

## CONCLUSION

[¶ 46]  For the reasons set forth above, Kupper Parties' Motion for Costs and Attorneys' Fees and Costs is **GRANTED**, **in part**, **and DENIED**, **in part**. The Clerk of Court is directed to amend the judgment to award Kupper Parties attorneys' fees in the amount of $1,085,186.44 and costs totaling $223,328.71. All other terms of the judgment shall remain in place.

[¶ 47]  **IT IS SO ORDERED.**

DATED April 7, 2025.

_____
Daniel M. Traynor, District Judge
United States District Court

- 15 -

**ADD-57**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

FA ND Chev, LLC, and
FA ND Sub, LLC,

                                Plaintiffs,

vs.

Robert Kupper et al.,

                                Defendants.

BAPTKO, Inc.,

                        Plaintiff and
           Counterclaim Defendant,

vs.

Foundation Automotive Corp. et al.,

                      Defendants and
              Counterclaimants.

Case No. 1:20-cv-00138

---

## ORDER DENYING RENEWED MOTION FOR JUDGMENT AS A MATTER OF LAW, DENYING MOTION FOR NEW TRIAL, AND FINDING AS MOOT MOTION TO STAY AND EXPEDITE

---

[¶1]    THIS MATTER comes before the Court on Foundation Parties' Renewed Motion for Judgment as a Matter of Law and Motion New Trial filed on December 5, 2024. Doc. No. 511. Kupper Parties filed a Response on January 6, 2025. Doc. No. 524. Foundation Parties filed a Reply on January 23, 2025. Doc. No. 528. Foundation Parties filed a Motion to Stay Execution of Judgment and a Motion to Expedite the Motion to Stay on March 21, 2025. Doc. Nos. 534, 536.

**ADD-58**

Kupper Parties responded on March 28, 2025. Doc. No. 539. For the reasons set forth below, Foundation Parties' Motions for Judgment as a Matter of Law and New Trial are **DENIED**. In consequence, the Motion to Stay Execution and the Motion to Expedite the Motion to Stay are **found as MOOT.**

## BACKGROUND

[¶2]   The Court held a jury trial in this case from October 28, 2024, through November 5, 2024. During trial, testimony was given about the value of the goodwill of the company, or "blue sky" value. Vehicle inventory is used to determine this value. Part of the Asset Purchase Agreement dictated that no material change would occur with regards to maintaining inventory. Foundation Parties argued at trial that Kupper Parties improperly turned down vehicles offered to the dealership in violation of the Asset Purchase Agreement. Kupper Parties presented evidence they followed standard business practices. Foundation Parties argued the financial statements included improper errors. Kupper Parties presented evidence the errors were common to these types of documents and Foundation Parties own documents after closing included similar errors. At the close of their case, Foundation Parties moved for judgment as a matter of, which the Court denied.

[¶3]   The Court instructed the jury, in part:

> A party to a contract is not excused from performing its obligations under the contract when the other party has substantially performed its obligations under the contract. A party has substantially performed its obligations under a contract when the essential purpose of the contractual performance is accomplished.
>
> A party to a contract is also not excused from performing its obligations under the contract when, after the other party has breached the contract, the non-breaching party subsequently performs an act indicating an intent to continue with the contract rather than ceasing or repudiating the contract. A party may waive a breach by another party and be liable for its own subsequent breach.

Doc. No. 487, ¶¶ 27–28.

**ADD-59**

[¶4]     After deliberations, the jury found in favor of Kupper Parties, specifically that they did not breach the Asset Purchase Agreement ("Agreement") and were owed payout amounts under that Agreement.

**DISCUSSION**

### I.     Motion for Renewed Judgment as a Matter of Law

[¶5]     Foundation Parties argue first they are entitled to judgment as a matter of law because Kupper Parties breached the contract by not maintaining inventory levels and Foundation was excused from performance of the contract by these breaches. Doc. No. 512, p. 21. Kupper Parties argue the jury's verdict was supported by evidence and facts established at trial. Doc. No. 524.

[¶6]     A party may renew a motion for judgment as a matter of law after the court previously denied the original motion and a jury has returned a verdict. Fed. R. Civ. P. 50(b). In deciding a Rule 50(b) motion, courts ask whether "'a reasonable Jury would not have a legally sufficient evidentiary basis' to support the verdict." Guttemeyer v. Transit Auth., 31 F.4th 638, 646 (8th Cir. 2022) (quoting Masters v. City of Independence, 998 F.3d 827, 835 (8th Cir. 2021)). It is well established when reviewing a motion for judgment as a matter of law courts must:

> (1) resolve direct factual conflicts in favor of the nonmovant; (2) assume as true all facts supporting the nonmovant which the evidence tended to prove; (3) give the nonmovant the benefit of all reasonable inferences; and (4) affirm the denial of the motion if the evidence so viewed would allow reasonable jurors to differ as to the conclusions that could be drawn.

Sherlock v. Quality Control Equip. Co., Inc., 79 F.3d 731, 735 (8th Cir. 1996) (quoting Grand Labs, Inc. v. Midcon Labs., 32 F.3d 1277, 1280 (8th Cir. 1994)). Courts are "highly deferential" to the jury's verdict and draw all reasonable inferences in favor of the verdict. Id. Mere speculation is insufficient to support a verdict. Id. The court "will not set aside a Jury's verdict lightly, and

Appellate Case: 25-1741   Page: 63   Date Filed: 07/25/2025 Entry ID: 5541519

[the court] will not weigh, evaluate, or consider the credibility of the evidence." <u>Kaplon v. Howmedica, Inc.</u>, 83 F.3d 263, 266 (8th Cir. 1996).

[¶7]   The Court finds sufficient evidence was presented at trial to support the jury's verdict in favor of Kupper Parties. Foundation Parties completed due diligence regarding the purchase of the dealerships, they agreed to the number of vehicles on the lot at closing despite any errors in other statements, Kupper Parties gave reasonable explanations for the discrepancies in paperwork and why some vehicles were not accepted from General Motors, and an expert with knowledge and skill presented confirming testimony to the jury about valuation and inventory. The Court's job at this stage is not to reweigh the evidence, <u>Kaplon</u>, 83 F.3d at 266, but to be deferential to the factfinders at trial. <u>Masters</u>, 998 F.3d at 835. Accordingly, there was sufficient evidence to support the verdict.[1]

[¶8]   Foundation Parties also argue Kupper Parties failed to prove which entity within Foundation Parties is obligated to pay under the Earnout Provision. Doc. No. 512, p. 23. Kupper Parties argues that issue was not raised at trial and additionally Foundation Parties are jointly and severally liable. Doc. No. 524, p. 11.

[¶9]   "A party's first motion for judgment as a matter of law must contain all the arguments it intends to raise in its 'renewed motion.'" <u>Parada v. Anoka Cnty.</u>, 54 F.4th 1016, 1022 (8th Cir. 2022) (quoting Fed. R. Civ. P. 50(b)). Therefore, "a party cannot raise 'new arguments in [a] Rule 50(b) motion.'" <u>Id.</u> (quoting <u>Miller v. Huron Reg'l Med. Ctr.</u>, 936 F.3d 841, 847–48 (8th Cir. 2019)).

---

[1] Because the verdict was supported by evidence, the Court does not need to address Foundation Parties' argument concerning excusal of contractual duties. However, the Court has already done so on several occasions. <u>See</u> Doc. No. 373, pp. 23–24.

[¶10]   Foundation Parties moved for judgment as a matter of law at the close of their case. Doc. No. 503, p. 53. They listed two grounds: (1) evidence showed Kupper Parties breached the contract regarding failure to maintain inventory levels and (2) evidence showed a claim for fraud against Kupper Parties. Id. at 53–66. The Court ruled on those two motions. Id. at 66. Determining the obligation to pay was not raised in the original motion and, therefore, cannot be renewed or made anew in this motion. Parada, 54 F.4th at 1022.

[¶11]   Accordingly, Foundation Parties' Motion for Judgment as a Matter of Law is **DENIED**.

## II.      Motion for New Trial

[¶12]   Foundation Parties argues for a new trial on several grounds: the verdict was against the weight of the evidence, the jury was improperly instructed, the Court's conduct prejudiced the jury, and their case was undermined by time limitations and denial of a request to play deposition testimony. Doc. No. 512, p. 24–25.

[¶13]   A court may grant a new trial "after a Jury trial, for any reasons for which a new trial has heretofore been granted in an action at law in federal court." Fed. R. Civ. P. 59(a)(1)(A). In reviewing a motion for new trial, the Court considers "whether a new trial is necessary to prevent a miscarriage of justice." Hallmark Cards, Inc. v. Murley, 703 F.3d 456, 462 (8th Cir. 2013). The Eighth Circuit has cautioned, "A new trial should be granted only if the evidence weighs heavily against the verdict," or "if the error misled the Jury or had a probable effect on its verdict." Id. (cleaned up).

### a.  Against the Weight of Evidence

[¶14]   Foundation Parties argues the verdict was against the weight of the evidence for all the same grounds as their renewed motion for judgment as a matter of law. Doc. No. 512, p. 25. The Court has found the evidence was sufficient to support the verdict. Supra ¶ 7.

**ADD-62**

### b. Improper Instructions

[¶15] Concerning jury instructions, Foundation Parties argues: (1) the Court should have made clear that if Kupper Parties breached the contract, Foundation Parties were excused from further performance; and (2) the prejudicial instructions implied Foundation Parties had already breached payment obligations under the Agreement. Doc. No. 512, pp. 25–26. Kupper Parties argues the instructions included explanation of excuse of performance; and further, because the jury found no breach, excuse of performance was never even considered by the jury. Doc. No. 524, p. 17.

[¶16] At Summary Judgment, the Court ruled that Foundation Parties had breached the contract. Doc. No. 373. This was the law of the case presented to the jury. The instructions did not concern Foundation Parties specifically but taught the general law of substantial performance and ratification. In that way, the instructions "fairly and adequately represent[ed] the evidence and applicable law in light of the issues presented to the jury." Blackorby v. BNSF Ry. Co., 849 F.3d 716, 719–20 (8th Cir. 2017). The Court finds the instructions given were proper.

### c. Prejudice from the Court

[¶17] Foundation Parties argue the Court prejudiced the jury on several grounds: (1) the Court ruled Foundation had breached the contract and the issue for the jury was a matter of damages, Doc. No. 386; (2) the jury deliberated for a short amount of time; (3) "the Court showed hostility" to them by "insert[ing] itself into the testimony–in a manner that was supportive of the Kupper Parties and damaging to the Foundation Parties"; (4) the Court limited expert testimony to Subaru vehicles; (5) "the tone and manner of questioning by the Court [of two witnesses] created an appearance of bias and hostility"; and (6) the cumulative effect of rulings on objections and management of the courtroom amounted to unfair prejudice.

**ADD-63**

[¶18]   The Court previously decided the issues of excuse of performance versus offset to damages and nothing in the trial changes that analysis. See Doc. No. 386. Foundation Parties includes the jury instruction about the Summary Judgment in their argument for prejudice. Doc. No. 528, pp. 7–8. The Court gave the following instruction:

> The Court has already determined the Foundation Parties breached the contract by failing to pay $3 million of Earnout Payments to BAPTKO, Inc. as required under the First Amendment to the Asset Purchase Agreement. The Court has also determined BAPTKO, Inc. is entitled to prejudgment interest in the amount of $362,716.19 as of November 4, 2024, with a daily rate of interest of $493.16.
> The jury is tasked with deciding whether the Foundation Parties have proven any of their claims against Bob Kupper or BAPTKO, Inc., and if so, what damages, if any, they are entitled to in relation to any proven claims. These damages will act as an offset against the amount already determined by law.

Doc. No. 487, ¶¶ 30–31. This instruction merely reiterates the Court's ruling and reasoning on Summary Judgment and throughout trial.

[¶19]   Foundation Parties argue the short time the jury deliberated is evidence the jury was prejudiced. Doc. No. 528, p. 7–8. The Eight Circuit has held "that brief jury deliberation alone is not a sufficient basis for a new trial." United States v. Aguilera, 625 F.3d 482, 487 (8th Cir. 2010). See also Transit Cas. Co. v. Transamerica Ins. Co., 387 F.2d 1011, 1014 (8th Cir. 1967) (holding extended jury deliberation is not a sign of lack of prejudice).

[¶20]   Foundation Parties argues the Court inserted itself into testimony that was supportive of Kupper Parties but does not cite to the transcript for specific instances for the Court to discuss. Instead, it focuses on comments made outside of the presence of the jury.

[¶21]   "A court may exercise 'proper control' over presentation of witness testimony." Russell v. Anderson, 966 F.3d 711, 721 (8th Cir. 2020). "The trial court has broad discretion in commenting on evidence and may do so in order to give appropriate assistance to the jury." Id. at 722 (quoting Reed v. Malone's Mech., Inc., 765 F.3d 900, 910 (8th Cir. 2014)). The court may even comment

**ADD-64**

on facts, so long as it comments "fairly and impartially, and [it] may express [its] opinion upon the facts so long as he makes it clear to the jury that all matters of fact are submitted to their determination. Id. at 911 (quoting Gant v. United States, 506 F.2d 518, 520 (8th Cir. 1974)). Comments must not be "intended or calculated to disparage [a party] in the eyes of the jury and to prevent the jury from exercising an impartial judgment upon the merits." Rush v. Smith, 56 F.3d 918, 922 (8th Cir. 1995) (en banc) (quoting La Barge Water Well Supply Co. v. United States, 325 F.2d 798, 802 (8th Cir. 1963)).

[¶22]   The Court does not find persuasive Foundation Parties' reliance on a district of Iowa case concerning comments made prior to trial. Doc. No. 512, p. 29; see also Schultz v. Amick, 955 F. Supp. 1087, 1102 (N.D. Iowa 1997). Since the standard here is prejudice of the jury, the Court finds there was not prejudice to the jury based on any comments made outside of the jury's presence.

[¶23]   Foundation argues it was not required to provide evidence of intentional misconduct on Mr. Kupper's part and therefore it was improper not to allow their expert, Ginger Knutsen ("Ms. Knutsen") to present her opinion regarding Subaru vehicles. Doc. No. 512.

[¶24]   Expert witnesses must have a factual basis for their testimony. Fed. R. Evid. 702. The claim at issue in the case is breach of contract. A breach requires that in some way, the inventory was reduced, and Mr. Kupper was involved. Foundation Parties had presented evidence that Mr. Kupper declined acceptance of Chevrolet inventory from General Motors; however, no comparable evidence was presented for Subaru inventory. See Doc. No. 502, p. 99:15–101:7. The mere contractual obligation of Mr. Kupper to monitor inventory does not equate to evidence supporting a legal finding of breach of contract. Id. at 138:18–139:3. Ms. Knutsen could not divide the results of her report between Chevrolet and Subaru. See id. at 142:2–8. Kupper Parties pointed

**ADD-65**

out this exact concern regarding the data to Foundation multiple times well in advance of trial. Id. at 144:15–21. Rather than bar Ms. Knutsen entirely, the Court allowed them to call the witness to testify to what had been proven in the record with the notice that instruction would be given as to the unproven numbers in the report. Id. at 146:17–147:3.

[¶25]   With the jury present and the witness on the stand, the Court gave the promised instruction:

> Members of the jury, I have made, at this point in the case -- and the Foundation Parties are not -- have not completed presentation of the evidence, but I have determined that thus far there is no factual witness that would support a claim that there was a reduction in Subaru numbers that were caused by Robert Kupper; and, therefore, that claim, at least insofar as what Ms. Knutsen is going to testify to, should not be considered by you with regard to Subaru.

> We do have some evidence in the record that Mr. Kupper made a determination not to take a certain allotment or allocation of vehicles from Chevrolet. So inasmuch as that might have impacted the value of the dealership that Foundation bought, Ms. Knutsen can testify as to that. And if she can't, to your satisfaction, separate out Subaru from Chevrolet, you should disregard her testimony.

Id. at 171:14–172:3. Even after evidence was presented that her information was based on inventory numbers, which had been determined to be more like estimates than actual numbers, the Court allowed her testimony to remain in the record. Id. at 207:22–208:24. To make sure the jury knew of the factual basis of her charts and information, the Court asked a several questions on redirect. Doc. No. 503, p. 25:2–23. The Court gave both parties an opportunity to ask further questions in light of the Court's inquiry. Id. at 25:24–26:4. The Court was exercising "proper control" over the testimony to make sure it abided by the Federal Rules of Evidence and did not mislead the jury. See Russell, 966 F.3d at 721–22.

[¶26]   Foundation Parties argue the Court was hostile to their witnesses, Derek Slemko ("Mr. Slemko") and Ms. Knutsen, by interrupting the witness and a using a raised "voice in a manner that suggested circumstances of wrongdoing and impropriety." Doc. No. 512, p. 32.

- 9 -                                                    **ADD-66**

[¶27]   Arguments are considered waived if no objection is made during trial. Harris v. Steelweld Equip. Co., Inc., 869 F.2d 396, 402 (8th Cir. 1989). See also Fed. R. Evid. 614(c) (allowing objections "at the next opportunity when the jury is not present"); Lange v. Schultz, 627 F.2d 122, 127 (8th 1980) (holding the lack of objection warrants a different standard of review). The Court notes that, while no objection was made specifically to Mr. Slemko or Ms. Knutsen, Foundation Parties did move for mistrial after the Court's ruling on Ms. Knutsen's testimony. Doc. No. 502, p. 207:3–8. In that motion, Foundation Parties mentions its disagreement with the Court's "interactions with witnesses today, in particular Mr. Slemko." Id. at 207:12–17.

[¶28]   Mr. Slemko's testimony spans 150 transcript pages. Doc. Nos. 501–02. The Court dealt with an issue of hearsay early in Mr. Slemko's testimony. Doc. No. 501, p. 65:2–67:5. In questioning about accessing information, Mr. Slemko testified that he had not accessed critical financial information prior to closing. Doc. No. 502, p. 107:15–18. Whether or not Mr. Slemko knew he could access the information at the time was critical to the factfinders. Foundation Parties argued they could not access the information prior to closing the purchase; Kupper Parties showed the authorizations that allowed access before closing. The Court asked Mr. Slemko if he knew he could access the information, and Mr. Slemko replied, "Well, we didn't access the information." Id. at 108:17–21. The Court asked a second time about his knowledge of access and Mr. Slemko repeated the same answer. Id. at 109:2–7. The Court asked a third and fourth time about Mr. Slemko's knowledge, and he did not answer the Court's question. Id. at 109:8–24. Finally, on the fifth time the Court asked if Mr. Slemko knew he could access the information at the time, he answered that he did not know. Id. at 109:25–110:2. The Court directed the jury to disregard whether or not the information was accessible because Mr. Slemko did not know or try to access the information. Id. at 110:3–6.

[¶29]   This line of questioning by the Court was done to ensure the factfinders had an accurate understanding of the evidence and not "intended or calculated to disparage" Foundation Parties or Mr. Slemko. See Rush, 56 F.3d at 922. The Court has already discussed the testimony from Ms. Knutsen. Supra ¶ 25. The clarification to the jury was not "intended or calculated to disparage" Ms. Knutsen. See Rush, 56 F.3d at 922. The Court's only concern was presenting the jury with truthful and accurate information.

[¶30]   Lastly, Foundation Parties argue the management of the courtroom unfairly prejudiced their case, specifically the shortened trial schedule, the Court's ruling not to play deposition testimony of witnesses present in the courtroom, and setting time limits on cross-examination and redirect. Doc. No. 512, p. 34–35.

[¶31]   "A district court has broad discretion over evidentiary and trial management decisions." Gonzalez v. Shahin, 77 F.4th 1183, 1191 (8th Cir. 2023). A court can "impose reasonable time limits on the presentation of evidence to prevent undue delay, waste of time, or needless presentation of cumulative evidence." Id. (quoting Cedar Hill Hardware & Constr. Supply, Inc. v. Ins. Corp. of Hannover, 563 F.3d 329, 352 (8th Cir. 2009)). See also Johnson v. Ashby, 808 F.2d 676, 678 (8th Cir. 1987) (A judge "not only may but must exercise strict control over the length of trials."). "Time limits formulated before trial must be 'sufficiently flexible to accommodate adjustment if it appears during trial that the court's initial assessment was too restrictive.'" Harris v. Chand, 506 F.3d 1135, 1141 (8th Cir. 2007) (quoting Life Plus Intern. v. Brown, 317 F.3d 799, 807 (8th Cir. 2003)). To preserve the issue, parties must object and make offer of proof of the evidence excluded by the time limits. Id.

[¶32]   This consolidated case was originally set for twelve days of trial. See Doc. No. 359 (the last continuance at twelve days). Subsequently, the Court issued its Order on Summary Judgment,

**ADD-68**

which disposed of seven claims relating to various parties, which reduced the issues remaining for trial by over half. Doc. No. 373. As trial neared, considering the court calendar and the issues remaining for trial, the Court informed the parties the trial days would be reduced to six on September 16, 2024, six weeks before trial began on October 28, 2024. Doc. Nos. 390, 395. The division of time was addressed in Foundation Parties' Trial Brief, Doc. No. 456, p. 5, and discussed at the pretrial conference. Doc. No. 499, p. 14:11–17. No objection was made concerning the length of trial. Foundation Parties mentioned the time limit in a motion for mistrial concerning the Court's ruling not to play deposition testimony of a witness who was present in the courtroom. Doc. No. 502, p. 210:1–212:4. However, the basis for that motion was not the number of days of the case. The Court granted more time to Foundation Parties when requested. See Doc. No. 503, p. 172:19–173:20. In fact, Foundation Parties and Kupper Parties were each to have two days, but Foundation Parties took an extra half day, and therefore the Court granted Kupper Parties' request for an extra half day. Doc. No. 501, p. 13:16–14:15. The Court took pains to keep the jury's view of the parties neutral when the schedule for the trial was extended. Id. at 13:11–14 ("I did make a representation to the jury that we were on track because I like to reassure them and give them – credit to the lawyers for keeping things going. And so, if that's not the case, I'll own it."). Additionally, when Foundation Parties went over on the estimated time for closing by forty minutes, the Court not only allowed them to go over but also took the blame by telling the jury the closing instructions took longer than anticipated. Doc. No. 504, p. 170:25–7, 172:16–25 ("You went over 40 minutes . . . and I'm not going to cut [Kupper Parties] short . . . so I'll be the bad guy . . . . The jury, some of them at least, were not happy with that determination, but those are the things that I have to decide."). Therefore, the Court finds the time limits given were sufficiently flexible. See Harris, 506 F.3d at 1141.

**ADD-69**

Appellate Case: 25-1741   Page: 72   Date Filed: 07/25/2025 Entry ID: 5541519

[¶33]   As to the limitation of playing deposition testimony, the Court did not allow either party to play the deposition testimony of witnesses available to testify in person. Doc. Nos. 460, 463. While the Federal Rules allow playing of deposition testimony, it has never been considered an alternative for witnesses present and able to testify in open court. Federal Rule of Civil Procedure 43 states, "At trial, the witnesses' testimony must be taken in open court unless" otherwise allowed by Congress or the Judiciary. The Notes on the 1996b Amendment state, "The importance of presenting live testimony in court cannot be forgotten. The very ceremony of trial and the presence of the factfinder may exert a powerful force for truthtelling. The opportunity to judge the demeanor of a witness face-to-face is accorded great value in our tradition." Transmission of testimony from a remote location is only allowed with a showing of good cause. Fed. R. Civ. Pro. 43, cmt on 1996 Amendments. Deposition testimony is the remedy for witnesses unavailable for trial, not those sitting in the courtroom. See id.

[¶34]   For example, the Court told the parties it preferred to only call a witness once. When Foundation Parties concluded their examination of Kevin Kutschinski ("Mr. Kutschinski") and Mr. Kupper, Kupper Parties indicated they would call these witnesses again in their case-in-chief. Doc. No. 500, p. 137:3–18. No objection was made at that time by Foundation Parties. Mr. Kupper was still present and was recalled to the stand. Foundation Parties informed the Court Mr. Kutschinski had left the area. Kupper Parties did not have advance notice that Mr. Kutschinski would not be staying for the duration of the trial. Because of this unanticipated situation, the Court allowed his deposition testimony to be used rather than require him to fly back to North Dakota. Doc. No. 504, p. 130:1–131:16.

[¶35]   As to the argument that Foundation Parties were prejudiced by the cumulative effect of the Court's rulings, it is the Court's responsibility to make sure the trial is moving efficiently; it is the

**ADD-70**

Appellate Case: 25-1741   Page: 73   Date Filed: 07/25/2025 Entry ID: 5541519

parties' responsibility to get their evidence on the record to make their case. Foundation Parties rested without sufficient evidence on the record. Foundation Parties did not object to the days for trial. When Foundation Parties ask for half a day more time, the Court obliged. Throughout the trial, the Court ruled in favor and against both parties. When Foundation Parties objected to the exclusion of Ms. Knutsen's testimony, the Court allowed her to testify with context given to the jury. Nothing in the Court's rulings or words were calculated to disparage a party. The Court's only concern was a timely trial with accurate evidence for the factfinders. Accordingly, Foundation Parties' Motion for New Trial is **DENIED**.

### III.  Motion to Stay Execution of Judgment

[¶36]  On March 21, 2025, Foundation Parties moved to Stay Execution of Judgment pending resolution of post-trial motions before the Court. Doc. No. 534. Foundation Parties also moved to expedite this Motion. Doc. No. 536. This Order resolves all pending post-trial motions. Therefore, this Motions are **found as MOOT.**

### <u>CONCLUSION</u>

[¶37]  For the foregoing reasons, Foundation Parties' Renewed Motion for Judgment as a Matter of Law and Motion for New Trial (Doc. No. 511) are **DENIED**, the Motions to Stay Execution of Judgment and Expediting that Motion (Doc. Nos. 534, 536) are **found as MOOT**.

[¶38]  **IT IS SO ORDERED**.

DATED April 7, 2025.

Daniel M. Traynor, District Judge
United States District Court

**ADD-71**