# IN THE UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

**FA ND CHEV, LLC; FA ND SUB, LLC**

*PLAINTIFFS-APPELLANTS*

**V.**

**BAPTKO, Inc.**

*PLAINTIFF-APPELLEE*

**V.**

**ROBERT KUPPER; BISMARCK MOTOR COMPANY; AND BMC MARINE LLC D/B/A MORITZ SPORT & MARINE**

*DEFENDANT-APPELLEES,*

**V.**

**FOUNDATION AUTOMOTIVE CORP., AN ALBERTA CORPORATION**

*DEFENDANTS-APPELLANT.*

**Appeal from the United States District Court for the District of North Dakota**
**Case No. 1:20-CV-138-DMT-CRH**
**Honorable Judge Daniel M. Traynor, District Judge**

**BRIEF OF PLAINTIFF-APPELLEE BAPTKO, INC. AND DEFENDANT-APPELLEE ROBERT KUPPER**

Randall J. Bakke (#03898)
BAKKE GRINOLDS WIEDERHOLT
300 West Century Avenue
P.O. Box 4247
Bismarck, ND 58502-4247
(701) 751-8188
rbakke@bgwattorneys.com

*Attorneys for Defendant-Appellee*
*Robert Kupper and Appellee-Plaintiff and*
*Counter-Defendant BAPTKO, Inc.*

# SUMMARY OF THE CASE

This case arises from the sale of two automotive dealerships in Mandan, North Dakota. The seller, Kupper Chevrolet, Inc. (now known as BAPTKO, Inc.), entered into an Asset Purchase Agreement ("APA") with Foundation Automotive Corp., who assigned its rights and obligations under the APA to FA ND CHEV, LLC and FA ND SUB, LLC.

In addition to the agreed upon price for the goodwill of the dealerships, which was paid at the closing, the APA included an earnout provision, which entitled BAPTKO to additional payments if the dealerships met certain threshold financial targets in the several years after the sale, and such targets were met, as both Foundation and Foundation parties' counsel conceded. The District Court ("Court") correctly entered judgment for BAPTKO on the earnout for $3 million, plus interest. The parties tried the remaining claims by Foundation parties against BAPTKO (which could have offset damages), but the jury rejected them.

The alleged errors complained of by Foundation parties were either waived (despite Foundation's counsel planning to appeal from day one of the trial), fairly decided by the Court or jury, or mooted by the jury's findings. Foundation parties received a fair trial; their arguments and evidence were rejected by the jury. Appellees request 20 minutes for oral argument.

Appellate Case: 25-1741     Page: 3     Date Filed: 08/27/2025 Entry ID: 5551844

## <u>CORPORATE DISCLOSURE STATEMENT</u>

BAPTKO, Inc. is not a publicly-held corporation and has no corporate parent.

No publicly-held corporation owns ten percent (10%) or more of BAPTKO, Inc.'s

stock.

Appellate Case: 25-1741     Page: 4     Date Filed: 08/27/2025 Entry ID: 5551844

# **TABLE OF CONTENTS**

SUMMARY OF THE CASE ................................................................. iii

CORPORATE DISCLOSURE STATEMENT ....................................... iv

TABLE OF CONTENTS .................................................................... v

TABLE OF AUTHORITIES ............................................................. vii

STATEMENT OF THE ISSUES ......................................................... 1

RESPONSE TO STATEMENT OF THE CASE ..................................... 2

    I.     RELEVANT FACTS ................................................................... 2

          A. The Parties .................................................................... 2

               1.    Kupper, KCI, and BAPTKO (Appellees) ................................... 2
               2.    Foundation, FA ND CHEV, and FA ND SUB (Appellants) ....... 2

          B. The Transaction Underlying the Parties' Dispute ................ 2

               1.    Letter of Intent and Asset Purchase Agreement ...................... 3
               2.    Amendments to the APA ........................................................ 6
               3.    Assignments to FA ND CHEV and FA ND SUB ..................... 10
               4.    Earnout Provision ............................................................... 12

          C. Foundation's Discussion Relating to Closing ..................... 13

          D. KCI's Allegedly Wrongful Conduct And Foundation's Alleged Damages ................................................................. 14

               1.    KCI Did Not Fail to Maintain Inventory Levels Pursuant to the Terms of the APA ............................................................... 15
               2.    KCI Did Not Improperly Turn Down New Vehicles Allocated by GM .................................................................................... 25
               3.    Foundation's Performance Was Not Excused by Alleged Post-Closing Interference ............................................................. 28

Appellate Case: 25-1741    Page: 5    Date Filed: 08/27/2025 Entry ID: 5551844

SUMMARY OF ARGUMENT ............................................................29

ARGUMENT .................................................................................29

II.    THE COURT PROPERLY GRANTED SUMMARY JUDGMENT ON THE EARNOUT OBLIGATION ..........................................30

    A. No Material Facts Were in Dispute.......................................30

    B. As Determined by the Jury, BAPTKO Did Not Breach the APA ......31

    C. Even if BAPTKO had Breached the APA, Appellants' Performance was Not Fully Excused.......................................31

    D. The Court's Summary Judgment Ruling Was Not Inconsistent Nor Deprive Appellants of Any Viable Defense at Trial..........................37

    E. The Court Properly Found that Appellants were Jointly and Severally Liable, and Appellants Have Waived this Issue In Any Event...........38

III.    THE COURT DID NOT PREJUDICE THE JURY AND THE TRIAL WAS FAIR ..................................................................41

    A. The Court Did Not Undermine the Credibility of the Jury.................41

    B. The Court Did Not Improperly Limit Evidence on Subaru Inventory ....................................................................49

    C. The Jury Instructions Did Not Misstate the Law ................................52

    D. The Court's Conduct Does Not Warrant Reversal or a New Trial .....54

IV.    THE COURT DID NOT ABUSE ITS DISCRETION IN GRANTING, IN PART, BAPTKO AND KUPPER'S BILL OF COSTS AND REQUEST FOR ATTORNEYS' FEES.......................................................54

    A. The Court Properly Awarded Attorneys' Fees and Contractual Costs to Kupper ....................................................................54

CONCLUSION ................................................................57

vi

# TABLE OF AUTHORITIES

## CASES

*Barrett v. Gilbertson*,
2013 ND 35, 827 N.W.2d 831 ................................................................1, 34

*Continental Resources, Inc. v. Northland Royalty Corp.,*
2022 WL 5179845 (D.N.D. Aug. 15, 2022) ..........................................32

*Dakota Partners, L.L.P. v. Glopak, Inc.,*
2001 ND 168, 634 N.W.2d 520 ........................................................1, 32

*Doe v. Pulaski Cnty. Special Sch. Dist.*, 306 F.3d 616 (8th Cir. 2002)..............1, 31

*Gaillard v. Jim's Water Serv., Inc.,*
535 F.3d 771 (8th Cir. 2008)............................................................1, 53

*Griner v. King*, 104 F.4th 1 (8th Cir. 2024)..........................................1, 31

*Harris v. Steelweld Equip. Co,*
869 F.2d 396 (8th Cir. 1989)....................................................1, 43, 46

*Hendricks Property Management Corp. v. Birchwood Properties Ltd.,*
2007 ND 181, 741 N.W.2d 461 ..........................................................37

*In re Gen. DataComm Indus., Inc.,*
407 F.3d 616 (3d Cir. 2005)................................................................53

*In re Prempro Products Liability Litigation*,
514 F.3d 825 (8th Cir. 2008)............................................................1, 48

*Jensen v. Clarke,*
94 F.3d 1191 (8th Cir. 1996)............................................................1, 57

*Monarch Photo, Inc. v. Qualex, Inc.*,
935 F. Supp. 1028 (D.N.D. 1996)..................................................34, 35

*Pegg v. Kohn*,
2015 ND 79, 861 N.W.2d 764 ............................................................35

Appellate Case: 25-1741    Page: 7    Date Filed: 08/27/2025 Entry ID: 5551844

*Reed v. Malone's Mechanical, Inc.*,
    765 F.3d 900 (8th Cir. 2014) ........................................................42

*Riggs v. Gibbs*,
    66 F.4th 716 (8th Cir. 2023) ....................................................1, 35

*Rosenberg v. Son, Inc.*,
    491 N.W.2d 71 (N.D. 1992) ......................................................1, 11

*Rush v. Smith*,
    56 F.3d 918 (8th Cir. 1995) ..........................................................42

*Ryan v. Clarke*,
    281 F. Supp. 2d 1008 (D. Neb. 2003), aff'd, 387 F.3d 785 (8th Cir. 2004) .42, 43

*U.S. v. Turner*,
    975 F.2d 490 (8th Cir.1992) .....................................................1, 43

*Warner v. Transamerica Ins. Co.*,
    739 F.2d 1347 (8th Cir. 1984) ..................................................1, 42

*Welease 2018 Operating LP v. Behan*,
    2021 WL 9666531 (D.N.D. Oct. 14, 2021) ................................34

## **STATUTES**

28 U.S.C. § 1920 ................................................................................56

N.D.C.C. § 9-08-03 ..........................................................................36

## **RULES**

Fed. R. Civ. P. 12 ...........................................................................41

Fed. R. Civ. P. 51(d)(1)(B) ...........................................................35

Fed. R. Evid. 103(a)(2). ...........................................................24, 40

Fed. R. Evid. 614(c) ........................................................................46

viii

# OTHER AUTHORITIES

15 Williston on Contracts § 44:53 (4th ed. 2023) ....................................................53

17A *Am.Jur.2d* Contracts § 731................................................................................36

20 Am. Jur. 2d Counterclaim, Recoupment, Etc. § 6 (1995) ...................................32

Black's Law Dictionary 1376 (7th ed. 1999) ...........................................................32

Appellate Case: 25-1741    Page: 9    Date Filed: 08/27/2025 Entry ID: 5551844

## STATEMENT OF THE ISSUES

1.    Whether the alleged errors complained of by Appellants were waived. *Riggs v. Gibbs*, 66 F.4th 716 (8th Cir. 2023); *Harris v. Steelweld Equip. Co.*, 869 F.2d 396 (8th Cir. 1989).

2.    Whether the alleged errors complained of by Appellants were fairly decided by the Court or jury. *Dakota Partners, L.L.P. v. Glopak, Inc.*, 2001 ND 168, 634 N.W.2d 520; *Barrett v. Gilbertson*, 2013 ND 35, 827 N.W.2d 831; *Jensen v. Clarke*, 94 F.3d 1191 (8th Cir. 1996); *Rosenberg v. Son, Inc.,* 491 N.W.2d 71 (N.D. 1992).

3.    Whether the alleged errors complained of by Appellants were mooted by the jury's findings. *Griner v. King*, 104 F.4th 1 (8th Cir. 2024); *Doe v. Pulaski Cnty. Special Sch. Dist.*, 306 F.3d 616 (8th Cir. 2002).

4.    Whether Appellants received a fair trial. *Gaillard v. Jim's Water Serv., Inc.*, 535 F.3d 771 (8th Cir. 2008); *In re Prempro Products Liability Litigation*, 514 F.3d 825 (8th Cir. 2008); *U.S. v. Turner,* 975 F.2d 490 (8th Cir.1992); *Warner v. Transamerica Ins. Co.*, 739 F.2d 1347 (8th Cir. 1984).

1

## RESPONSE TO STATEMENT OF THE CASE

## V.     RELEVANT FACTS

### A.     The Parties

#### 1. Kupper, KCI, and BAPTKO (Appellees)

Robert Kupper ("Kupper") is sole owner of BAPTKO, Inc. ("BAPTKO"). BAPTKO was formerly named Kupper Chevrolet, Inc. ("KCI") before a name change on July 11, 2019. BAPTKO owned both a Chevrolet and a Subaru dealership in Mandan, North Dakota (collectively "Mandan Dealerships"), which BAPTKO sold to appellants. At trial, Kupper and BAPTKO were referred to interchangeably and collectively as the Kupper Parties. (App.351; R.Doc.499 at 30:22-25.)

#### 2. Foundation, FA ND CHEV, and FA ND SUB (Appellants)

FA ND CHEV, LLC ("FA ND CHEV") and FA ND SUB, LLC ("FA ND SUB") are related entities of Foundation Automotive Corp. (App.301; R.Doc.50 at ¶¶ 2-3.) Foundation Automotive Corp., FA ND CHEV, and FA ND SUB were referred to interchangeably and collectively as Foundation, Foundation Automotive, or the Foundation Parties. (App.351; R.Doc.499 at 30:18-21.) When referred to collectively, these parties are referred to as "Foundation."

### B.     The Transaction Underlying the Parties' Dispute

Foundation presents a misleading one-sided explanation of the transaction underlying the dispute, which misstates facts and ignores counterevidence produced. The facts and evidence convinced the jury to find against Foundation.

### 1. Letter of Intent and Asset Purchase Agreement

On August 1, 2018, Foundation Automotive Corp. provided KCI a Letter of Intent ("LOI") to purchase the Mandan Dealerships. (App.1679 [Ex.P136].) The closing date was December 3, 2018, and allowed due diligence for the transaction commencing August 1, 2018. (App.1680 [Ex.P136] at FAND0041445.) KCI and Foundation Automotive Corp. executed an Asset Purchase Agreement ("APA"), effective November 28, 2018. (App.1562 [Ex.P2].) Per the APA, KCI agreed to sell, and Foundation Automotive Corp. agreed to purchase substantially all the assets of BAPTKO used in the operations of the Mandan Dealerships. The closing on this transaction was to be by January 31, 2019. The APA stated, "the closing date shall occur no later than January 31, 2019 (the "Closing Date")." (App.1565 [Ex.P2] at § 3.1(a).)

In addition to due diligence allowed by the LOI, per Section 5.1 of the APA, Foundation Automotive Corp. had 60 days following the effective date of the APA ("Diligence Period") to conduct due diligence of the Mandan Dealerships, and could terminate the APA for any reason during the Diligence Period upon written notice to Seller. (App.1576 [Ex.P2] at § 5.1.) Kupper individually agreed to provide to

3

buyer at closing an executed copy of a Noncompetition and Nonsolicitation Agreement ("NCNSA). (App.75; R.Doc.3-1.)

Per the APA, Foundation was required to pay $14 million for the goodwill of the Mandan Dealerships (plus earnout amounts to be paid over several years, depending on post-closing financial performance of the dealerships). Foundation suggests its analysis of the reasonableness of the goodwill price was off due to alleged misinformation provided by Kupper. (Opening Brief of Appellants ("Brief") at 8-9.) Foundation points to inaccuracies in the vehicle inventory counts listed within the Dealer Financial Statements ("DFS") KCI provided to the broker. (Brief at 7.) Kupper testified Foundation should have known vehicle inventory counts on the DFS could not be relied on. (App.1195; R.Doc.504 at 874:6-9.) He testified the Subaru numbers were substantially wrong and explained any accounting person would have quickly determined the number of Subarus listed did not correspond with the dollar amounts for Subaru vehicles on the DFS as the cost identified was much too small per new vehicle identified. (App.1192-1194; R.Doc.504 at 871:2-873:3.)After it purchased and took over operation of the Mandan Dealerships, Foundation made the same error in the months following the closing on June 21, 2019, and the  vehicle numbers they identified on their DFS were drastically misstated. (App.1197, R.Doc.504 at 876:7-25.) Kupper and his automotive accounting expert Hewitt testified errors in DFS are common and DFS are known

4

by car dealers to be unreliable as to unit numbers (vehicles) described. (App.1197; R.Doc.504 at 876:7-25; App.1039-1040; R.Doc.503 at 718:20-719:19.) Rather, the New Vehicle Schedules are what should be and are relied on by dealers because the dollar amounts identified in the New Vehicle Schedules are known to be reliable. (App.1194-1195; R.Doc.504 at 873:10-874:5.)

Foundation CFO Slemko testified Foundation's analysis of the reasonableness of the goodwill price was a projection of future events, and that Foundation failed to account for many factors that occurred after the sale, which would have affected its forecast. (App.721-723; R.Doc.502 at 400:15-402:21.) This included a hail event in August 2019, a 40-day GM strike in September/October 2019, COVID, a chip shortage, and a significant $3 million dollar budget reduction Foundation voluntarily made to purchase new vehicle inventory in September, 2019, shortly after the closing. (Aple.App.726 [Ex.D542]; App.1200-1201; R.Doc.504 at 879:22-880:16.) Foundation's discussion in this regard is not relevant to any issue on appeal. The jury heard Slemko's testimony on how Foundation believed Kupper misled them into making a different projection/forecast than they would have made had Kupper provided the correct information, particularly accurate DFS, and determined Kupper/BAPTKO did not breach the APA.

Interestingly, Foundation provides a "goodwill" definition in its brief, stating, "[g]oodwill" (also called "blue sky") is, at its core, the value of the **intangible** assets

Appellate Case: 25-1741    Page: 14    Date Filed: 08/27/2025 Entry ID: 5551844

of a dealership—including the established name, reputation, websites, accumulated operational expertise a business, which is a valuable asset." (Brief at 6, 9 (citing App.533-34, R.Doc.500 at 212:23-213:9) (emphasis added). Foundation admits their expert Ginger Knutsen improperly valued goodwill as a **tangible** asset (App.864; R.Doc. 502 at 543:7-13.), which may be why the jury disregarded or otherwise found her testimony not reliable. In addition, the LOI at paragraph 1(a), identified goodwill as an intangible asset, not a tangible asset. (App. 1680 [Ex.P136] at 1(a).) The APA likewise identified goodwill as an intangible asset, not a tangible asset as Knutsen testified. (App.1610 [Ex.P2] at § N; App.864; R.Doc. 502 at 543:7-13.)

## 2. Amendments to the APA

The sale did not close by the required January 31, 2019 closing date. (App.1166; R.Doc.504 at 845:5-10; App.1565 [Ex.P2] at § 3.1(a).) While Foundation attempts to spread blame for the delay on all parties (Brief at 13), the delay was solely Foundation's fault. (App.573; R.Doc.500; 252:4-8; App.1128-1129; R.Doc.503 at 807:25-808:7; App.1165-1166; R.Doc.504 at 844:25-845:19; App.1216-1217; R.Doc.504 at 895:10-896:1; App.1219-1220; R.Doc.504 at 898:13-899:6.)

Following further negotiations, on May 1, 2019, BAPTKO and Foundation entered into First Amendment to Asset Purchase Agreement ("First Amendment"), which amended the APA terms, purportedly retroactively to January 27,

2019. (App.1635 [Ex.P4].) Per the First Amendment, the closing was then to occur no later than June 3, 2019. (App.1636 [Ex.P4] at § 4(a) (deleting and replacing § 3.1(a).)

As BAPTKO and Kupper argued to the jury (and Foundation presented counterarguments), there was no contract between BAPTKO and Foundation between February 1, 2019 (APA was terminated for failing to timely close) and May 1, 2019 (when Kupper signed an extension of the APA). (App.581-582; R.Doc.500 at 260:5-261:15; App.1227-1228; R.Doc.504 at 906:22-907:22.) During that time, BAPTKO and Kupper did not owe duties to Foundation, and they presented evidence at trial they committed no alleged breaches during that time. Whether the APA was terminated from February 1, 2019, until the extension was signed May 1, 2019 was not an issue separately decided by either the Court or jury, nor did Foundation request this issue be separately decided at trial. (App.218; R.Doc.488; App.105; R.Doc.454.)

Even assuming arguendo the contract was binding during that time, and BAPTKO and/or Kupper engaged in some wrongful conduct at any time (which they did not), as stated in Section 6 of the First Amendment, **"[t]he Parties acknowledge and agree that the Diligence Period has expired, and Buyer [Foundation Automotive Corp.] is satisfied with the results of its diligence review as of the date hereof."** (App.1637 [Ex.P4] at Section 6 (emphasis added).) Foundation chose

to close the due diligence window on May 1, 2019, and indicate it was satisfied with the results. This was part of its effort to get Kupper back into an agreement to sell the Mandan Dealerships after Foundation delayed and failed to close in time under the original APA. (App.468-469; R.Doc.499 at 147:19-148:24; App.471; R.Doc.499 at 149:20-150:5; App.684-685; R.Doc.501 at 363:16-364:18; App.1167-1168; R.Doc.504 at 846:15-847:20.)

On May 31, 2019, the parties entered into Second Amendment to Asset Purchase Agreement ("Second Amendment"), extending the closing date to June 21, 2019, due to more delay by Foundation. (App.1671 [Ex.P5] at § 3(a); (App.575; R.Doc.500; 252:4-8; App.1128-1129; R.Doc.503 at 807:25-808:7; App.1165-1166; R.Doc.504 at 844:25-845:19; App.1216-1217; R.Doc.504 at 895:10-896:1; App.1219-1220; R.Doc.504 at 898:13-899:6.)

Both the First Amendment and Second Amendment expressly provided "[e]xcept as modified by this Amendment, the terms and conditions of the Agreement [APA], as previously amended, are hereby ratified, confirmed and shall remain unchanged and in full force and effect." (App.1638 [Ex.P4] at § 13; App.1672 [Ex.P5] at § 5.) Foundation delayed the closing date three times and decided to p close despite any concerns it now expresses. Any changes agreed to in the amendments were voluntary choices by Foundation. Foundation is essentially complaining about a purchase it voluntarily proceeded with. (App.571-573;

8

R.Doc.500 at 250:6-252:20.) At any time prior to closing, Foundation could have walked away and refused to close. They decided not to walk away, or even to raise any issues complained about in this later litigation. (App.752-754; R.Doc.502 at 431:24-433:8.)

Foundation states, "on January 31, 2019, Kupper and his longtime business partner and friend, Chris Schneider, exchanged text messages indicating that Foundation was preparing an extension for the original closing date of the APA, but that Kupper hadn't signed it yet." (Brief at 13 (citing App.574; R.Doc.500 at 253:1-24; App.1703; Ex.P12, at 5). Kupper testified Foundation never sent the extension, and regardless, Kupper had no obligation to agree to extend the contract deadline. (App.581-582; R.Doc.500 at 260:5-261:2; App.1130; R.Doc.503 at 809:2-12.)

Foundation claims, "when neither Party exercised their right to terminate under Section 7.1(c), the Parties had no further outs—termination was no longer an option." (Brief at 14.) Contradicting this, there was testimony the APA could be terminated by Foundation after January 31, 2019. (App.466-467; R.Doc.499 at 145:16-146:4.) Regardless, Section 7.1(c) does not state that any certain form of termination notice is required. Foundation CEO Kutschinski sent text messages to Kupper indicating Foundation would not meet the January 31, 2019 deadline to close, terminating the APA. (Aple.App.539-544 [Ex.P141] at KUPPER-000534-539).

9

Foundation claims it "maintained its 'right to have its diligence review updated following the expiration of the Diligence Period and prior to the Closing to ensure there was no material change in the operations of the Dealerships prior to the Closing.'" (Brief at 16 (quoting App.1576 (Ex.P2) §5.1). If this were correct, the language in the First Amendment regarding the Diligence Period having "expired" would have no meaning. Slemko testified it was his understanding the statement regarding the Diligence Period having expired in the First Amendment meant that Foundation was "satisfied with our review to that point." (App.685-686, R.Doc.501, at 364:23–365:13.) The First Amendment says what it says. Slemko admitted he is not an attorney. (App.748; R.Doc.502 at 427:20-23.) He further acknowledged "expired" under the First Amendment would mean the Diligence Period is "done." (App.752-754; R.Doc.502 at 431:19-433:21.)

Despite Foundation claiming it was "in the dark as to the details and circumstances of Kupper and KCI's operation of the dealerships" (Brief at 15 (citing App. 1635, Ex. P4), Devere Boyd, the sales agreement broker for all parties, testified by video deposition played at trial by Foundation's counsel, that Foundation was not in the dark at all and Kupper provided all information and documents Foundation requested to evaluate the purchase, and often multiple times. (App.1418; R.Doc.512-1 at 117:06-118:14; App.1420; R.Doc.512-1 at 122:01-122:04.)

### 3. Assignments to FA ND CHEV and FA ND SUB

On June 21, 2019, Foundation Automotive Corp. entered into two nearly identical Assignment and Assumption Agreements in which it assigned <u>all of its rights and obligations</u> under the APA, as amended, to FA ND CHEV and FA ND SUB. (App.1674 [Ex.P6]; App.1677 [Ex.P7].) The assignment to FA ND SUB provides:

> 1. <u>Assignment</u>. Subject to Section 9.6 of the Asset Agreement, Assignor hereby assigns, transfers and conveys to Assignee, its successors and assigns, all of Assignor's right, title and interest in, to and under the Asset Agreement relating to the Subaru Assets, including without limitation, all rights to receive assets and all obligations to perform under the Asset Agreement relating to the Subaru Site.

> 2. <u>Assumption</u>. Subject to Section 9.6 of the Asset Agreement, Assignee hereby assumes all obligations and liabilities of Assignor under the Asset Agreement from and after the date hereof as such relate to the Subaru Assets, releases Assignor from any and all obligations and liabilities associated therewith, and agrees to indemnify and hold Assignor harmless with respect thereto.

(App.1677 [Ex.P7].) Similarly, the assignment to FA ND CHEV provides essentially identical terms as the Subaru assignment, but instead assigns all of Foundation's rights and obligations in relation to the Chevrolet assets. (App.1674 [Ex.P6].) The language of the Assignments clearly assign to FA ND CHEV and FA ND SUB all of Foundation's rights, interests <u>and obligations</u> under the APA. Because of the assignments from Foundation Automotive Corp. to FA ND CHEV and FA ND SUB, all three Foundation parties were responsible for complying with the terms of the APA as amended. *See Rosenberg v. Son, Inc.,* 491 N.W.2d 71, 74–76 (N.D. 1992).

Appellate Case: 25-1741     Page: 20     Date Filed: 08/27/2025 Entry ID: 5551844

The fact Foundation Automotive Corp. assigned its rights and obligations under the APA was addressed in multiple contract documents and provisions, as discussed by the Court in an early order denying a motion to dismiss. (App.262-263; R.Doc.40 at 4-5.)

### 4. Earnout Provision

The APA included an earnout provision, entitling BAPTKO to additional payments if the Mandan Dealerships met certain threshold financial targets in the years after the sale. Such targets were met, as Foundation conceded. (App.331; R.Doc.499 at 10:7-13; App.347; R.Doc.499 at 26:8-12.) Per Sections 2.1(d)-(e) of the APA, as amended, BAPTKO was entitled to an earnout of $750,000 for each calendar year in which the Mandan Dealerships (i.e. both the Chevrolet and Subaru dealerships combined) reached the normalized earnings before taxes threshold of $2.5 million for a calendar year, calculated using the methodology described in Exhibit D to the APA, and to be paid no later than May 1 of the following calendar year. (App.1635-1636 [Ex.P4] at § 3.)

The normalized earnings before taxes threshold for a calendar year was lowered in the First Amendment (to $2.5 million) from the original APA provision ($3.5 million), which Foundation voluntarily agreed to. While Foundation CEO Kutschinski claimed Foundation did not want to agree to the $2.5 million earnout threshold, text messages were introduced between Kutschinski and Kupper wherein

Kutschinski not only agreed to the amendment, but stated he had the exact same idea. (App.1168-1169; R.Doc.504 at 847:21-848:16; Aple.App.588; Ex.P141 at KUPPER-000583.) Kupper testified the amendment was a mutual agreement between Kupper and Kutschinski after several attempted solutions that would work for both of them. (App.1167-1168; R.Doc.504 at 846:15-847:20.)

The Mandan Dealerships surpassed the normalized EBT target of $2.5 million for calendar years ending December 31, 2020, 2021, 2022, and 2023 following the sale, as Foundation conceded in Foundation Automotive Corp., FA ND CHEV, LLC, and FA ND SUB, LLC's Trial Memorandum (App.151; R.Doc.456) and in a conference with the Court outside the presence of the jury the first trial day. (App.331; R.Doc.499 at 10:7-13; App.347; R.Doc.499 at 26:8-12.) Therefore, BAPTKO was contractually entitled to four annual payments of $750,000 (totaling $3 million), which was never paid. The Mandan Dealerships hit the threshold financial performance under the earnout provision each year after the sale despite alleged breaches by BAPTKO and Kupper (which were rejected by the jury).

### C. Foundation's Discussion Relating to Closing

The closing on the Mandan Dealerships occurred on June 21, 2019. (App.1671 [Ex.P5] at § 3(a).) At closing, Kupper individually executed and delivered to Foundation the NCNSA, as agreed. (App.75; R.Doc.3-1.) Foundation paid $14 million for goodwill at closing, but never paid any earnout payments

13

despite the contractual financial threshold being met each year for the four years following closing.

Foundation claims dozens of vehicles were missing the day of closing. (Brief at 18 (citing App. 703, R. Doc. 501, at 382:9-19; App. 703-04, R. Doc. 501, at 382:21-383:3.) Notably, Foundation chose to close. The evidence established there were no missing vehicles at closing and vehicles not delivered were in the process of being customized or repaired, or were delivered later. (App.1202; R.Doc.504 at 881:1-882:20.) Foundation and its bank counted the vehicles at closing and only paid for vehicles present at closing, which Foundation conceded. (App.787-789; R.Doc.502 at 466:10-468:12; App.1202-1204; R.Doc.504 at 881:1-883.) Foundation's bank representative was present several days prior to close. (App.733; R.Doc.502 at 412:8-12.)

### D. KCI's Allegedly Wrongful Conduct And Foundation's Alleged Damages

Foundation claims KCI failed to maintain inventory levels before closing pursuant to the APA terms, and KCI improperly turned down new vehicles allocated by GM. (Brief at 19-25.) Foundation suggests these were part of a deliberate attempt by Kupper to sabotage Foundation (*Id.* at 13-14.)[1]. There was no evidence to support

---

[1] Foundation misrepresents text messages from Kupper, claiming, "[m]aking matters worse, it appeared that Kupper's pre-closing failures under the terms of the APA resulted in a decrease in the value of the dealerships. Kupper lamented this predicament in text messages with Chris Schneider on February 20, 2019…." (Brief

this suggestion, and Foundation does not cite any. Sabotaging Foundation's vehicle sales after closing is illogical as it would defeat reaching the earnout thresholds Kupper wanted Foundation to meet. (App.1050; R.Doc.503 at 729:1-9.)

Foundation CFO Slemko testified between January 31, 2019 and May 1, 2019, he never contacted Kupper to tell him to maintain certain inventory, and there was no written or verbal agreement during that time requiring Kupper maintain a certain amount of vehicles. (App.747-748, R.Doc.502 at 426:20-427:8.)

These were all contested factual issues with evidence and counterevidence from both sides. After the close of Foundation's case, the Court denied a directed verdict motion by BAPTKO on the inventory issue, stating, "the failure to maintain inventory levels motion for directed verdict is denied, and that issue will be answered by the jury." (App.989; R.Doc.503 at 668:23-25.). Foundation argues the issue to this Court as if not already presented to and rejected by the jury, which it was. (App.218; R.Doc.488.)

### 1. KCI Did Not Fail to Maintain Inventory Levels Pursuant to the Terms of the APA

---

at 14 (citing App. 1714, Ex. P12, at BMC00881). Kupper testified his concern about the decrease in value was due to market changes that occurred during the eight-month delay caused by Foundation – it had nothing to do with Kupper's alleged pre-closing failures. (App.588-589; R.Doc.500 at 267:16-268:13.)

Kupper testified he did not change any inventory ordering practices of KCI/BAPTKO before closing, and while Kupper was not personally involved in ordering vehicles, he had knowledge of the process. (App.562-564; R.Doc.500 at 241:6-243:11.) Kupper testified BAPTKO could only accept what GM was offering and could not order inventory unavailable. (App.1176-1178; R.Doc.504 at 855:19-857:16; App.1181-1183; R.Doc.504 at 860:25-862:13.) Kupper testified KCI/BAPTKO never turned down Subarus. (Aple.App.439; R.Doc.363-3 at 164:11-15.) Per Subaru's rules, it was required to take all inventory Subaru offered and Kupper did so prior to closing, as it had always done. (Aple.App.439; R.Doc.363-3 at 164:11-15.)

The only fact testimony by Foundation that KCI supposedly did not meet the rolling average of inventory or use best efforts was given by Foundation Houston based CFO Slemko. (App.748-749; R.Doc.502 at 427:9-428:3.) However, Slemko admitted he was not involved in the consensus process (for ordering vehicles) for the Mandan Dealerships, had no personal knowledge on the consensus process, and never even opened up the consensus link for GM. (App.745-746; R.Doc.502 at 424:16-425:6.) There was no foundation for any testimony on this topic and Slemko conceded so. (App.746; R.Doc.502 at 425:7-11.)

Foundation argues the rolling average inventory requirement applies to KCI's entire vehicle inventory, including both GM and Subaru vehicles. (Brief at 21.)

16

Foundation attempted to improperly inject undisclosed Subaru losses at trial through its expert, Knutsen. The Court gave a cautionary instruction to the jury as to certain testimony of Foundation's expert Knutsen relating to allegedly lost Subaru sales, based upon a lack of any evidence to support her opinions, and failure to make a claim in this regard by Foundation. (App.881-882; R.Doc.502 at 560:14-561:3.) Specifically, the evidence was that:

- Foundation was not claiming vehicle sales or lost income or damages relating to Subaru's, and there was no testimony from Foundation in this regard. In fact, Kutschinski testified Foundation was not making a claim in relation to lost Subaru sales, as did Slemko. (Aple.App.132-133; R.Doc.297-10 at 36-38; Aple.App.032-034; R.Doc.255-17 at 127:1-135:15.)

- Knutsen conceded in discovery depositions she could not segregate out damages relating to lost Subaru sales, even though she made a calculation in her expert report for alleged lost Subaru sales which was combined with lost GM sales. (Aple.App.057-058; R.Doc.257-1 at 61:2-64:14; Aple.App.235-236; R.Doc.363-2 at 29:22-30:25; App.843; R.Doc.502 at 522:6-20.)

- No one at Foundation testified about lost Subaru inventory. Instead, Knutsen simply assumed reduced Subaru inventory and included it in her damage's calculation without evidentiary support. (Aple.App.237; R.Doc.363-2 at 34:1-13.)

17

- No testimony was provided on the Subaru consensus process for ordering and securing new Subaru vehicle inventory. Had there been such testimony for Foundation, it would have been countered by Kupper, who would have explained the Subaru consensus process for securing new Subaru vehicles is entirely different than the GM consensus process. (App.842-843; R.Doc.502 at 521:16-522:5.) Subaru, because it is a smaller quantity producer than GM, requires dealers to accept all vehicles offered, without any ability to reject allocations. (Aple.App.439; R.Doc.363-3 at 164:11-15.)

The Court indicated in his ruling Foundation's arguments regarding Knutsen's testimony and opinions were directly refuted and if there is no factual basis for the expert's testimony, it must be excluded. (App.846; R.Doc.502 at 525:2-22.) The Court indicated there was no evidence tying Kupper to making any decision to reduce Subaru inventory. (App.808-811; R.Doc.502 at 487:9-490:7; App.848-849; R.Doc.502 at 527:22-528:3.) Foundation asserted because there was reduced inventory prior to the sale, there was "circumstantial evidence". (App.848-849; R.Doc.502 at 527:22-528:1.) The Court was not convinced any such circumstantial evidence, if any, was tied to Kupper, which it was not. The Court said this was mere speculation. (App.849; R.Doc.502 at 528:1-3.) Foundation's counsel asserted Knutsen was going to testify to "a trend" (App.850; R.Doc.502 at 529:9-12.), but

18

had zero evidence to tie the alleged trend to Kupper. (App.938; R.Doc.503 at 617:9-17; Aple.App.251; R.Doc.363-2 at 92:18-93:21.)

Before the Court's decision on cautioning the jury about Knutsen's testimony, Foundation's counsel conceded after consulting with Knutsen outside the courtroom that Knutsen "is not able to separate Subaru and Chevrolet" damages. (App.853; R.Doc.502 at 532:15-21.)

Despite the Court had serious misgivings regarding Knutsen not basing her opinions on evidence, the Court allowed her to testify and recognized her as an accounting expert witness. (App.858; R.Doc.502 at 537:5-8; App.865; R.Doc.502 at 544:6-8.) The Court allowed her to testify about vehicle inventories based on a 12-month rolling average for Kupper Chevrolet. (App.869; R.Doc.502 at 548:16-22.) The Court overruled objections by Kupper/BAPTKO's counsel regarding the scope of Knutsen's testimony. (App.871-872; R.Doc.502 at 550:20- 551:1-2.) Knutsen did not offer testimony about any rolling averages for Kupper Subaru, even though the Court had not precluded Foundation's counsel from such questioning.

Knutsen was allowed to testify regarding her assertion the "dealership that Foundation purchased was much smaller than what they were expecting", (App.873; R.Doc.502 at 552:9-11) and consequently Foundation received less BlueSky/goodwill value than they agreed to pay for, which was $17 million. (App.875; R.Doc.502 at 554:15-16; App.876; R.Doc.502 at 555:18-24.)

Despite ruling there was no evidence to support a claim for lost Subaru sales by Foundation and no evidence of lost Subaru sales attributable to Kupper, the Court nonetheless allowed Foundation's attorney to present a demonstrative exhibit, PX1, to the jury. (App.881-882; R.Doc.502 at 560:11-561:4; Aple.App.686 [Ex.PX1].) In that demonstrative exhibit, Knutsen included both new and used Subaru vehicles and financial information to support her testimony on damages by Foundation, which Foundation asserted were attributable to Kupper. (App.878-882; R.Doc.502 at 557:11-561:13.) The Court overruled the objection by BAPTKO/Kupper relating to the demonstrative exhibit. (App.881; R.Doc.502 at 560:9-13.) The Court allowed this testimony by Knutsen despite Knutsen's testimony she could not segregate which of the financial damages being testified to by her related to new and used Subarus versus new and used Chevrolets. (App.879; R.Doc.502 at 558:5-8.) The Court instructed the jury there was evidence in the record that Kupper made a determination not to take a certain allocation of vehicles from Chevrolet and cautioned that if Knutsen through her testimony could not to the jury's satisfaction separate out Subaru from Chevrolet damages that the jury should disregard her testimony regarding alleged Subaru losses. (App.881-882; R.Doc.502 at 560:22-561:3). Based on the demonstrative, Knutsen testified the vehicles Foundation acquired at closing in June 2019 "was a lot less" and determined the difference from what was in inventory in May 2019. (App.885-886; R.Doc.502 at 564:23-565:1.)

Knutsen did not testify this decline in vehicles was attributable to Kupper or suggest Kupper selling vehicles prior to closing in late June 2019 was improper. Kupper objected to Knutsen's testimony about reduced inventory for both Chevy and Subaru units throughout Knutsen's testimony, but was overruled. (App.886; R.Doc.502 at 565:2-11.) Knutsen testified the vehicle inventory for Kupper Chevrolet should have been 526 vehicles at closing instead of the 479 on the dealer financial statement, and therefore Kupper Chevrolet had not complied and maintained inventory in compliance with the rolling 12-month average. (App.889; R.Doc.502 at 568:1-11.) Knutsen did not testify any failure to maintain inventory by KCI was caused by Kupper. (App.938; R.Doc.503 at 617:8-17.) Knutsen calculated a reduction in earnings by Foundation based on less vehicles at Kupper Chevrolet. (App.890-891; R.Doc.502 at 569:24-570:3.) She also testified to a reduction in earnings by Foundation based on the BlueSky multiple to come up with goodwill loss to Foundation of $1,332,864. (App.891; R.Doc.502 at 570:4-14.)

Knutsen testified to a total negative impact to goodwill because of the purported smaller dealership sold to Foundation of $2,374,529. (App.894; R.Doc.502 at 573:16-18.) No witness testified to this negative impact being caused by Kupper or breach by him. Knutsen's testimony was rebutted by BAPTKO's highly qualified automotive accounting expert, Steve Hewitt. (App.1012-1014;

R.Doc.503 at 691:3-692:693:3; App.1050; R.Doc.503 at 729:1-9; App.1054; R.Doc.503 at 733:6-15; App.996-1001; R.Doc.503 at 675:2-680:12.)

Knutsen was permitted to testify Kupper Chevrolet was not maintaining its inventory levels in accordance with Section 5.2 of the APA (App.898; R.Doc.502 at 577:11-14), including a corresponding goodwill reduction of $604,000. (App.898-899; R.Doc.502 at 577:24-578:1.) Knutsen conceded there was no testimony by any Foundation witness that Foundation was buying a smaller operation than they thought. (App.900-901; R.Doc.502 at 579:19-580:16.) She also conceded if her testimony was true, Foundation purchased this smaller operation voluntarily because they knew the number of units they were buying at closing and only paid for the inventory they received. (App.901-902; R.Doc.502 at 580:17-581:1; App.902-903; R.Doc.502 at 581:18-21, 24-25-582:1.) She conceded any less units below the rolling average amounts that Foundation supposedly expected to receive at the closing were units Foundation never paid Kupper for. (App.903-904; R.Doc.502 at 582:17-583:14.)

During cross examination it was revealed Knutsen only prepared demonstrative exhibit, PX1, during the trial itself the day before her testimony and the demonstrative was only provided to Kupper's counsel the day of Knutsen's trial testimony. (App.908; R.Doc.502 at 587:18-19; App.909; R.Doc.502 at 588:8-16; Aple.App.686 [Ex.PX1].) After the demonstrative was about to be shown to the jury,

BAPTKO's counsel briefly questioned Knutsen about PX1 and she conceded she included both Subaru and Chevrolet alleged losses in PX1 and could not segregate Subaru from Chevrolet losses, (App.556-558; R.Doc.500) and counsel objected to PX1 (App.558; R.Doc.500 at 237:1-10). The Court overruled BAPTKO's objections. (App.560; R.Doc.500 at 239:1-13) The Court addressed out of the hearing of the jury that Foundation had failed to disclose this document or the contents thereof until the testimony of Knutsen during the trial. (App.911; R.Doc.502 at 590:2-25.) Counsel for Foundation conceded this information was available well prior to trial and could have been disclosed at Knutsen's most recent deposition, ten months before trial. (App.911; R.Doc.502 at 590:3-16.) Outside the hearing of the jury, the Court stated and correctly concluded Knutsen's testimony on reduced inventory was a deceptive game in front of this jury because Knutsen was using inventory numbers Kupper had testified were incorrect, instead of using the actual financial numbers for the value of the vehicles. (App.914; R.Doc.502 at 593:12-25.) Knutsen advised the Court in camera she could have used the values and that those values had been available to her for some time prior to trial. (App.915; R.Doc.502 at 594:1-13.) Even though this was trial by ambush/surprise, the Court did not exclude her testimony and allowed her testimony to be considered by the jury. (App.917-918; R.Doc.502 at 596:21-597:7.) While the Court expressed reservations about Knutsen's testimony, describing it outside the presence of the jury

23

as "garbage in, garbage out," the Court allowed Knutsen to testify overall on Subaru and Chevrolet numbers and instructed the jury if they felt that the information was not reliable, they were to rely on their own evaluation of the evidence in the record and to disregard the information from Knutsen. (App.979-981; R.Doc.503 at 658:25-660:6.)

Foundation's attorney advised the Court he would provide a "short brief" to develop a record on the alleged contradiction in Kupper's testimony on inventory in his prior depositions but failed to do so. (App.919; R.Doc.502 at 598:9-19). This was in relation to Foundation's request to play all or part of Kupper/BAPTKO's lengthy five depositions to the jury. (App.920; R.Doc.502 at 599:5-23.) Similarly, Foundation made no offer of proof as to Knutsen and waived its ability to appeal any claimed limitations by the Court on Knutsen's testimony or opinions. (App.919; R.Doc.502 at 598:9-24; see Fed. R. Evid. 103(a)(2).)

Most importantly, the jury heard about reduced inventory and did not find BAPTKO breached the APA provisions, despite Foundation's purported evidence. The jury never reached the issue of recoverable damages by Foundation, and therefore Knutsen's testimony about lost goodwill value and/or damages due to reduced Chevrolet and Subaru inventory, new and used, is irrelevant as the jury never addressed damages. Knutsen conceded she was assuming liability in this case and was not offering testimony on liability issues, including any breach of contract

24

by Foundation. (App.938; R.Doc.503 at 617:9-17.) Nor would she be qualified or allowed to testify as to a breach of contract. *Id.*

### 2. KCI Did Not Improperly Turn Down New Vehicles Allocated by GM

Kupper testified the Chevrolet GM inventory offered through the consensus process was strictly determined by GM for any consensus cycle. Kupper testified KCI/BAPTKO would not take new vehicle inventory that was not needed or would not sell. (App.1177-1178; R.Doc.504 at 856:20-857:2.) This was the same process followed by Foundation after the sale, wherein it also turned down certain vehicles. (App.1181-1183; R.Doc.504 at 860:25-862:13.) GM representative David Sikkenga testified dealers would not want to accept inventory not selling. (App.1465-1466; R.Doc.512-2 at 116:17-116:25; App.1470; R.Doc.512-2 at 124:14-124:20.)

Foundation argues, "David Sikkenga—the then-Chevrolet zone manager for Minnesota and North Dakota—explained that KCI chose not to accept allocation of 152 new trucks from February 2019 to May 2019. Kupper admitted to doing so at trial, stating, "I declined 152 trucks, yes." (Brief at 22.) (citing App.1740-43, Ex.P18; App.1744-47, Ex.P20; App.1444-45, R.Doc.512-2, at 62:04-64:12; App.1221, R.Doc.504, at 900:8-16) (also citing App.1221, R.Doc.504, at 900:16.) This is deceiving. Kupper declined 152 light-duty ("LD") trucks because KCI had enough of this model of truck. (App.1176; R.Doc.504; 855:1-18.) Sikkenga testified pickups declined were LDs (half-ton) (App.1445; R.Doc.512-2 at 63:04-63:12; App. 1445-

46, R.Doc.512-2 at 64:20-64:25.) It was not necessary or advisable to have excess inventory, just a 90-day supply. (App.563-564; R.Doc.500 at 242:11-243:1.)

The geographic area Kupper Chevrolet sold and serviced was western North Dakota, where Kupper sold mostly heavy-duty ("HD") pickups, not LD pickups. (App.1172; R.Doc.504 at 851:11-25; App.1447; R.Doc.512-2 at 68:04-68:12.)

Foundation argues, "The Silverado 1500 was indisputably KCI's best-selling vehicle in the years leading up to the Transaction. The Executive Summary that Boyd prepared and provided to Foundation contains KCI's historical sales of the Silverado 1500, among other makes and models…." (Brief at 22.) Sikkenga testified Kupper's best-selling vehicles were three-quarter ton Silverado HD pickups and the half ton Silverado crew cab LD pickup. (App.1456, R.Doc.512-2 at 99:17-99:23.) Kupper testified that Foundation turned down 78 LD and HD pickup trucks after closing. Kupper only declined LDs before closing. (App.1180-1181; R.Doc.504 at 859:20-860:4; App.1182-1183; R.Doc.504 at 861:5-862:4; Aple.App.727 [Ex.D649]; Aple.App.694 [Ex.D528]; App.1740 [Ex.P18].) If Foundation was short on LD pickups, it would not have declined those trucks after closing. (App.1183; R.Doc.504 at 862:5-13.) As Kupper had more Silverado LDs in inventory, and high sales of Silverado LDs between January 2019 and June 21, 2019, Foundation was eligible for a large consensus of Silverado LDs after closing and was then handling

26

consensus with GM. (App.1185-1187; R.Doc.504 at 864:20-866:21; App.1445; R.Doc.512-2 at 64:02-64:09.)

Kupper testified Silverado HDs were his biggest seller as farmers and ranchers, his primary pickup purchasers, bought HDs not LDs. (App.1172; R.Doc.504 at 851:11-21.) In 2019 before closing on June 21, 2019, there were very few HDs allocated by GM and Kupper took them all. (App.1461, R.Doc.512-2 at 110:13-22.) Kupper testified there were no HD trucks available due to a body style change. (App.1175; R.Doc.504 at 854:3-20.) Kupper's rolling average of HD pickups he received from GM in February through May, 2019 was less than four HDs per month. (App.1461-62; R.Doc.512-2 at 111:03–111:14.) Kupper could not order inventory not available. (App.1188-1189; R.Doc.504 at 867:22-868:11.) Conversely, Kupper was allocated and accepted 174 HDs between February 2018 and January 2019 for a monthly average of 14.5 and asked for four more for a total of 178 HDs. So, an average of 14.83 HDs per month. (App.1462, R.Doc.512-2 at 112:07-112:13; 112:15; App.1048-49; R.Doc.503 at 727:14-728:24.) Sikkenga, from GM, testified between February 2019 and closing the GM Oshawa plant was shut down and was not producing HDs. (App.1449, R.Doc. 512-2 at 73:09-73:18.) "It shut the plant down." (App.1450, R.Doc. 512-2 at 76:11-76:14.) This explains why Kupper could not obtain its best-selling HD pickups in 2019 before closing. Kupper's and Sikkenga's testimony established KCI/BAPTKO met its duties with

inventory. (App.562-564; R.Doc.500 at 241:6-243:11.) Sikkenga admitted Kupper's practice was to accept all HDs GM allocated and offered. (App.1463, R.Doc.512-2 at 113:06-113:15; 113:18-113:19.) In fact, Kupper's routine practice was to ask for more HDs than GM allocated. (App.1463-64, R.Doc.512-2 at 113:21-114:01; and 114:05-114:06.)

Further, Kupper said Foundation can ask for an extra allocation when they became a new dealership owner, but Foundation failed to do so, which shows Foundation was not short on inventory after closing. (App.1201; R.Doc.504 at 880:6-16.)

### 3. Foundation's Performance Was Not Excused by Alleged Post-Closing Interference

Foundation mischaracterizes the nature of the APA earnout provision, claiming without citation, "[t]he parties came to an essential understanding that the purpose of the Earnout Provision was to ensure Kupper's continued support of Foundation's ownership of the Mandan Dealerships beyond the Closing of the Transaction." (Brief at 25.) There were no contract provisions conditioning payment of earnout on any post-closing support or non-interference. Kupper testified Foundation CEO Kutschinski asked him to assist post-closing, and Kupper did so, but early on it became clear Foundation wanted no advice so he backed off. (App.547; R.Doc.500 at 226:25-230:14; App.591; R.Doc.500 at 270:14-277:16; App.1119; R.Doc.503 at 798:16-799:22.)

28

## SUMMARY OF ARGUMENT

Foundation received a fair trial – the jury simply rejected Foundation's arguments and evidence (and accepted BAPTKO's). All of the alleged errors Foundation points to on appeal were either waived, fairly decided by the Court or jury, or mooted by the jury's findings.

The Court granted summary judgment in favor of BAPTKO on the earnout issue due to the admission by Foundation's counsel the normalized EBT threshold was met for each calendar year after the sale – the only condition necessary to trigger the earnout. Foundation's excuse of performance defense could have resulted in an offset in damages, but the jury found no breach of the contract by BAPTKO, and thus there were no damages owed to Foundation to offset the earnout damage owed to BAPTKO. All of the Foundation parties were jointly and severally liable for the earnout amount under the APA terms, and Foundation failed to preserve the issue of joint and several liability for appeal.

Foundation also complains of various comments and rulings by the Court, which were appropriate and correctly decided. None of the Court's conduct deprived Foundation of a fair trial and there is no cause for a new trial.

Additionally, the Court correctly awarded attorneys' fees and costs pursuant to the APA terms.

## ARGUMENT

29

## II.  THE COURT PROPERLY GRANTED SUMMARY JUDGMENT ON THE EARNOUT OBLIGATION

### A.  No Material Facts Were in Dispute

The Court properly granted summary judgment on the earnout, as there was no genuine issue of material fact in dispute and BAPTKO was entitled to judgment as a matter of law. Per the APA, Foundation's obligation to pay the earnout was <u>only</u> contingent on the Mandan Dealerships achieving $2,500,000 normalized EBT threshold per calendar year after the sale. (App.1635-1636 [Ex.P4] at ¶3.) Foundation conceded this threshold was met in their trial memorandum, (App.149; R.Doc.456 at 3.) and again conceded this prior to opening statements at trial. (App.331; R.Doc.499 at 7-10.) Foundation fully acknowledged the only contractual contingency relating to the earnout was met, making summary judgment appropriate.

However, Foundation argued, and continues to argue, that Foundation's performance under the earnout provision should have been excused due to BAPTKO's alleged breaches of unrelated APA provisions. Foundation's argument is flawed two ways: 1) the jury found that BAPTKO did <u>not</u> breach the APA (App.218-219; R.Doc.488.), thereby mooting any alleged errors relating to Foundation's excuse of performance defense; 2) even if BAPTKO had breached the APA, the Court correctly held any damages to Foundation relating to BAPTKO's alleged breaches could only offset BAPTKO's damages relating to the

30

unpaid earnout.

**B.    As Determined by the Jury, BAPTKO Did Not Breach the APA**

All arguments relating to the excuse of performance defense are moot and can be disregarded because the jury found BAPTKO did not breach the APA. *See Griner v. King*, 104 F.4th 1, 7 n. 4 (8th Cir. 2024) (citing *Doe v. Pulaski Cnty. Special Sch. Dist.*, 306 F.3d 616, 621 (8th Cir. 2002)).   Foundation cannot be excused from performance based upon alleged breaches by BAPTKO which were found not to have occurred.

Foundation argues BAPTKO breached the APA by allegedly failing to maintain new vehicle inventory consistent with the 12-month rolling average, and by providing DFS which allegedly knowingly contained inaccurate vehicle inventory counts. (Brief at 31-32.) Foundation introduced evidence on these claims, and made these same arguments to the jury, and in response BAPTKO introduced counterevidence and counter arguments. (Supra at 4-5, 14-28.) Nonetheless, the jury found BAPTKO did <u>not</u> breach the APA. (App.218-219; R.Doc.488.) Importantly, the Court's grant of summary judgment to BAPTKO on the earnout, and the Court's handling of the excuse of performance defense, did not prevent Foundation from introducing evidence or making arguments that BAPKTO breached the APA. Foundation did so and it was rejected by the jury.

**C.    Even if BAPTKO had Breached the APA, Appellants' Performance was Not Fully Excused**

Even if BAPTKO had breached the APA, which it did not as the jury found, Foundation would not be relieved of contractual duties to pay the earnout. At most, Foundation would be entitled to offset damages, not complete relief from the contractual responsibility to pay earnout amounts. This was correctly explained by the Court before and at trial. (Add.23-24; App.2014-2015; R.Doc.373 at 23-24; Add.37-38; App.2028-2029; R.Doc.386 at 1-2; App.331-333; R.Doc.499 at 10:25-12:4.) As the Court explained:

> In North Dakota, "[t]he doctrine of setoff is 'an equitable doctrine requiring that the demands of mutually indebted parties be set off against each other and that only the balance be recovered.'" Dakota Partners, L.L.P. v. Glopak, Inc., 2001 ND 168, ¶ 21, 634 N.W.2d 520 (quoting 20 Am. Jur. 2d Counterclaim, Recoupment, Etc. § 6 (1995); see also Continental Resources, Inc. v. Northland Royalty Corp., 2022 WL 5179845, *8 (D.N.D. Aug. 15, 2022) ("North Dakota appears to recognize an extrajudicial right to setoff."). The terms "offset" and "setoff" are synonymous. Glopak, 2001 ND 168 at ¶ 21. North Dakota defines "setoff" as "'a defendant's counterdemand against the plaintiff, arising out of a transaction independent of the plaintiff's claim' or 'a debtor's right to reduce the amount of a debt by any sum the creditor owes the debtor; the counterbalancing sum owed by the creditor.'" Id. (quoting Black's Law Dictionary 1376 (7th ed. 1999)).

(App.2015; R.Doc.373 at 24.)

Foundation argues it should have been allowed to argue to the jury its obligation to pay the earnout was fully excused, and no set off was necessary. (App.328; R.Doc.499 at 7:21-8:5.) The Court gave a more complete excuse of performance jury instruction than Foundation requested from the Court. (Compare

App.205; R.Doc.487 to App.136; R.Doc.454) However, Foundation's counsel failed to make this argument in closing argument. Foundation's position ask the Court to essentially strike from the contract only the earnout provision, but enforce all other provisions, which is wholly unsupported by the facts or applicable law.

Foundation attempts to characterize the contractual provisions on inventory and financial statements, and other provisions, as conditions precedent to the requirement to pay the earnout, but cites no contractual language establishing the provisions as conditions precedent. (Brief at 11-12.) Payment of the earnout to BAPTKO under § 2.1(d) and (e) of the APA (App.1564-1565 [Ex.P2].) as amended by § 3 of the First Amendment (App.1635-1636 [Ex.P4].) was <u>only</u> conditioned upon the Mandan Dealership's meeting specified normalized EBT threshold targets – targets which were undisputedly met. Foundation's assertions the earnout was contingent on other factors are fabrications ungrounded in the contract documents themselves. The earnout provisions were <u>not</u> prefaced with "provided BAPTKO is not otherwise in breach of the APA" or any similar conditional language. The earnout payments were additional compensation amounts related to post-closing financial performance of the Mandan Dealerships, and were not conditioned upon BAPTKO's or Kupper's compliance with any other contract provision.

Foundation claims the Court informing the jury Foundation had already breached the earnout provision of the APA "nullif[ied] their primary defense…."

33

(Brief at 28.) However, Foundation admitted they owed the earnout, so admitted they had no defense to the earnout claim. Foundation admits the earnout obligation was a "performance-based obligation triggered only if the seller delivered a business capable of achieving profitability targets," which was indisputably delivered. (Brief at 36.) Foundation admitted the profitability target of $2.5 million net profit was met four years in a row after the sale. (App.331; R.Doc.499 at 10:7-13; App.347; R.Doc.499 at 26:8-12.) As the Court explained, "Whether the Foundation Parties were excused from their payment obligations is a question that is essentially related to damages." (Brief at 38 [citing App. 2029, R.Doc. 386 at 2, Add. 38.]) Foundation's performance could have been "excused" in the sense that damages for BAPTKO's alleged breaches could have offset the earnout damages, but the jury found no breaches by BAPTKO.

Foundation mischaracterizes the excuse of performance defense under North Dakota law, claiming any alleged prior breach by BAPTKO and/or Kupper fully excuses Foundation from performing under the earnout. Excuse of performance only applies when one party fails to substantially perform its contractual obligations, or where one party prevents the other party from performing under the contract, neither of which apply here. *See Welease 2018 Operating LP v. Behan*, 2021 WL 9666531 (D.N.D. Oct. 14, 2021); *Monarch Photo, Inc. v. Qualex, Inc.*, 935 F. Supp. 1028 (D.N.D. 1996); *Barrett v. Gilbertson*, 2013 ND 35, ¶ 19, 827 N.W.2d 831, 840.

34

Foundation never alleged it was prevented from performing under the APA as a result of any alleged APA breach by BAPTKO/ Kupper.

Regarding substantial performance, the North Dakota Supreme Court has explained, "it is well settled that a party who substantially performed the duties imposed upon him under a contract may recover for a breach of the contract because substantial performance is sufficient consideration to make the contract binding between the parties." *Pegg v. Kohn*, 2015 ND 79, ¶ 12, 861 N.W.2d 764, 767.

Foundation did not request a jury instruction on substantial performance nor request any question in its proposed special verdict form whether Kupper/BAPTKO substantially performed the contract. (App.105; R.Doc.454; App.141; R.Doc.454.) Foundation failed to preserve that issue for appeal and cannot raise it now. *Riggs v. Gibbs*, 66 F.4th 716, 719–20 (8th Cir. 2023); Fed. R. Civ. P. 51(d)(1)(B).

Regardless, BAPTKO did substantially perform its obligations under the APA. Foundation received the Mandan Dealerships and operated those dealerships over five years through trial– the transfer of which alone constituted substantial performance. The Mandan Dealerships exceeded the post-closing financial performance metrics agreed upon, triggering the earnout owed BAPTKO. Even assuming arguendo Foundation proved their breach of contract claims, which they did not, such would not establish a failure of substantial performance of the contractual agreements as a whole. At issue at trial were relatively minor claims of

35

alleged failure to maintain historical inventory levels for new Chevrolet vehicles (not Subaru), and minor matters as to the transaction.

In addition, it is well settled in American contract law that:

> Where there has been a material breach which does not indicate an intention to repudiate the remainder of the contract, the injured party has an election of continuing performance, or of ceasing to perform, or of repudiating the contract. Any act by the injured party indicating an intent to continue will operate as a conclusive election, not depriving him of his right of action for the breach which has already taken place, but depriving him of any excuse for ceasing performance on his own part ... a party may waive a breach by the other party and be liable for his own subsequent breach. 17A *Am.Jur.2d* Contracts § 731.

*Monarch Photo, Inc. v. Qualex, Inc.*, 935 F. Supp. 1028, 1033 (D.N.D. 1996). There was never a repudiation of the remainder of the APA. To the contrary, BAPTKO transferred the assets of the Mandan Dealerships to Foundation and sought enforcement of the APA earnout provision, while Foundation accepted and operated the Mandan Dealerships for over 5 years through trial, manifesting an intent to continue under the APA – a conclusive election making Foundation liable for any subsequent APA breach by them.

Even assuming the APA provided for cancellation of the earnout payments due BAPTKO upon any alleged nonperformance by BAPTKO/Kupper of any other contract provision, which it does not, any such provision would be void as a penalty under North Dakota law. "Penalties imposed by contract for any nonperformance thereof are void." N.D.C.C. § 9-08-03. Foundation has not argued the APA contains

a liquidated damages provision, let alone one pertaining to the earnout payments which meets North Dakota legal requirements. *See Hendricks Property Management Corp. v. Birchwood Properties Ltd.*, 2007 ND 181, ¶ 18, 741 N.W.2d 461, 467. Foundation is arguing any breach of any contract term by either BAPTKO or Kupper, regardless of materiality would result in a forfeiture of all earnout amounts regardless of the financial performance of the Mandan Dealerships – a void penalty.

### D. The Court's Summary Judgment Ruling Was Not Inconsistent Nor Deprive Appellants of Any Viable Defense at Trial

BAPTKO moved for summary judgment before the dispositive motion deadline, seeking among other things summary judgment on its earnout claim. (Aple.App.728; R.Doc.16 [Case No.1:21-CV-00183].) In its order, the Court stated the motion was granted as there is no factual dispute that Foundation was required to make the earnout payments and have failed to do so. (App.2002-2003; R.Doc.373 at 11-12; App.2015-2016; R.Doc. 373 at 24-25.) The Court found there were still questions of fact that needed to be decided in relation to the alleged breaches by Kupper/BAPTKO, which could offset the damages owed to BAPTKO for the unpaid earnout amounts. *Id.* That the damages sought against Kupper/BAPTKO would serve as an offset was reiterated in a clarifying order of the Court. (App.2028; R.Doc.386.)

At the time of the Court's summary judgment order and clarification (App.1992; R.Doc.373; App.2028; R.Doc.386), it was undisputed the earnout

37

thresholds were met for 2020 through 2022, but when briefing was finished, the annual review for 2023 was not complete and nothing was due for 2023. Thus, it was uncertain how much Foundation would ultimately owe BAPTKO relating to the earnout. This was also uncertain as to an earlier order by the Court on a motion to dismiss. (App.266-267; R.Doc.40 at 8-9.) However, by the first trial day, Foundation conceded the earnout thresholds were met for the calendar years ending December 31, 2020 through 2023, establishing the total Foundation owed to BAPTKO was $3 million and judgment was appropriate. (App.331; R.Doc.499 at 10:7-13; App.347; R.Doc.499 at 26:8-12.) Had Foundation been successful on its claims against BAPTKO at trial, it could have obtained an offset against those damages, but it was not.

### E. The Court Properly Found that Appellants were Jointly and Severally Liable, and Appellants Have Waived this Issue In Any Event

The Court's judgment held all Foundation Parties jointly and severally liable for the $3 million earnout owed BAPTKO. (App.2030; R.Doc.490 at 1.) Foundation argues the APA named only "Foundation Automotive Corp. or its permitted assigns" as the Buyer in the sale from BAPTKO, and the record did not establish whether FA CHEV or FA SUB assumed liability for the earnout. (Brief at 40.)

Foundation has waived this issue and failed to make an appropriate record to preserve the issue for appeal. In a Court conference on the first day of trial without

the jury present, counsel for BAPTKO/Kupper specifically asked how the earnout issue should be handled with the jury. (App.327-328; R.Doc.499 at 6:21-7:17.) Counsel then made arguments to the Court regarding whether the excuse of performance defense could result in only an offset or potentially a complete excuse for the obligation to pay the earnout. (App.328-329; R.Doc.499 at 7:20-8:6; App.330: R.Doc.499 at 9:7-21; App.330, R.Doc.499 at 9:24-10:24.) During this discussion with the Court, counsel for Foundation never raised the issue of FA CHEV or FA SUB supposedly not being liable for the earnout. (App.327-348; R.Doc.499 at 6:21-27:11.) The issue was never raised at trial.

Foundation's own proposed jury instructions and proposed special verdict form failed to address this issue. (App.105; R.Doc.454.) Foundation never asked the Court to present the issue to the jury. In fact, Foundation specifically requested the following special verdict language on the issue of the earnout payments, which does not distinguish between the liability of the Foundation Parties: "What amount of money will fairly compensate BAPTKO, Inc. for the damages caused by Foundation Automotive Corp., FA ND CHEV, LLC and FA ND SUB, LLC's breach of the Asset Purchase Agreement for not making Earn Out payments to BAPTKO, Inc.?" *Id.* at 42 (App.146; R.Doc.454 at Foundation's Special Verdict Question No. 15).

Counsel for BAPTKO and Kupper have been unable to identify any trial questions or arguments relating to this issue. Foundation also fails to identify any

trial record where this issue was raised by Foundation. Likewise, Foundation never requested nor made any offer of proof on this issue, either before or during the trial. "A party may claim error in a ruling to admit or exclude evidence only if the error affects a substantial right of the party and… if the ruling excludes evidence, a party informs the court of its substance by an offer of proof, unless the substance was apparent from the context." Fed. R. Evid. 103(a)(2).

The Court correctly held in a post-trial motion order that Foundation waived this issue by failing to raise the issue earlier. (App.2052-2053; R.Doc.544 at 4-5.) Foundation never presented any facts on this issue and admitted through testimony and exhibits it offered at trial, which were received, that ND CHEV, LLC and ND SUB, LLC were obligated to pay amounts due BAPTKO. (App.1674 [Ex.P6]; App.1677 [Ex.P7]; App.487-490; R.Doc.499 at 166:13-169:4.) There could have been no other purpose for Foundation to offer this evidence. *Id.*

Even if Foundation had properly preserved this issue for appeal, which it did not, it apparently concedes the issue in its briefing, acknowledging that Foundation "transferred all of its right, title and interest in, to and under the APA relating to the assets and all rights to receive assets and **all obligations to perform under the APA**" to the FA ND entities. (Brief at 9 (citing to App.1674-76, Ex.P6; App.1677-78, Ex. P7.) (Bold Added)

Foundation claims "[t]he district court did not make a definitive finding on

40

assignment in prior orders [before the judgment]", which is patently false. The Court expressly found in its order on motions for summary judgment, "Foundation [Automotive Corp] subsequently assigned its rights and obligations under the agreement to the two named Plaintiffs, FA ND Chev and FA ND Sub." (App.1993-1994; R.Doc.373 at 2-3 (citing Doc. Nos. 44-3, §§ B-C & §§ 1-2; 44-4, §§ B-C, §§ 1-2). The Court also made this legal determination in a prior order denying the Foundation Parties' Rule 12 motion requesting dismissal of the earnout claim, determining the assignment documents expressly assign all rights and obligations of Foundation Automotive Corp. to ND CHEV and ND SUB.  (App.265-267; R.Doc. 40 at ¶¶ 17-22.)[2]

## III.    THE COURT DID NOT PREJUDICE THE JURY AND THE TRIAL WAS FAIR

### A.    The Court Did Not Undermine the Credibility of the Jury

Foundation falsely claims, "[f]rom the outset of trial, the district court exhibited a pattern of hostility toward Appellants and their counsel," which allegedly

---

[2] In its order on Foundation Parties' Rule 12 motion to dismiss the earnout claim, the Court concluded "what constitutes 'relating to the operation of the Dealership at the Subaru Site' will necessarily involve a factual inquiry into what sort of activities actually resulted in the $2,500,000 threshold for the $750,000 payout to BAPTKO." (App.267; R.Doc.40 at 9.) However, this factual issue was resolved by Foundation's counsel's concessions at the conference with the Court the first trial day. (App.331; R.Doc.499 at 10:8-13.) Previously, the thresholds reached in the years after closing were unknown, but were known and conceded by trial.

41

assignment in prior orders [before the judgment]", which is patently false. The Court expressly found in its order on motions for summary judgment, "Foundation [Automotive Corp] subsequently assigned its rights and obligations under the agreement to the two named Plaintiffs, FA ND Chev and FA ND Sub." (App.1993-1994; R.Doc.373 at 2-3 (citing Doc. Nos. 44-3, §§ B-C & §§ 1-2; 44-4, §§ B-C, §§ 1-2). The Court also made this legal determination in a prior order denying the Foundation Parties' Rule 12 motion requesting dismissal of the earnout claim, determining the assignment documents expressly assign all rights and obligations of Foundation Automotive Corp. to ND CHEV and ND SUB.  (App.265-267; R.Doc. 40 at ¶¶ 17-22.)[2]

## III.    THE COURT DID NOT PREJUDICE THE JURY AND THE TRIAL WAS FAIR

### A.    The Court Did Not Undermine the Credibility of the Jury

Foundation falsely claims, "[f]rom the outset of trial, the district court exhibited a pattern of hostility toward Appellants and their counsel," which allegedly

---

[2] In its order on Foundation Parties' Rule 12 motion to dismiss the earnout claim, the Court concluded "what constitutes 'relating to the operation of the Dealership at the Subaru Site' will necessarily involve a factual inquiry into what sort of activities actually resulted in the $2,500,000 threshold for the $750,000 payout to BAPTKO." (App.267; R.Doc.40 at 9.) However, this factual issue was resolved by Foundation's counsel's concessions at the conference with the Court the first trial day. (App.331; R.Doc.499 at 10:8-13.) Previously, the thresholds reached in the years after closing were unknown, but were known and conceded by trial.

41

prejudiced the jury. (Brief at 44.) "The trial court has broad discretion in commenting on evidence and may do so in order to give appropriate assistance to the jury. The only limitation on the discretion is that the comments must not preclude a fair evaluation of the evidence of the jury." *Reed v. Malone's Mechanical, Inc.*, 765 F.3d 900, 910-11 (8th Cir. 2014) (internal quotations and citations omitted). "While [the Eighth Circuit Court of Appeals] previously stated that a few improper comments are not necessarily enough to require reversal, [it] also recognized at the same time that each case of allegedly prejudicial comments made by the trial judge must turn on its own circumstances." *Rush v. Smith*, 56 F.3d 918, 922 (8th Cir. 1995) (internal quotations and citations omitted). In *Warner v. Transamerica Ins. Co.*, the Eighth Circuit Court of Appeals explained, "In order to reverse on grounds of excessive judicial intervention, the record must either disclose actual bias on the part of the trial judge [or] leave the reviewing court with an abiding impression that the judge's remarks and questioning of witnesses projected to the jury an appearance of advocacy or partiality." 739 F.2d 1347, 1351 (8th Cir. 1984) (internal quotes and citations omitted). This is a very high bar, which Foundation cannot even come close to meeting.

First, almost all the statements from the Court Foundation complains about were made outside the hearing of the jury and thus could not have prejudiced the jury. *See Ryan v. Clarke*, 281 F. Supp. 2d 1008, 1080 (D. Neb. 2003), aff'd, 387 F.3d

785 (8th Cir. 2004) (stating, "Reading these comments out of context, they certainly sound as prejudicial as the petitioner argues. It is critical to note, however, that each comment was made at side bar…. Thus, based on the evidence before me, it is unlikely the jury heard any of those comments, and Ryan has failed to prove that the jury's deliberations and decision were influenced by these comments."); *see also U.S. v. Turner,* 975 F.2d 490 (8th Cir.1992) (finding no prejudice where, although trial judge was sarcastic and disparaging toward defense counsel, these comments and arguments were made outside the jury's presence). Similar to the *Ryan* case, most of the Court's comments now complained of were made outside the hearing of the jury and there is no evidence the jury was influenced by them. (Brief at 44 (citing App.336-37, R.Doc.499, at 15:19-16:13; App.337, R.Doc.499 at 16:4-6.) Further, the comments are not prejudicial when considered in context.

Foundation complains of various statements and questions from the Court, none of which constitute plain error. These statements and questions are addressed below, however, Kupper/BAPTKO assert overall the Court's conduct at trial was appropriate and necessary to facilitate the expedient presentation of trial evidence. *See Harris v. Steelweld Equip. Co.*, 869 F.2d 396, 403 (8th Cir. 1989).

Foundation complains of a comment by the Court at the pretrial conference outside the hearing of the jury. (Brief at 44 (citing App.336-337; R.Doc.499 at 15:19-16:13.) In relation to Foundation's refusal to stipulate to foundation for

43

BAPTKO/Kupper's trial exhibits, the Court stated, "If you're not going to stipulate to exhibits in that nature, it is not going to go well for you in your ruling -- in my rulings. Do you understand me?" (App.337; R.Doc.499 at 16:4-6.) The Court was merely expressing Foundation's refusal to stipulate to foundation for many exhibits without justification would result in adverse rulings regarding foundation at trial. The Court had issued an order nine months before trial, stating in relevant part, "[t]he court strongly encourages agreement as to foundation and expects counsel to waive foundation unless there is a strong, specific objection to a particular exhibit." (Aple.App.225; R.Doc.359 at 4.) Despite the Court's clear guidance, Foundation failed to provide a strong, specific objection to foundation as to particular exhibits, instead refusing to stipulate to foundation unjustifiably as to many exhibits. (App.335-337; R.Doc.499 at 14:23-16:13.) There were 166 exhibits offered and received at trial. The Court's statements were appropriate and consistent with its prior written orders.

Foundation complains of a comment by the Court when the jury was not present about the fact BAPTKO already prevailed on summary judgment on its earnout claim, for $3 million in damages, which could only offset their claimed damages. (Brief at 44.) (App.345-346, R.Doc.499 at 24:24-25:10.) During that discussion, the Court briefly mentioned the strength of the Foundation Parties' solicitation claim. Specifically, the Court stated,

> That's what you have is you have a setoff. You have an offset. You don't have the right to not pay him the 3 million. He starts with 3 million and insofar as it gets reduced by this -- these various claims of him poaching your employees, which -- you know, good luck with that, because, you know, based upon what I reviewed of the record, they're not very strong claims.

(App.345-346; R.Doc.499 at 24:24-25:10.) This comment was made outside the jury's hearing and could not have prejudiced the jury against Foundation. This comment referenced only the Foundation Parties' solicitation claim (stating, "they're not very strong claims."). The Court's comments turned out to be spot on due to lack of evidence introduced by Foundation on the solicitation claim, and the Court's later dismissal of this claim as a matter of law for lack of sufficient evidence (which Foundation does not challenge in this appeal). (App.961; R.Doc.503 at 640:6-17; Add-16; App.2007; R.Doc.373; Add-32-33; App.2023-2024; R.Doc.373.) The Court did not place any limitations on Foundation's ability to present evidence of solicitation at trial; the Court simply commented on the weakness of the claim outside the presence of the jury.

Counsel for Foundation acknowledged the solicitation claim was not Foundation's main claim, explaining the inventory claim was the "main thrust of our case." (App.346, R.Doc.499 at 25:11-15.) As to alleged solicitation of employee Kelsey Hanson, Foundation's counsel conceded no evidence was introduced, stating, "[a]s to Kelsey Hanson, we concede that that -- the evidence of solicitation was not put in in our case in chief…." (App.959; R.Doc.503 at 638:5-7.) The Court's

comment also related to Foundation's attorneys' misunderstanding of the effect of granting summary judgment to BAPTKO on the earnout. Foundation incorrectly claimed (and still claims now) their excuse of performance defense could somehow eliminate the APA earnout requirement, so that Foundation owed $0.00 in earnout payments, while not repudiating the contract and still enforcing all other contract provisions against Kupper/BAPTKO. The Court correctly ruled against Foundation on this issue. (App.329-332; R.Doc.499 at 8:9-11:25.) The Court's comment was not hostile. It clarified the Court's orders and correctly addressed Foundation's counsel's misunderstanding of the excuse of performance defense in relation to the earnout finding (being merely an offset). These comments also did not occur in front of the jury.

Foundation disagrees with the tone and manner in which the Court questioned Foundation's corporate representative Slemko ("Slemko"). (Brief at 44.) Foundation waived any objection to the Court's questioning of Slemko by failing to object at trial under Federal Rule of Evidence 614(c), which states, "[a] party may object to the court's calling or examining a witness either at that time or at the next opportunity when the jury is not present." *See Harris v. Steelweld Equip. Co.*, 869 F.2d 396, 403 (8th Cir. 1989) (stating, "Again, appellants did not object to the court's questions as required by Fed.Rules of Evid. 614(c) and, therefore, have waived any alleged complaint of error."). Further, the brief questioning and even "castigating"

46

of a party's representative is not error, particularly in light of a failure to object at trial. *Id.* at 402.

Regarding the Court's questioning of Slemko, the brief Court questioning included multiple instances of Slemko failing to answer the question asked, justifiably resulting in an instruction to answer the question. (App.819-820; R.Doc.502 at 498:2-499:2.) The Court's instruction to Slemko to "answer questions when you're asked" (App.820; R.Doc.502 at 499:8.) is no different than an instruction that might be given to any witness who fails to answer the actual question, whether the questioning was done by an attorney or the court. There is nothing improper about such an instruction to a witness.

The Court's statement to the jury after the foregoing interaction was also proper. Specifically, the Court told the jury, "[a]nd so, members of the jury, they did not know whether or not they could access this information. You are to put out of your mind his testimony that he could not access the information because he didn't know it at the time." (App.820; R.Doc.502 at 499:3-6.) Importantly, the Court's questioning of Slemko ending in this instruction to the jury came immediately after an objection by counsel for BAPTKO and Kupper as to the relevancy of Slemko's access to data prior to the closing on the sale. Counsel for Foundation was questioning Slemko about access to this data, at which time counsel for BAPTKO and Kupper objected. (App.817-818; R.Doc.502 at 496:25-497:4.) The Court then

asked some clarifying questions of the witness, and on the basis of the answers, instructed the jurors to put out of their minds that Slemko could not access the information because he did not know it at the time. There was nothing improper about the Court's handling of the objection, questioning of the witness to get clarity, or instructing the jury. Foundation's complaints amount to simply complaining about the trial judge performing the role of trial judge. Statements made by the Court about this issue outside the hearing of the jury during a motion for directed verdict could not have prejudiced the jury. (Brief at 47-48 (citing (App. 1275-76, R.Doc. 504 at 954:3-955:2.)

None of the statements or questions from the Court Foundation now complains of constituted plain error. Even assuming arguendo the statements and questions from the Court constituted plain error, which they did not, the alleged errors were effectively cured by the Court with final jury instruction F2, entitled "Judge's Opinion", which states:

> [¶ 4] I have not intended to suggest what I think your verdict should be by any of my rulings or comments during the trial.
>
> [¶ 5] During this trial I have asked some questions of witnesses. Do not try to guess my opinion about any issues in the case based on the questions I asked.

(App.193; R.Doc. 487 at 4.) "A jury is presumed to follow the instructions given." *In re Prempro Products Liability Litigation*, 514 F.3d 825, 832 (8th Cir. 2008). Foundation has not shown or argued the jury failed to follow the Court's instructions.

48

Even if the Court did introduce plain error at trial through its statements and comments, which it did not, the issue has been effectively cured and does not justify a new trial.

### B. The Court Did Not Improperly Limit Evidence on Subaru Inventory

Foundation complains about the Court's ruling (outside the hearing of the jury) cautioning the jury about Foundation expert Knutsen's testimony regarding Subaru inventories. (Brief at 48-49.) Importantly, the Court's decision and comments were because Knutsen's opinions were grounded in assumed facts Foundation never established through evidence at trial, nor even asserted as a claim before trial. (App.938; R.Doc.503 at 617:8-17.) Foundation is essentially blaming the trial court for Foundation's own failure to make a claim and present evidence in support of the claim.

The Court heard the arguments of counsel and appropriately concluded Foundation had not identified any evidence linking alleged reduced Subaru inventory to any Kupper conduct. (App.851-852; R.Doc.502 at 530:22-531:1.) No witness testimony or evidence was presented by any witness or document claiming or establishing any diminished Subaru inventory at all, let alone in relation to any conduct by Kupper. Foundation CEO Kutschinski even testified Foundation was not making any claims as to Subaru Inventory at all. (Aple.App.132-133; R.Doc.297-10 at 36:22-38:17; App.1268; R.Doc.504 at 947:18-19.) Unlike GM, Subaru requires

49

dealers to take all inventory offered by the manufacturer. (Aple.App.439; R.Doc.363-3 at 164:11-15.) There was no discretion on the part of KCI to decline any vehicles offered by Subaru, so Kupper and BAPKTO could not have been the cause of any alleged drop in Subaru inventory. The Court was correct when it said, "there is no evidence in the record establishing that Mr. Kupper had anything to do with the reduced inventory numbers at the Subaru store or that he took any actions to do so, similar to what you have with regard to the GM transactions." (App.851-852; R.Doc.502 at 530:22-531:1.) Foundation incorrectly asserts "[t]he court's inquiry into whether Appellants had shown that Kupper intentionally suppressed Subaru inventory was legally erroneous and created an improper evidentiary barrier that severely undercut the expert's testimony and prejudiced their case." (Brief at 49.) The Court in fact correctly concluded, in order to establish a breach, Foundation needed to introduce some evidence Kupper caused or at least had something to do with the allegedly low Subaru inventory, which Foundation did not introduce. Foundation CEO Kutschinski even conceded that Kupper did not cause the allegedly low Subaru inventory. (Aple.App.132-133; R.Doc.297-10 at 36:22-38:17; App.1268-1269; R.Doc.504 at 947:14-948:1.)

Knutsen admitted at her two discovery depositions she had no evidence or basis to suggest there was any reduced Subaru inventory, new or used, or that Kupper was supposedly responsible for any reduced Subaru inventory. She simply assumed

50

everything Foundation claimed was true. (App.938; R.Doc.503 at 617:8-17; Aple.App.058; R.Doc.257-1 at 63; Aple.App.237; R.Doc.363-2 at 34:1-13.) She also admitted she included Subaru inventory losses, new and used, in her calculation of damages for Foundation, and was unable to segregate her losses for claimed reduced Chevrolet inventory (new and used) from the unclaimed and nonexistent Subaru inventory (new and used). (Aple.App.057-058; R.Doc.257-1 at 61-63; Aple.App.237; R.Doc.363-2 at 34-35; Aple.App.244; R.Doc.363-2 at 64-65; App.878-879; R.Doc.502 at 557:11-558:8.) Under the evidence presented by Foundation, the jury would have been left to guess or engage in utter speculation which of Foundation's claimed damages related to reduced Chevrolet inventory versus reduced Subaru inventory.

Foundation provided no testimony or evidence on the Subaru inventory process which would have been required if the Foundation Parties were making a reduced inventory claim. (Aple.App.132-133; R.Doc.297-10 at 36:22-38:17; App.1268-1269; R.Doc.504 at 947:14-948:1.) The Court correctly determined "if there is no factual basis for the expert's testimony, she can't testify to it in the trial". (App.846; R.Doc.502 at 525:20-22.) Even Foundation's attorney admitted there was no such evidence but categorized it as "circumstantial evidence". (App.848-849; R.Doc.502 at 527:24-528:1.)

Even though BAPTKO and Kupper's counsel moved to exclude Knutsen's

testimony on her false definition of goodwill[3] and other accounting principles that Knutsen misstated or misconstrued, the Court allowed her to offer opinions to the jury on these made up and/or misconstrued theories. (App.840-846; R.Doc.502 at 519:8-525:7; App.856; R.Doc.502 at 535:17-536:13)

All alleged errors in this regard are moot. The topic of both reduced Chevrolet and Subaru inventory was never addressed by the jury, as they never reached the issue of damages because the jury decided Kupper did not breach the contract with Foundation. (App.218; R.Doc.488.)

### C. The Jury Instructions Did Not Misstate the Law

The Foundation Parties argue the jury was not properly instructed on the law relating to excuse of performance. (Brief at 49-50.) The Court gave the following jury instruction, which is an accurate statement of North Dakota law in relation to this defense:

> [¶ 27] A party to a contract is not excused from performing its obligations under the contract when the other party has substantially performed its obligations under the contract. A party has substantially performed its obligations under a contract when the essential purpose of the contractual performance is accomplished.

> [¶ 28] A party to a contract is also not excused from performing its obligations under the contract when, after the other party has breached the contract, the non-breaching party subsequently performs an act indicating an intent to continue with the contract rather than ceasing or repudiating the contract. A party may waive a breach by another party and be liable for its own subsequent breach.

---

[3] See supra at 5-6.

(App.205; R.Doc.487 at 16.) By the time the jury received this instruction, they knew the Foundation Parties owed earnout money to BAPTKO. The jury was still instructed on excuse of performance, which was an instruction for Foundation's benefit. The Court instructed the jury on excuse of performance and the jury could have relied on excuse of performance in this case, but did not.

Further, even assuming arguendo this instruction contained an error, which it did not, the jury never had to consider the excuse of performance defense because it found no breaches by BAPTKO. Any error relating to this instruction is harmless. This Court has explained:

> We review a district court's decision to give particular instructions for abuse of discretion. We consider whether the jury instructions, taken as a whole and viewed in light of the evidence and applicable law, fairly and adequately submitted the issues in the case to the jury. Because many errors are harmless, we will not reverse the judgment unless the alleged error was prejudicial.

*Gaillard v. Jim's Water Serv., Inc.*, 535 F.3d 771, 775 (8th Cir. 2008) (internal citations and quotations omitted).

Foundation argues, "[u]nder longstanding contract principles, substantial performance does not suffice where the contract demands strict compliance." (Brief at 50.) (citing *In re Gen. DataComm Indus., Inc.*, 407 F.3d 616, 623-24 (3d Cir. 2005); 15 Williston on Contracts § 44:53 (4th ed. 2023) [stating, "[I]f the terms of an agreement make full, strict, or literal performance an express condition precedent

to recovery, substantial performance will not suffice."]). However, Foundation has failed to identify any contractual language in the APA or related agreements that specifies that breaches of other provisions in the agreement excuses performance of the earnout provision. Why would the Court instruct the jury on aspects of the excuse of performance defense that do not apply to the contractual language or facts at issue in this case? Foundation wholly fails to explain why the Court should have treated the earnout provision as if it was contingent on BAPTKO and Kupper's strict compliance with unrelated provisions such as the inventory provision (with such claims having been rejected by the jury in any event). The jury instructions were an accurate reflection of North Dakota law and the Court's rulings prior to and during trial.

> **D.** **The Court's Conduct Does Not Warrant Reversal or a New Trial**

The Court's conduct at trial complained of by Foundation, individually and collectively, did not deprive Foundation of a fair trial and there is no cause for reversal or a new trial.

> **IV.** **THE COURT DID NOT ABUSE ITS DISCRETION IN GRANTING, IN PART, BAPTKO AND KUPPER'S BILL OF COSTS AND REQUEST FOR ATTORNEYS' FEES**

> **A.** **The Court Properly Awarded Attorneys' Fees and Contractual Costs to Kupper**

The APA provision at issue states as follows in section 9.7 (Expenses):

Each Party will pay all of its expenses, including attorneys' and accountants' fees in connection with the negotiation of this Agreement or any Related Agreement, the performance of its obligations hereunder or thereunder, and the consummation of the transactions contemplated by this Agreement or any Related Agreement; provided that **in any proceeding or other attempt to enforce, construe or to determine the validity of this Agreement or any Related Agreement, the nonprevailing Party will pay the reasonable expenses of the prevailing Party, including reasonable attorneys' fees and costs**.

(App.1588 [Ex.P2] at 27.) (emphasis added).

Foundation argues "[t]he district court erred by awarding attorneys' fees and non-taxable expenses under the APA to Robert Kupper, who was not a signatory to that agreement." (Brief at 53.) All the attorneys' fees were actually paid by BAPTKO not Kupper. (Aple.App.493; R.Doc.495 at 2.) As noted by the Court, Kupper is not being personally reimbursed. (App.2041; R.Doc.543 at 8.) BAPTKO paid the attorneys' fees and costs, and BAPTKO is being reimbursed. *Id.* This is the correct outcome.

Contrary to Foundation's assertion, Kupper was a party to the APA, having signed in his individual capacity as to Section 5.13 (Non-Solicitation; Exclusivity) and Section 5.14 (Confidentiality). (App.1591 [Ex.P2] at 30.) Kupper was also a party in his individual capacity to the non-compete agreement (App.75; R.Doc.3-1), which is a related agreement to the APA. Further, in Section 4.1(d), "Knowledge of Seller" includes knowledge of "Bob Kupper," not Kupper Chevrolet, Inc. (App.1568 [Ex.P2] at 7.)

Foundation itself sought to recover attorneys' fees and costs from Kupper individually under Section 9.7 of the APA for Kupper's alleged breach of contract. (App.91; R.Doc.3 at ¶ 58.) Foundation sought to use the APA and non-compete agreement as a sword against Kupper, and now unfairly seeks to deny Kupper's right to use the APA as a shield.

Additionally, as the Court noted, Foundation argued at trial their non-performance of the contract with BAPTKO was excused by Kupper's alleged violation of the non-solicitation and confidentiality agreements. (App.2041; R.Doc. 543 at 8.) "BAPTKO's efforts to enforce its contract necessarily included defending Mr. Kupper as an individual." *Id.*

Foundation also argues, "[c]ompounding the error, the district court applied legal principles inconsistently across related rulings." (Brief at 53.) Foundation goes on to assert a series of non sequiturs about orders that have nothing to do with the attorneys' fee award. (Brief at 53-54.) For example, the Court's correct finding there was no evidence introduced of alleged Subaru inventory declines due to alleged wrongdoing of Kupper relates to the failure of Foundation to garner sufficient evidence. It does not establish any inconsistency by the Court.

Further, the fact that some costs fell outside the purview of 28 U.S.C. § 1920 and were contractually collectable under the provisions of the APA is not error. (App.1588 [Ex.P2] at 27.)

Foundation argues the Court erred in calculating the attorneys' fee award. As the Court noted, the attorneys' fees billed to BAPTKO totaled $1,558,208.92, which was supported by a verified statement of recoverable costs, with over 600 pages of supporting documents, including time summaries reflecting time spent by BAPTKO/Kupper's counsel and staff from the inception of the case to November 7, 2024, at rates the Court found reasonable. (App.2045; R.Doc.543 at 12.) The amounts sought were not "hypothetical," as Foundation claims. The Court performed a full lodestar analysis and found the attorneys' fees reasonable. (App.2034, R.Doc.543.) The Court noted some difficulty with the documentation provided, and applied a reduction of 10%, which this Court of Appeals has previously upheld and deferred to the discretion of the Court. *Jensen v. Clarke*, 94 F.3d 1191, 1203 (8th Cir. 1996) (stating, "As we have consistently held, '[t]he trial court is in a much better position than this court to view the evidence and to evaluate the testimony and work product of the attorney.'").

## CONCLUSION

For the foregoing reasons, the Court should affirm the judgment of the Court in its entirety.

Dated this 25th day of August, 2025.

BAKKE GRINOLDS WIEDERHOLT

By: */s/ Randall J. Bakke*
    Randall J. Bakke (#03898)

57

300 West Century Avenue
P.O. Box 4247
Bismarck, ND 58502-4247
(701) 751-8188
rbakke@bgwattorneys.com

Attorney for Defendant-Appellee
Robert Kupper and Appellee-Plaintiff
and Counter-Defendant BAPTKO,
Inc.

# CERTIFICATE OF COMPLIANCE

1.    This motion complies with 8th Cir. R. 28(A) and the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because: this brief contains 12,973 words, excluding the parts of the motion exempted by Fed. R. App. P. 27(f).

2.    This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because: this document has been prepared in a proportionally spaced typeface using Microsoft Word in Time New Roman 14 point.

3.    This motion has been scanned for viruses and the brief is virus-free.


*/s/Randall J. Bakke*
Attorneys for Defendant-Appellee
Robert Kupper and Appellee-Plaintiff and
Counter-Defendant BAPTKO, Inc.
Dated: August 25, 2025

Appellate Case: 25-1741   Page: 68   Date Filed: 08/27/2025 Entry ID: 5551844