# In the United States Court of Appeals For the Eighth Circuit

FA ND CHEV, LLC; FA ND SUB, LLC
*Plaintiffs – Appellants*

BAPTKO, INC.
*Plaintiff – Appellee*

v.

ROBERT KUPPER
*Defendant – Appellee*

BISMARCK MOTOR COMPANY;
BMC MARINE, LLC, doing business as MORITZ SPORT & MARINE
*Defendants*

v.

FOUNDATION AUTOMOTIVE CORP., an Alberta Corporation
*Defendant – Appellant*

Appeal from the United Stated District Court for the District of North Dakota
No. 1:20-cv-00138-DMT-CRH | Honorable Daniel M. Traynor

## REPLY BRIEF OF APPELLANTS

Maxwell N. Shaffer, Esq.
Kensye N. Wood, Esq.
**LELAND SHAFFER LLP**
8694 E. 28th Avenue
Denver, Colorado 80238
(720) 556-1872
Maxwell.Shaffer@lelandshaffer.com
Kensye.Wood@lelandshaffer.com

*Attorneys for Appellants*

## TABLE OF CONTENTS

TABLE OF CONTENTS .................................................................................. i

TABLE OF AUTHORITIES ...................................................................... iii

INTRODUCTION ............................................................................................ 1

ARGUMENT ..................................................................................................... 2

I.   THE DISTRICT COURT ERRED IN ENTERING SUMMARY JUDGMENT ON THE EARNOUT OBLIGATION. ............................................................. 2

   A. BAPTKO and Kupper's Material Breaches Created Genuine Disputes of Fact Precluding Summary Judgment. ........................................................ 2

   B. The District Court Improperly Resolved the Excuse of Performance Defense Without Jury Determination. ........................................................ 5

   C. The District Court's Procedural Timing Materially Prejudiced the Foundation Parties. ..................................................................................... 8

   D. Even Assuming No Disputed Material Facts Existed, the District Court's Legal Conclusions Were Erroneous. ........................................................ 10

II.  THE DISTRICT COURT ERRED BY IMPOSING JOINT AND SEVERAL LIABILITY WITHOUT DETERMINING WHICH FOUNDATION PARTY WAS LIABLE FOR THE EARNOUT OBLIGATION. ................................. 13

   A. The Governing Contracts Foreclose Joint and Several Liability Through Deliberate Definitional Changes. ............................................................. 13

   B. The Assignment and Assumption Agreements Created Ambiguity Regarding Earnout Liability. ..................................................................... 15

   C. The Foundation Parties Did Not Waive This Issue. .................................. 19

III. THE DISTRICT COURT'S CONDUCT DEPRIVED THE FOUNDATION PARTIES OF A FAIR TRIAL. ..................................................................... 21

i

A. The District Court's Threats Regarding Exhibit Stipulations Unduly Interfered With Counsel's Conduct At Trial. ...............................................21

B. The District Court's Questioning of Slemko Standing Alone Requires A New Trial. .................................................................................................23

    1. Foundation did not waive any objections regarding the district court's questioning...................................................................................23

    2. The questioning was not harmless.....................................................25

    3. The jury instructions were fundamentally ineffective toward curing the prejudice that the district court caused................................................28

IV. THE DISTRICT COURT ERRED IN AWARDING ATTORNEYS' FEES AND COSTS TO KUPPER...........................................................................28

CONCLUSION ...............................................................................................29

CERTIFICATE OF COMPLIANCE....................................................................31

CERTIFICATE OF SERVICE.............................................................................32

Appellate Case: 25-1741     Page: 3     Date Filed: 10/16/2025 Entry ID: 5568415

# TABLE OF AUTHORITIES

**Cases**

*Bunting v. Sea Ray, Inc.*,
    99 F.3d 887 (8th Cir. 1996)..........................................................................23

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986)................................................................................... 6

*Griner v. King*,
    104 F.4th 1 (8th Cir. 2024)......................................................................... 8

*Speed RMG Partners, LLC v. Arctic Cat Inc.*, Case No. 20-CV-609 (NEB/LIB),
    2024 WL 4543340 (D. Minn. Oct. 17, 2024) ...............................................22

*United States v. Morrow*,
    977 F.2d 222 (6th Cir. 1992).......................................................................23

**Rules**

Fed. R. Evid. 602 ......................................................................................21, 22

Fed. R. Evid. 614 ......................................................................................23, 24

**Treatises**

1 McCormick On Evid. § 10 (9th ed. 2025) .........................................................21

Appellate Case: 25-1741    Page: 4    Date Filed: 10/16/2025 Entry ID: 5568415

# **INTRODUCTION**

In their Answer Brief, Appellees BAPTKO, Inc. ("BAPTKO") and Robert Kupper ("Kupper") attempt to rewrite both the trial record and established law to justify a fundamentally flawed judgment. Through selective citation, mischaracterization of the evidence, and circular reasoning, BAPTKO and Kupper seek to obscure the central errors that pervade this case. Their central thesis—that the Foundation Parties received a "fair trial" and that any errors were "waived" or "mooted"—ignores the procedural irregularities that infected this case from the moment the district court entered judgment in favor of BAPTKO on the morning of trial through the final judgment imposing collective liability without legal analysis.

As explored below, three fundamental errors warrant reversal. First, the district court granted judgment in BAPTKO's favor on its breach of contract claim, despite extensive factual disputes regarding BAPTKO's material breaches and the Foundation Parties' excuse of performance defense. Second, the district court imposed joint and several liability on all the Foundation Parties without first determining which entities actually assumed the Earnout obligation under the governing contracts. Third, and finally, the district court's conduct throughout trial demonstrated hostility toward the Foundation Parties and improperly prejudiced the jury against them. Independently, each error requires reversal; collectively, they demand it.

1

**ARGUMENT**

## I. THE DISTRICT COURT ERRED IN ENTERING SUMMARY JUDGMENT ON THE EARNOUT OBLIGATION.

### A. BAPTKO and Kupper's Material Breaches Created Genuine Disputes of Fact Precluding Summary Judgment.

BAPTKO and Kupper contend that summary judgment was proper because the Foundation Parties "conceded" that the normalized earnings before tax threshold was met for each calendar year after closing. (Appellee Br. at 30, 38.) Unfortunately, this argument misses the point entirely.

The Foundation Parties never disputed that the Dealerships achieved certain financial thresholds in the years following the closing. Rather, the Foundation Parties maintained—and continue to maintain—that Kupper and BAPTKO's pre-closing material breaches of the APA excused the Foundation Parties' obligation to make any Earnout payments whatsoever. (See App. 96-107, R.Doc. 379.)

The record contains abundant evidence of Kupper and BAPTKO's material breaches. Kupper misrepresented inventory data in KCI's dealer financial statements, which formed the basis of Foundation's valuation and purchase price. (App. 1574 (Ex.P2) §4.1(y); App. 561, R.Doc. 500, 240:12-23.) Kupper materially deviated from past practices by reducing new vehicle inventory levels and rejecting over 150 vehicle allocations from General Motors during the pre-closing period—precisely when the APA required Kupper to "keep all ratios, including, but not

2

limited to inventory levels, in accordance with a 12-month rolling average." (App. 1575 (Ex.P2) §5.2.) More importantly, however, Kupper, as KCI's sole shareholder, officer, or director with decision-making authority, testified that he never adjusted monitored or adjusted his inventory to comply with the Earnout provision that he agreed to comply with in the APA. (*See* App. 560-66, R.Doc. 500, 239:6-245:2.) These breaches substantially impaired the value of the Dealerships that Foundation ultimately acquired.

BAPTKO and Kupper's argument that the First Amendment's diligence waiver provision eliminates these disputes misconstrues both the contract language and the temporal scope of the APA's obligations. (Appellee Br. at 16.) The First Amendment states that "the Diligence Period has expired" and that Foundation "is satisfied with the results of its diligence review as of the date hereof." (App. 1637, (Ex.P4) §6.) This language means only that Foundation could no longer terminate the APA for any reason during the Diligence Period, which had already expired on January 27, 2019, pursuant to the APA's original terms. (App. 1576 (Ex.P2) §5.1.) The First Amendment was executed on May 1, 2019, with an effective date of January 27, 2019—meaning it merely acknowledged what had already occurred under the APA's terms.

Critically, the APA expressly preserved Foundation's "right to have its diligence review updated following the expiration of the Diligence Period and prior

to the Closing to ensure there was no material change in the operations of the Dealerships prior to the Closing." (App. 1576 (Ex.P2) §5.1.) Kupper's inventory manipulations and operational sabotage occurred between January 2019 and the June 21, 2019 closing—after the Diligence Period expired but while the APA's Section 5.2 obligations remained in full force. The diligence waiver provision does not, and cannot, excuse Kupper's ongoing contractual obligations between the effective date and closing. To hold otherwise would render Section 5.2 meaningless.

Moreover, the record demonstrates that Kupper actively concealed his breaches from Foundation. Kupper admitted at trial that he knew the vehicle inventory counts in KCI's dealer financial statements were not accurate, yet he provided those statements to Foundation as part of the due diligence process and represented in the APA that they were "correct and complete." (App. 1574 (Ex.P2) §4.1(l); App. 602-07, R.Doc. 500 at 281:24-286:8.) This intentional misrepresentation goes to the heart of the transaction and cannot be waived by a general diligence provision.

The district court compounded its error by granting the motion to reconsider or clarify in such a way that it preserved the Foundation Parties' excuse of performance defense in theory but eliminated it in practice. The court stated that "whether the Foundation Parties were excused from their payment obligations is a question that is essentially related to damages" and that "there are no contradictions

4

between the Court's holding in the Order on Motions for Summary Judgment and permitting the Foundation Parties to raise the issue of excuse of performance at trial." (App. 2029, R.Doc. 386 at 2, Add. 38.) Yet, during the pretrial conference, the district court dramatically departed from its pretrial rulings, and entered summary judgment on BAPTKO's Earnout claim. (App. 332, R.Doc. 499 at 11:4-7.) Just as important, the ruling gutted the Foundation Parties' excuse of performance defense. Holding that the Foundation Parties had already "failed to pay" and breached the contract rendered the defense meaningless. The ruling fundamental changed the scope of trial just minutes before it was set to begin.

Whether the Foundation Parties were entitled to complete excuse of performance or merely an offset depends on the materiality of BAPTKO's breaches and the structure of the contractual obligations at issue. These disputed factual issues should have been made by the jury after considering all the evidence. That the district court instead decided to weigh conflicting evidence, assess witness credibility, and make factual findings about the parties' conduct—all functions reserved for the jury—requires reversal.

**B.    The District Court Improperly Resolved the Excuse of Performance Defense Without Jury Determination.**

BAPTKO and Kupper argue that "the jury found that BAPTKO did not breach the APA" and therefore "any alleged errors relating to Foundation's excuse of performance defense" are "mooted." (Appellee Br. at 30.) This argument

fundamentally misunderstands both the nature of the error and the standard of appellate review.

Summary judgment on the Earnout obligation is a standalone legal error that this Court must review *de novo*. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The district court's entry of summary judgment is an error that prevented the Foundation Parties from presenting their complete defense and shaped every aspect of the trial that followed.

On this issue, the sequence of events matters. The district court entered judgment on the Earnout obligation the morning of the first day of trial, ruling that the Foundation Parties owed BAPTKO three million dollars ($3,000,000.00) as a matter of law. This ruling was premised on the Foundation Parties' alleged concessions that the normalized earnings before taxes thresholds triggering the Earnout were met. However, this is a myopic reading ignoring the ultimate genuine issue of material fact—whether KCI had substantially performed its own obligations under the APA such that the Foundation Parties' performance was excused.

By granting summary judgment, the district court removed from the jury's consideration the integrated question of whether the Foundation Parties owed the Earnout at all. That is, the jury never had the opportunity to adjudicate the excuse of performance defense because the district court had already ruled that the Foundation Parties breached the contract by failing to pay the Earnout. Instead, the court

6

bifurcated the issues, telling the jury that the Foundation Parties already owed three million dollars and that any breach by BAPTKO could only offset that predetermined liability. This framing fundamentally altered the trial and prejudiced the Foundation Parties in multiple ways.

Given the district court's jury instructions, BAPTKO and Kupper's decision to rely on the jury verdict to moot the excuse of performance defense is particularly troubling.. The court instructed the jury that the Foundation Parties had already "breached the contract by failing to pay $3 million of Earnout Payments to BAPTKO" and that BAPTKO was "entitled to prejudgment interest $362,716.19." (App. 207, R.Doc. 487 at 18.) These instructions communicated to the jury that the district court had already found against the Foundation Parties on the central question in the case. And this was not merely a matter of framing; it substantively limited the Foundation Parties' theory of defense. This predetermined conclusion fundamentally tainted any subsequent jury deliberation on the Foundation Parties' affirmative claims.

Further, the summary judgment ruling on the Earnout affected how evidence was presented and received. When the Foundation Parties introduced evidence of Kupper and BAPTKO's pre-closing failures regarding inventory maintenance and financial statement accuracy, the district court repeatedly questioned the relevance of such evidence, noting that summary judgment had already been granted. The

district court's skepticism was palpable and undoubtedly influenced the jury's assessment of this evidence.

In their Answer Brief, BAPTKO and Kupper cite *Griner v. King*, 104 F.4th 1 (8th Cir. 2024), specifically for the proposition that issues are moot when they are "necessarily resolved by the jury." (Appellee Br. at 31.) Unfortunately for BAPTKO and Kupper, *Griner* is inapposite. There, the Eighth Circuit found certain claims moot because the jury necessarily rejected the factual predicates for those claims when rendering its verdict. *See Griner*, 104 F.4th at 7. By contrast, the jury at trial was never permitted to consider the factual and legal predicates for the Foundation Parties' excuse-of-performance defense because the district court removed those issues from the jury's consideration through its summary judgment ruling.

### C. The District Court's Procedural Timing Materially Prejudiced the Foundation Parties.

The procedural posture of the summary judgment ruling compounds the error. As the record reflects, the district court initially entered its summary judgment order on August 5, 2024—more than two months before trial. (App. 1992-2025, R.Doc. 373, Add. 1-34.) The Foundation Parties filed a motion to reconsider or clarify on August 30, 2024, specifically requesting that the district court address the excuse of performance defense and clarify whether the Foundation Parties would be permitted to present this defense to the jury. (R.Docs. 378, 384.) The district court did not rule on that motion until September 10, 2024. (App. 2028-29, R.Doc. 386, Add. 37-38.)

8

Trial was scheduled to begin on October 28, 2024. The district court did not enter judgment on the Earnout claim until the morning of October 28, 2024—the first day of trial—immediately before *voir dire* began. (App. 327, R.Doc. 499 at 6:21-7:17.) This timing deprived the Foundation Parties of any meaningful opportunity to seek interlocutory appellate review or to adjust their trial strategy in light of the final ruling.

The Foundation Parties moved the district court to certify an interlocutory appeal on the excuse of performance issue during the pretrial conference, which was denied. (App. 341-48, R.Doc. 499 at 20:13-27:13.) The Foundation Parties were thus forced to proceed to trial knowing that their primary defense had been eviscerated but without any opportunity to seek appellate review before expending substantial resources on a trial that was fundamentally compromised from the outset.

This procedural irregularity distinguishes this case from the typical summary judgment appeal. The Foundation Parties did not simply lose a motion for summary judgment with adequate time to prepare for trial on the remaining issues. Instead, the district court granted partial summary judgment, ostensibly preserved the excuse of performance defense, and then announced on the morning of trial that the defense could not succeed because the Foundation Parties had already breached the contract. This bait-and-switch denied the Foundation Parties a fair opportunity to present their case.

9

### D. Even Assuming No Disputed Material Facts Existed, the District Court's Legal Conclusions Were Erroneous.

Even if this Court were to conclude that no genuine disputes of material fact existed, the district court's legal interpretation of the Earnout provision and the excuse of performance defense was fundamentally flawed and warrants reversal.

The district court held that the Earnout obligation was unconditional except for meeting the financial performance threshold. This interpretation ignores the integrated nature of the APA and the parties' expectations at the time of contracting. The Earnout provision was not a standalone obligation but rather part of a comprehensive agreement governing the sale of the dealerships. The provision was designed to align the parties' interests by ensuring that if the Dealerships performed well post-closing, BAPTKO would receive additional compensation reflecting that success.

This structure necessarily implies that Kupper and BAPTKO would perform their own obligations under the APA, including maintaining adequate inventory levels pending closing and providing accurate financial information. If BAPTKO could breach these fundamental obligations while still claiming the full Earnout payment, the Earnout provision would become a one-way ratchet benefiting only BAPTKO. Such an interpretation contravenes basic principles of contract law and commercial reasonableness.

10

The district court rejected the Foundation Parties' argument that the Earnout obligation should be interpreted as conditional on BAPTKO's performance by invoking the doctrine of substantial performance. The district court instructed the jury that BAPTKO's prior material breaches could not excuse the Foundation Parties' performance unless BAPTKO substantially performed its obligations. (Appellee Br. at 52-53, citing jury instruction.) This formulation, however, inverts the proper analysis. Indeed, the critical inquiry here is not whether the Foundation Parties substantially performed, but whether BAPTKO substantially performed. If BAPTKO failed to substantially perform its obligations under the APA, then the Foundation Parties' duty to pay the Earnout could be excused regardless of whether the financial threshold was met.

The district court's focus on the Foundation Parties' performance reflects a fundamental misunderstanding of excuse-of-performance principles. Under North Dakota law, when one party materially breaches a contract, the non-breaching party is excused from further performance. The district court improperly shifted this burden by requiring the Foundation Parties to prove their own substantial performance rather than focusing on whether BAPTKO's breaches were material enough to excuse the Foundation Parties' obligations.

Here, the APA contains an express provision demonstrating that the parties viewed the agreement as an integrated whole. The First Amendment states that

11

"[e]xcept as modified by this Amendment, the terms and conditions of the Agreement [APA], as previously amended, are hereby ratified, confirmed and shall remain unchanged and in full force and effect." (App. 1638 (Ex.P4) §13; App. 1672 (Ex.P5) §5.) This language demonstrates that all provisions remained in effect and were mutually dependent. BAPTKO cannot cherry-pick which provisions to honor while demanding strict compliance with provisions benefiting BAPTKO.

The APA also contains conditions precedent to the Foundation Parties' obligations. Section 6.1 provides that Foundation's obligations "are subject to the satisfaction, on or prior to the Closing Date," of multiple conditions, including that "Seller will have fully complied with and performed all its obligations under this Agreement" and that "all representations of Seller in this Agreement and the Related Agreements will be true and complete as of the date when given and on the Closing Date." (App. 1585-86 (Ex.P2) §6.1(a)-(b).) These provisions expressly conditioned Foundation's performance on BAPTKO's compliance with its own obligations. The district court's ruling effectively read these conditions out of the contract by treating the Earnout as an unconditional obligation divorced from BAPTKO's performance.

The district court's legal error is particularly stark when examined in the context of BAPTKO's inventory breaches. The APA required BAPTKO to maintain inventory levels "in accordance with a 12-month rolling average" during the pre-closing period. (App. 1576 (Ex.P2) §5.2.) This provision was not merely a technical

12

requirement; it was fundamental to preserving the value of the business being sold. When Kupper and BAPTKO deliberately reduced inventory levels and rejected vehicle allocations during this period, it materially diminished the value of what Foundation was purchasing. The post-closing financial performance that triggered the Earnout was thus built on a foundation that BAPTKO itself had undermined through its breaches.

To hold that the Foundation Parties must pay an Earnout based on this compromised performance—performance that would have been substantially higher had BAPTKO honored its inventory obligations—is both legally unsound and commercially unreasonable. The district court's interpretation rewards BAPTKO for its own breaches and penalizes Foundation for purchasing impaired Dealerships— the state of which Kupper concealed from Foundation. This cannot be the correct interpretation of the parties' agreement.

## II. THE DISTRICT COURT ERRED BY IMPOSING JOINT AND SEVERAL LIABILITY WITHOUT DETERMINING WHICH FOUNDATION PARTY WAS LIABLE FOR THE EARNOUT OBLIGATION.

### A. The Governing Contracts Foreclose Joint and Several Liability Through Deliberate Definitional Changes.

The contractual language demonstrates that the parties deliberately narrowed liability for the Earnout obligation. Both the APA and the First Amendment define "Seller" identically as "Kupper Chevrolet, Inc." (App. 1562 (Ex.P2), 1; App. 1635,

13

(Ex.P4), 1.) However, their definitions of "Buyer" differ in a manner that is dispositive of the liability question. The APA defines "Buyer" as "Foundation Automotive Corp. ... or its permitted assigns pursuant to Section 9.6 hereof." (App. 1562 (Ex.P2), 1.) The First Amendment—which substantially modifies the Earnout obligation—identifies "Buyer" solely as "Foundation Automotive Corp." (App. 1635 (Ex.P4), 1.) This redefinition omits entirely the broader language referring to permitted assigns.

The First Amendment's narrowed definition of "Buyer" is particularly significant because the First Amendment governs the Earnout provision at issue. When the parties modified the Earnout obligation through the First Amendment— reducing the normalized EBT threshold from $3,500,000 to $2,500,000 and making other substantive changes—they simultaneously redefined the obligated party. This deliberate narrowing reflects the parties' intent to limit Earnout liability to Foundation Automotive Corp. alone.

Additionally, the definition of "Dealerships" in the APA remains operative because the First Amendment did not redefine this term. The APA defines "Dealerships" as "certain assets used or useful in the operation of Chevrolet and Subaru motor vehicle sales and service businesses" that the Seller owned at the time of execution. (App. 1562 (Ex.P2) ¶A.) Because the First Amendment modifies the Earnout obligation but does not redefine "Dealerships," the original APA definition

14

continues to apply. This continuity demonstrates that the parties intended the Earnout to be based solely on the performance of the specific assets transferred from the Seller—not on any expanded or restructured business operations that the Buyer might undertake post-closing.

**B.    The Assignment and Assumption Agreements Created Ambiguity Regarding Earnout Liability.**

BAPTKO and Kupper argue that the district court "expressly found" that Foundation Automotive Corp. "subsequently assigned its rights and obligations under the agreement to the two named Plaintiffs, FA ND Chev and FA ND Sub." (Appellee Br. at 41.) This argument lacks merit.

The record reveals that the plain language of the Assignment and Assumption Agreements are ambiguous as to this critical question. The assignment to FA-SUB states that it "assumes all obligations and liabilities of Assignor under the Asset Agreement from and after the date hereof as such relate to the Subaru Assets." (App. 1677 (Ex.P7) §2.) Similarly, the assignment to FA-CHEV assumes obligations and liabilities "as such relate to the Chevrolet Assets." (App. 1674 (Ex.P6) §2.) These provisions clearly limit each assignee's assumed obligations to those relating to its respective dealership's assets. Yet, the Earnout provision is based on the combined performance of both Dealerships. Indeed, the First Amendment specifies that KCI "shall receive ... $750,000 per year . . . when the Dealerships reach the normalized EBT threshold target of $2,500,000 for a calendar year." (App. 1635-36 (Ex.P4)

15

§3(d).) The APA defines "Dealerships" as including both the Chevrolet and Subaru dealerships. As such, the Earnout obligation cannot be divisible between the two Dealerships. It must depend on their collective performance.

The parties' intent to limit the Earnout obligation to Foundation is further evidenced by a detailed methodology set forth in Exhibit D to both the APA and its First Amendment. Notably, it includes specifics for calculating the normalized earnings before tax threshold, as well as precise accounting treatments, adjustments, and computational formulas. (App. 1606, Ex. P2, Exhibit D.) Of greater importance, however, is what Exhibit D does not include: guidance for apportioning the Earnout obligation between FA-CHEV and FA-SUB. If the parties had intended for FA-CHEV and FA-SUB to have joint and several liability for the Earnout, the parties would have plainly included language to that effect in the exhibit. That they did not serves to confirm that the Earnout obligation was never intended to transfer to the assignees.

The district court unfortunately never addressed this ambiguity. Rather, in entering its order on summary judgment order the district court simply stated—in conclusory fashion—that Foundation "subsequently assigned its rights and obligations under the agreement to the two named Plaintiffs." (App. 2027, R.Doc. 373 at 2, Add. 2.) In doing so, the district court failed to make the necessary findings as to the specific obligations that FA-CHEV, FA-SUB, both—or neither—assumed

16

or were assigned with respect to the Earnout. Moreover, the district court's earlier order denying the Foundation Parties' motion to dismiss similarly failed to resolve the question, noting only that "what constitutes 'relating to the operation of the Dealership at the Subaru Site' will necessarily involve a factual inquiry." (App. 267, R.Doc. 40 at 9.)

When a contract's meaning is ambiguous, the interpretation becomes a question of fact for the jury. The district court cannot properly impose joint and several liability without first determining, as a matter of fact and law, which party or parties assumed the relevant obligation. The court's failure to make this threshold determination renders its summary judgment legally deficient.

The APA was executed on November 28, 2018. The First Amendment was executed on May 1, 2019, with an effective date of January 27, 2019. The Assignment and Assumption Agreements were executed on June 21, 2019, at closing. This chronology is critical: the First Amendment came into existence after the original APA but before the assignments. When interpreting these documents together, the First Amendment's narrowed definition of "Buyer" controls because it represents the parties' most recent expression of intent regarding the Earnout provision specifically.

The Assignment and Assumption Agreements further demonstrate the parties' intent to limit liability. Each agreement confines the assignee's assumed obligations

exclusively to those "as such relate to" either the Chevrolet Assets or the Subaru Assets. (App. 1674 (Ex.P6) §2; App. 1677 (Ex.P7) §2.) The Earnout obligation, however, is expressly based on the combined performance of both dealerships reaching a $2,500,000 normalized EBT threshold collectively—not on the separate performance of each dealership. (App. 1635-36 (Ex.P4) §3(d).) An obligation dependent upon collective performance across both dealerships cannot logically "relate to" either the Chevrolet Assets or the Subaru Assets exclusively. The Assignment and Assumption Agreements therefore did not assign the Earnout obligation to either FA-CHEV or FA-SUB.

This contractual analysis forecloses the imposition of joint and several liability. The First Amendment redefined "Buyer" to mean Foundation Automotive Corp. alone—omitting the language from the APA that would have extended liability to assigns. The court's judgment imposing joint and several liability on all Foundation Parties directly contradicts this contractual limitation. The district court failed to analyze these definitional changes and instead imposed collective liability without determining which entity actually assumed the Earnout obligation under the governing contracts. This constituted reversible error.

**C.    The Foundation Parties Did Not Waive This Issue.**

BAPTKO and Kupper argue that the Foundation Parties "waived this issue and failed to make an appropriate record to preserve the issue for appeal." (Appellee Br. at 38.) This argument fails on multiple levels.

First, the Foundation Parties raised this issue in their motion for reconsideration or clarification filed on August 30, 2024, before trial. The motion specifically addressed the ambiguity regarding which Foundation Party was liable for the Earnout and requested clarification from the district court. (R.Docs. 378, 384.) The district court's order on that motion failed to address this question, stating only that "whether the Foundation Parties were excused from their payment obligations is a question that is essentially related to damages." (App. 2029, R.Doc. 386 at 2, Add. 38.) The court did not clarify which specific Foundation Party or Parties were obligated to pay.

Second, during the pretrial conference on the first day of trial, the Foundation Parties' counsel engaged in extensive colloquy with the district court regarding the Earnout issue and the related questions of liability and damages. (App. 327-48, R.Doc. 499 at 6:21-27:11.) While counsel did not specifically articulate the joint-and-several-liability issue in those exact terms during that particular exchange, the Foundation Parties cannot be faulted for failing to anticipate that the district court would impose collective liability without any analysis. The district court had not yet

entered final judgment at that point, and counsel reasonably believed the issue would be addressed in the court's final order.

Third, the Foundation Parties raised this issue in their renewed motion for judgment as a matter of law and motion for new trial filed after trial. (R.Doc. 512 at 24-25.) The district court acknowledged the argument but held that the court could not address it because the Foundation Parties "did not raise this issue in their original motion" for judgment as a matter of law. (App. 2052-53, R.Doc. 544 at 9-10, Add. 61-62.) This ruling places the Foundation Parties in an impossible position: they could not raise the issue in their original motion because the district court had not yet entered final judgment imposing joint and several liability, but once the court entered that judgment, they were told they had waived the issue by not raising it earlier. The Foundation Parties preserved this issue to the maximum extent possible given the compressed procedural timeline and the district court's rulings. The issue is properly before this Court on appeal.

The district court's imposition of joint and several liability without resolving the threshold assignment question was legal error. BAPTKO bore the burden of proving which of the Foundation Parties were obligated to pay under the Earnout provision. The ambiguous language of the Assignment and Assumption Agreements, combined with the First Amendment's narrowed definition of "Buyer," demonstrates that BAPTKO failed to meet its burden. Summary judgment was

therefore inappropriate, and the subsequent judgment imposing collective liability cannot stand.

## III. THE DISTRICT COURT'S CONDUCT DEPRIVED THE FOUNDATION PARTIES OF A FAIR TRIAL.

Through their Answer Brief, BAPTKO and Kupper argue that the district court's conduct "was appropriate and necessary to facilitate the expedient presentation of trial evidence" and that any comments by the district court "were made outside the hearing of the jury" and therefore could not have caused prejudice. (Appellee Br. at 43, 52.) These arguments ignore both the pervasive nature of the district court's hostility and the prejudicial impact of the its comments and rulings on the jury's deliberations.

### A. The District Court's Threats Regarding Exhibit Stipulations Unduly Interfered With Counsel's Conduct At Trial.

BAPTKO and Kupper attempt to diminish the impact of the district court's threats regarding its rulings by claiming that Foundation's Fed. R. Evid. 602 concerns were contrary to the district court's prior directives on exhibits. Such an argument has no merit.

At its core, Rule 602 is a rule of testimonial foundation. It is a reflection of the law's "prefer[ence] that a witness testify as to fact, based on personal knowledge, rather than the opinions inferred from such facts." 1 McCORMICK ON EVID. § 10 (9th ed. 2025). Rule 602 "excludes testimony concerning matter[s] the witness did

21

not observe or had no opportunity to observe." *United States v. Lyon*, 567 F.2d 777, 783-84 (8th Cir. 1977). It follows, therefore, that Rule 602 prohibits a witness from testifying as to "the substance of an exhibit … that … is not within that witness's personal knowledge." *See Speed RMG Partners, LLC v. Arctic Cat Inc.*, Case No. 20-CV-609 (NEB/LIB), 2024 WL 4543340, *3 (D. Minn. Oct. 17, 2024).

Counsel raised this evidentiary issue at trial not to avoid exhibit stipulations, but, rather, to draw a distinction between documentary and testimonial foundations. Foundation was willing to stipulate to the admissibility of multiple documents without the need for further foundation, but had no intention of allowing either BAPTKO or Kupper to use exhibits with witnesses who had absolutely no personal knowledge of the document or the matters set forth within it. To not insist on adherence with Rule 602 would all but stipulate to speculation by every witness who testified at trial.

Unfortunately, instead of fully considering and appreciating counsel's position, the district court made clear: fall in line, or the trial will go bad for Foundation. Indeed, the Court directed the following to counsel:

> If you're not going to stipulate to exhibits in that nature, *it is not going to go well for you* in your ruling—*in my rulings*. Do you understand me?

(App. 337, R.Doc. 499 at 16:4-6.)

"A trial judge has the duty to maintain an atmosphere free from prejudicial comment." *Bunting v. Sea Ray, Inc.*, 99 F.3d 887, 890 (8th Cir. 1996). "The threat of prejudice is greatest when a judge overpowers a jury, … or when [he] unduly interferes with counsel's conduct of the case." *United States v. Morrow*, 977 F.2d 222, 225 (6th Cir. 1992). It is difficult to conceive of a more undue interference with counsel's conduct of his case than to compromise his willingness to make evidentiary objections, and preserve his clients' rights on the record. Unfortunately, that is precisely what happened here. The resulting prejudice requires a new trial.

### B. The District Court's Questioning of Slemko Standing Alone Requires A New Trial.

BAPTKO and Kupper also ask the Court to disregard the error that Foundation assigns to the district court's questioning of Derrick Slemko—Foundation's Chief Financial Officer. They argue in support that (1) Foundation "waived any objection to the Court's questioning of Slemko" by failing to contemporaneously object at trial; (2) that the district court's questioning—and concluding instruction to the jury—were objectively appropriate; and, further, (3) that the district court cured any alleged errors in its jury instructions. None of these arguments have merit.

#### 1. Foundation did not waive any objections regarding the district court's questioning.

Fed. R. Evid. 614 governs a district court's examination of a trial witness. It plainly provides that "[a] party may object to the court's calling or examining a

witness either at that time or at the next opportunity when the jury is not present." F.R.E. 614(c). This provision "is designed to relieve counsel of the embarrassment attendant upon objecting to questions by the judge in the presence of the jury, while at the same time assuring that objections are made in apt time to afford the opportunity to take possible corrective measures." F.R.E. 614(c) advisory committee's notes to 1972 proposed rules.

At trial, the district court did not take a break following Mr. Slemko's testimony. Instead, it went right into the next witness—Chris Schneider. (*See* App. 823, R.Doc.502, 502:15-20.) Following Mr. Schneider's testimony, the district court proceeded directly to argument on BAPTKO and Kupper's renewed *Daubert* motion challenging the admissibility of Foundation's next witness—its retained expert, Ginger Knudsen. (*See* App. 839-58, R.Doc. 502, 518:20-537:1.) There was no opportunity to address any objections with respect to the district court's questioning of Mr. Slemko during the unanticipated *Daubert* hearing. (*See id*.) During cross-examination of Ms. Knudsen, counsel for BAPTKO and Kupper again challenged the admissibility of Ms. Knudsen's testimony—which counsel for BAPTKO and Kupper initially argued, and the district court initially commented on, in the presence of the jury. (*See* App. 908-10, R.Doc.502, 587:20-589:24.) At undersigned counsel's suggestion, the district court dismissed the jury to allow for continued argument. (App. 910, R.Doc. 502, 589:22-24.) This constituted the "next"

24

opportunity for undersigned counsel to address and object to the district court's questioning of Mr. Slemko, which counsel presented as part of a broader motion for mistrial. (App. 917, R.Doc. 502, 596:3-21.) The district court specifically denied the mistrial motion on the record. (App. 921-22, R.Doc. 502, 600:13-601:5.) The issue has plainly been preserved for appeal. The Court should reject any arguments to the contrary.

### 2. The questioning was not harmless.

Here, BAPTKO and Kupper suggest that the district court's questioning of Mr. Slemko was appropriate because it "came immediately after an objection by counsel for BAPTKO and Kupper as to the relevancy of [Mr.] Slemko's access to data prior to the closing of the sale." According to BAPTKO and Kupper, the district court simply "asked some clarifying questions of the witness[.]" This suggestion is, unfortunately, fundamentally misleading.

Although true that counsel for BAPTKO and Kupper lodged a relevancy objection immediately before the district court's line of questioning, the district court disregarded it, holding:

> THE COURT: Well, it's relevant insofar as you made reference to the fact that he couldn't access it.

(App. 818, R.Doc. 502, 497:3-6.)

To be sure—there was no need for any "clarity" on the issues Mr. Slemko testifying to. Immediately before the district court began its questioning, Mr. Slemko

established that Foundation did not have access to any data that CDK maintained for either dealership prior to the closing. (App. 816-18, R.Doc. 502, 495:7-497:2.) Mr. Slemko was, in fact, unequivocal in testifying that in all of the transactions that he has been involved with for Foundation, the company has "[n]ever" received "access to" CDK "data prior to closing" the transaction. (App. 817-18, R.Doc. 502, 496:9-497:2.)

Despite the clarity of Mr. Slemko's testimony on the point, the district court nonetheless proceeded with its questioning. Unfortunately, in doing so, the district court muddled and confused critical aspects of the CDK exhibits (D521, D522, D523, and D524). Perhaps most significant, the district court suggesting multiple times—incorrectly—that Mr. Slemko executed the CDK documents on behalf of Foundation:

> THE COURT: And so, *at the time that you signed this document*, [you] did not know whether or not you could access the information; correct?
>
> …
>
> THE COURT: You testified that you could not access the CDK information. That's not anything that *you knew when you signed this information related to the Kupper transaction*; correct?
>
> …
>
> THE COURT: That's not the answer to my question. *You need to listen to my question and answer it*. Okay?
>
> *When you signed this document*, did you know whether or not you could access the information? Yes or no.

Appellate Case: 25-1741    Page: 30    Date Filed: 10/16/2025 Entry ID: 5568415

…

THE COURT:  And so you did not know, and neither did Foundation, as to whether or not you could access the information *when you signed the document here in this Kupper transaction*; correct?

…

THE COURT:  No.  No.  No.  You.  What did you know?  Answer my question.

THE WITNESS:  I—*I didn't know*.

(App. 818-20, R.Doc. 502, 497:17-499:2 (emphasis added).)

To be perfectly clear—Mr. Slemko did not sign any of the CDK Exhibits.  The last answer highlighted above, therefore, is provably and verifiably true.  *He didn't know*.  He was not involved in the CDK process for the Kupper transaction.  (*See* App. 817, R.Doc. 502, 496:1-5.)  Yet, after confusing the facts, and misstating these key aspects of these documents, the district court made the decision to tear Mr. Slemko down in front of the jury, highlighted by a concluding evidentiary instruction to the jury to not only disregard Mr. Slemko's testimony regarding CDK, but to *accept* that Foundation did not know if it had the ability to access the dealerships' historical inventory information prior to closing.  Considering the importance of this issue to the claims and defenses in the case—the district court's conduct objectively prejudiced Foundation's rights.  A new trial is warranted.

27

### 3. The jury instructions were fundamentally ineffective toward curing the prejudice that the district court caused.

Finally, BAPTKO and Mr. Kupper claim that none of the Court's comments can constitute plain error because "the alleged errors were effectively cured by the Court with final jury instruction F2…." (Appellee Br. at 48.) The instruction—titled, "Judge's Opinion"—cautions the jury both that the Court did not *intend* to suggest what he thought the final verdict should be in the case, and, further, that the jury was not "to guess" what the Court's "opinion[s] about any issues in the case" were "based on the questions I asked." (*Id.*) Unfortunately, the district court did not simply provide opinions on Mr. Slemko's testimony. Rather, the Court intentionally and purposefully instructed the jury that Mr. Slemko was not credible, and, further, that significant portions of his testimony should be disregarded. The impact on Mr. Slemko's testimony was as material as it was significant—it fundamentally tainted the very core of Foundation's case at trial. The only way to cure the prejudice that the district court created is to order a new trial.

## IV. THE DISTRICT COURT ERRED IN AWARDING ATTORNEYS' FEES AND COSTS TO KUPPER.

BAPTKO and Kupper argue that the district court properly awarded attorneys' fees and costs to Kupper because BAPTKO paid those fees on his behalf. (Appellee Br. at 54, 63.) This argument improperly circumvents both corporate separateness and the plain language of the APA's fee-shifting provision.

28

The APA's Section 9.7 expressly limits fee-shifting to "Parties," defined as "Buyer" (Foundation Automotive Corp.) and "Seller" (Kupper Chevrolet, Inc.). (App. 1588 (Ex.P2) §9.7; App. 1562 (Ex.P2) 1.) Kupper was separately defined as the "Seller Principal"—not as a "Party" entitled to enforce fee-shifting rights. (App. 1566 (Ex.P2) §3.2(d).) The district court cannot rewrite the contract to extend fee-shifting rights to non-parties simply because one party voluntarily chose to pay another's legal expenses.

Moreover, the district court applied these principles inconsistently. In its summary judgment order, the court held that BAPTKO could not be liable for Kupper's individual breaches of the non-compete agreement because "all liability for breaching this provision falls to Kupper individually and not BAPTKO." (App. 2010, R.Doc. 373 at 19, Add. 19.) The district court cannot simultaneously hold that corporate separateness shields BAPTKO from liability for Kupper's breaches while ignoring that same separateness when it benefits Kupper. The fee award to Kupper must be reversed.

## CONCLUSION

The district court committed three independently reversible errors. First, it granted summary judgment despite genuine factual disputes regarding BAPTKO's material breaches and legally erred by treating the Earnout as an unconditional obligation divorced from the parties' integrated agreement. Second, it imposed joint

and several liability without determining which Foundation Party assumed the Earnout obligation—ignoring the First Amendment's deliberate narrowing of "Buyer" to exclude assigns and the absence of any apportionment methodology in the agreements. Third, it conducted trial in a manner that demonstrated persistent hostility toward the Foundation Parties and prejudiced the jury against them from the outset.

These compounding errors denied the Foundation Parties a fair trial. The Foundation Parties, therefore, respectfully request that this Court reverse the judgment and remand for a new trial.

Dated this 15th day of October, 2025.

Respectfully submitted,

By:   */s/ Maxwell N. Shaffer*
Maxwell N. Shaffer, Esq.
Kensye N. Wood, Esq.
LELAND SHAFFER LLP
8694 E. 28th Avenue
Denver, Colorado 80238
(720) 556-1872
Maxwell.Shaffer@lelandshaffer.com
Kensye.Wood@lelandshaffer.com

*ATTORNEYS FOR APPELLANTS*

## <u>CERTIFICATE OF COMPLIANCE</u>

1.     This Reply Brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because the Reply Brief contains 6,481 words, excluding the items exempted by Fed. R. App. P. 32(f), as determined by the word counting feature of Microsoft Word 360.

2.     This Reply Brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this Reply Brief has been prepared in 14-point Times New Roman font.

3.     This Reply Brief has been scanned for viruses and is virus-free.

DATED: October 15, 2025                    Respectfully submitted,

*/s/ Kensye N. Wood*
Attorney for Appellants

31

Appellate Case: 25-1741    Page: 35    Date Filed: 10/16/2025 Entry ID: 5568415

## **CERTIFICATE OF SERVICE**

Pursuant to Rule 25 of the Federal Rules of Appellate Procedure and Circuit Rule 25A(a), I hereby certify that on this 15th day of October, 2025, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit through the Court's CM/ECF system. I further certify that all participants in the case are registered users of the CM/ECF, and that service will be accomplished by the CM/ECF system.

Respectfully submitted,

*/s/ Kensye N. Wood*
Attorney for Appellants

32